Michael C. Hendershot (State Bar No. 211830)
mhendershot@jonesday.com
Catherine T. Zeng (State Bar No. 251231)
czeng@jonesday.com
JONES DAY
1755 Embarcadero Road
Palo Alto, CA 94303
Telephone: +1.650.739.3939
Facsimile:  +1.650.739.3900

Anna E. Raimer (State Bar No. 234794)
aeraimer@jonesday.com
JONES DAY
717 Texas Avenue, Suite 3300
Houston, TX 77002
Telephone: +1.832.239.3939
Facsimile:  +1.832.239.3600

*Attorneys for Plaintiff Cohesity, Inc.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

| | |
|---|---|
| COHESITY, INC.,<br><br>  Plaintiff,<br><br>  v.<br><br>CARTESIAN THEATRE CORP., and DOES 1 – 25,<br><br>  Defendants. | Case No. 4:24-CV-09104-JST<br><br>**DECLARATION OF ANNA E. RAIMER IN SUPPORT OF PLAINTIFF COHESITY, INC.'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS, OR IN THE ALTERNATIVE FOR A MORE DEFINITE STATEMENT, FOR A STAY, OR TO STRIKE (ECF NO. 37)** |

I, Anna E. Raimer, hereby declare as follows:

1.      I am a partner with the law firm Jones Day, counsel for plaintiff Cohesity, Inc. ("Cohesity") in the above-captioned lawsuit.  I am a member in good standing of the State Bar of California.  I make this declaration in support of Cohesity's opposition to Defendant Cartesian Theatre Corp.'s ("CT") motion to dismiss or in the alternative for a more definite statement, for a stay, or to strike (ECF No. 37).  The facts and information contained in this declaration are either known to me personally, or were obtained from documents and public records that I have reviewed in connection with this case.

2.      Attached hereto as **Exhibit A** is a true and correct copy of an October 15, 2024 email from Facebook to CT, through principal and founder Kipling Warner, that CT produced under Bates Numbers CT_100264-271, which was introduced as Exhibit 44 and authenticated in the August 28, 2025 Deposition of Mr. Warner (hereinafter "Warner Deposition").

3.      Attached hereto as **Exhibit B** is a true and correct copy of an October 15, 2024 email from CT to Apple that CT produced under Bates Numbers CT_100106-108, which was introduced as Exhibit 37 and authenticated in the Warner Deposition.

4.      Attached hereto as **Exhibit C** is a true and correct copy of excerpts from the transcript of the August 28, 2025 Warner Deposition.

5.      CT's October 4, 2024 takedown notice sent to Amazon, which was directed to the general email addresses copyright@amazon.com and contracts-legal@amazon.com, was not limited to the takedown of Cohesity's material in Canada, but broadly requested Amazon "confirm that the Unauthorized Usage has been removed from all websites, platforms, and social media accounts under your possession or control."  Declaration of Kipling Warner, Exh. J (ECF No. 37-3).  CT defined "the Unauthorized Usage" as "Cohesity, Inc.'s commercial offerings, publications, and related promotional materials that make use of the 'HELIOS' trademark on various websites, platforms, and social media accounts," listing "[n]on-exhaustive particulars" from ".com" websites.  Attached hereto as **Exhibit D** is a true and correct copy of an October 14, 2024 letter response from Amazon's counsel at DLA Piper to CT that CT produced under Bates Numbers CT_100033-34,

1    which was introduced as Exhibit 36 and authenticated in the Warner Deposition.

2        6.    Attached hereto as **Exhibit E** is a true and correct copy of an October 15, 2024 email

3    from Instagram to CT that CT produced under Bates Numbers CT_100326-327, which was

4    introduced as Exhibit 45 and authenticated in the Warner Deposition.

5        7.    Attached hereto as **Exhibit F** is a true and correct copy of CT's U.S. Trademark

6    Application Serial No. 98/724,373 for the mark HELIOS, which was produced in this litigation

7    under Bates Numbers COHESITY_000600-612 and introduced as Exhibit 3 and authenticated in

8    the Warner Deposition.

9        8.    No oppositions were filed against CT's pending U.S. Trademark Application Serial

10    No. 98/724,373 for the mark HELIOS, and a registration should issue in the next month.  Trademark

11    Status and Document Retrieval records of the United States Patent and Trademark Office for this

12    application, a true and correct copy of which is attached hereto as **Exhibit G**, note "EXTENSION

13    OF TIME TO OPPOSE PROCESS – TERMINATED" as of August 24, 2025.

14        9.    Attached hereto as **Exhibit H** is a true and correct copy of an email from CT's

15    counsel, Gary Shuster, to my partner at Jones Day, Michael C. Hendershot, dated February 13,

16    2025, a copy of which was forwarded to me.  The prior emails in the email string have been

17    excluded.

18        10.    Attached hereto as **Exhibit I** is a true and correct copy of a compendium of emails

19    sent by Mr. Warner from the email address "kip@thevertigo.com" on September 3, 2024, to

20    thirteen Cohesity employees, which was produced in this litigation under Bates Numbers

21    COHESITY_000012-24 and introduced as Exhibit 31 and authenticated in the Warner Deposition.

22        11.    Attached hereto as **Exhibit J** is a true and correct copy of a May 26, 2021, email

23    from Intel Corporation to CT that CT produced under Bates Numbers CT_100496-497, which was

24    introduced as Exhibit 9 and authenticated in the Warner Deposition.

25        12.    Attached hereto as **Exhibit K** is a true and correct copy of the Intel Partner Alliance

26    Terms and Conditions that CT produced under Bates Numbers CT_100469-495, which was

27    introduced as Exhibit 10 and authenticated in the Warner Deposition.

28

13.     Attached hereto as **Exhibit L** is a true and correct copy of a webpage from Intel's Intel.com website, accessed and printed on August 21, 2025, and produced in this litigation under Bates Numbers COHESITY_000615-616, which was introduced as Exhibit 11 and authenticated in the Warner Deposition.

14.     Attached hereto as **Exhibit M** is a true and correct copy of March 24, 2025 email from Intel® Partner Alliance to CT that CT produced under Bates Numbers CT124396-397, which was introduced as Exhibit 12 and authenticated in the Warner Deposition.

15.     Attached hereto as **Exhibit N** is a true and correct copy of a November 23, 2020 email from Nvidia to CT that CT produced under Bates Numbers CT_100516-517, which was introduced as Exhibit 13 and authenticated in the Warner Deposition.

16.     Attached hereto as **Exhibit O** is a true and correct copy of a webpage from the OpenPower Foundation's website that CT produced under Bates Numbers CT122190, which was introduced as Exhibit 5 and authenticated in the Warner Deposition.

17.     Attached hereto as **Exhibit P** is a true and correct copy of Oracle America, Inc.'s Confidential Disclosure Agreement for Development/Manufacturing Transactions, dated April 6, 2022, which was introduced as Exhibit 19 and authenticated in the Warner Deposition.

18.     Attached hereto as **Exhibit Q** is a true and correct copy of a November 22, 2024 email from Palo Alto Networks to CT that CT produced under Bates Numbers CT122214, which was introduced as Exhibit 23 and authenticated in the Warner Deposition.

19.     Attached hereto as **Exhibit R** is a true and correct copy of a SiFive, Inc.'s Mutual Non-Disclosure Agreement, dated March 17, 2022, that CT produced under Bates Numbers CT_100662-665, which was introduced as Exhibit 16 and authenticated in the Warner Deposition.

20.     Attached hereto as **Exhibit S** is a true and correct copy of CT's website accessed and printed on October 19, 2024, and produced in this litigation under Bates Numbers COHESITY_000578-597, which was introduced as Exhibit 6 and authenticated in the Warner Deposition.

21.     Attached hereto as **Exhibit T** is a true and correct copy of Amazon Web Services,

Inc.'s Mutual Nondisclosure Agreement, dated April 21, 2022, that CT produced under Bates Numbers CT_100345-347, which was introduced as Exhibit 20 and authenticated in the Warner Deposition.

22.    Attached hereto as **Exhibit U** is a true and correct copy of Microchip Technology Incorporated's Mutual Nondisclosure Agreement, dated May 5, 2022, that CT produced under Bates Numbers CT_100508-510, which was introduced as Exhibit 21 and authenticated in the Warner Deposition.

23.    Attached hereto as **Exhibit V** is a true and correct copy of CT's Non-Disclosure Agreement with IBM, dated December 5, 2019, that CT produced under Bates Numbers CT_100367-369, which was introduced as Exhibit 24 and authenticated in the Warner Deposition.

24.    Attached hereto as **Exhibit W** is a true and correct copy of a letter from IBM to CT, dated June 22, 2020, that CT produced under Bates Numbers CT122189, which was introduced as Exhibit 27 and authenticated in the Warner Deposition.

25.    Attached hereto as **Exhibit X** is a true and correct copy of an April 7, 2024 email from IBM for Startups to CT's founder that CT produced under Bates Numbers CT_100467-468, which was introduced as Exhibit 25 and authenticated in the Warner Deposition.

26.    Attached hereto as **Exhibit Y** is a true and correct copy of blog post titled "Next generation music AI engine available for RISC-V" that CT produced under Bates Number CT_100661, which was introduced as Exhibit 18 and authenticated in the Warner Deposition.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on the 15th of September 2025, in Houston, Texas.

_Anna Raimer_
_____
Anna E. Raimer

# EXHIBIT A

Exhibit 44

Warner, K.
08/28/25
aptus.

# Trademark Report Form #577815514622209

**Date:** Tue, 15 Oct 2024 04:00:15 -0700

**To:** kip@heliosmusic.io

**X-Priority:** 3

**X-Mailer:** ZuckMail [version 1.00]

**From:** Facebook <case++aazqau6oq24azc@support.facebook.com>

**Reply-To:** Facebook <case++aazqau6oq24azc@support.facebook.com>

**X-Gnd-Status:** LEGIT

Hi,

Thanks for contacting us. We've reviewed your report, and it's not clear that the reported content infringes your trademark rights. In particular, the reported content doesn't appear to be directed at the geographic location(s) where you claim trademark rights. For this reason, we're unable to act on your report.

-

https://www.facebook.com/cohesity/posts/pfbid025eKMKsQ4pgUsHcLcsKaExRjKr2ah5rKrk5N5x9ZHtqYzDKRBSWYQvWXzs7heDz99l

-

https://www.facebook.com/cohesity/videos/1028771774329227/

-

https://www.facebook.com/cohesity/videos/1036966863835819/

-

https://www.facebook.com/cohesity/videos/1105128700318899/

-

https://www.facebook.com/cohesity/videos/1176743512673849/

-

https://www.facebook.com/cohesity/videos/1226107704466754/

-

https://www.facebook.com/cohesity/videos/1373046229763304/

-

https://www.facebook.com/cohesity/videos/1455752108178416/

-

https://www.facebook.com/cohesity/videos/1632845903746121/

-

https://www.facebook.com/cohesity/videos/1701292490064916/

-

CT_100265

https://www.facebook.com/cohesity/videos/260380845196858/

-

https://www.facebook.com/cohesity/videos/274012953646824/

-

https://www.facebook.com/cohesity/videos/368196947573949/

-

https://www.facebook.com/cohesity/videos/384684810089241/

-

https://www.facebook.com/cohesity/videos/4794152897344207/

-

https://www.facebook.com/cohesity/videos/519150566138558/

-

https://www.facebook.com/cohesity/videos/532764207802970/

-

https://www.facebook.com/cohesity/videos/559140188096293/

-

https://www.facebook.com/cohesity/videos/626120098304774/

-

https://www.facebook.com/cohesity/videos/660610428188409/

-

https://www.facebook.com/cohesity/vide

CT_100266

9335963222932/

- https://www.facebook.com/cohesity/videos/943983183910672/
- https://www.facebook.com/photo/?fbid=1018829388291679&set=a.483397335168223
- https://www.facebook.com/photo/?fbid=1517080505133229&set=a.483397335168223
- https://www.facebook.com/photo/?fbid=1702830176558260&set=a.483397335168223
- https://www.facebook.com/photo/?fbid=1716746315166646&set=a.483397335168223
- https://www.facebook.com/photo/?fbid=1964145700426705&set=a.483397335168223
- https://www.facebook.com/photo/?fbid=2051836518324289&set=a.483397335168223
- https://www.facebook.com/photo/?fbid=2055125337995407&set=a.483397335168223
- https://www.facebook.com/photo?fbid=10220476014070615&set=pcb.10220476017870710
- https://www.facebook.com/photo?fbid=10220476014430624&set=pcb.10220476017870710
- https://www.facebook.com/photo?fbid=10220476016710681&set=pcb.10220476017870710

If you have trademark rights in the same geographic location as the reported content, you may reply to this message...

CT_100267

that information, and we'll continue to look into your report.

To learn more about intellectual property, please visit the Intellectual Property section of the Help Center: https://www.facebook.com/help/intellectual_property?ref=cr


We removed the content you reported for violating Facebook's Terms of Service or Instagram's Terms of Use. We understand this action to resolve your intellectual property issue.

-
https://www.facebook.com/cohesity/posts/pfbid026x7GzXBf7MQndh6yiTfadEVppDmwMC2L5BP8saYd8wHhVwGT1Jjf2RNpKNboX5UEl

-
https://www.facebook.com/cohesity/posts/pfbid02ec9e91RnhYWocmZxcBoyiPfNDrHnKS8myQUbsREcZo7cBJrS9zRVL4z1jBVLmKk5l

-
https://www.facebook.com/cohesity/posts/pfbid0A3DQG7rD4o36ML5CW9JZPhKARMQ9txSbm1TZpzwFzsmRJD3cChfYqEtQC9ZdYnh8l

-
https://www.facebook.com/cohesity/posts/pfbid0K3ZpDUkFTdk1jL2Am4juDHV5BceymP2RVr

CT_100268

NzGi1QDGucBMcWjahJj3az2Cl

-

https://www.facebook.com/cohesity/posts/pfb
id0h2vU3UBSoGUTTF9oeRFk7QURLjwHSZuHw2wfZXhd
aBQR2KkCMPbkBFbTuvL6JNaAl

-

https://www.facebook.com/cohesity/posts/pfb
id0xtFd4Hu9yPVh5JvaJ2qArqvrsPgrXnKYQvhyzSCr
nYd6DAjYUap7Nvq45VDwyiRul

-

https://www.facebook.com/cohesity/posts/pfb
id0yg81GeXbjLDZFmehgzdvdu7auCcwqrXpXXoGq58U
5NLNRjGKYjHWNX6AbZJokPNFl

-

https://www.facebook.com/cohesity/posts/pfb
id0zwcuu3TvXDDvo1tyYnnRaLKGxKCDPiUJ2td9R61s
QghfGb6vTzce7FDCpzKXPsRnl

- https://www.facebook.com/photo/?
fbid=1022292467945371&set=a.483397335168223

- https://www.facebook.com/photo/?
fbid=1028494023991882&set=a.483397335168223

- https://www.facebook.com/photo/?
fbid=1034377016736916&set=a.483397335168223

- https://www.facebook.com/photo/?
fbid=1034913370016614&set=a.483397335168223

- https://www.facebook.com/photo/?
fbid=1039178172923467&set=a.483397335168223

- https://www.facebook.com/photo/?
fbid=1114027255438558&set=a.483397335168223

- https://www.facebook.com/photo/?
fbid=1120357014805582&set=a.483397335168223

CT_100269

- https://www.facebook.com/photo/?fbid=1125778127596804&set=a.483397335168223
- https://www.facebook.com/photo/?fbid=1215907908583825&set=a.483397335168223
- https://www.facebook.com/photo/?fbid=2050239331817341&set=a.483397335168223

If you'd like to retract your report, please fill out the appropriate retraction form for Facebook or Instagram:

https://www.facebook.com/help/contact/237593160842825?original_report=577815514622209

https://help.instagram.com/contact/3373960976225657?original_report=577815514622209

For more information about retractions, please visit our Help Centers:

https://www.facebook.com/help/1206218382801108?ref=cr

https://help.instagram.com/275268756304020?ref=cr

If you'd like to report something else, or if you don't believe this action resolved your issue, please submit a new report:

https://www.facebook.com/help/contact/634636770043106?ref=cr

https://help.instagram.com/contact/372592039493026?ref=cr

If you have questions about intellectual property, please visit our Help Centers:

https://www.facebook.com/help/intellectual_property?ref=cr

https://help.instagram.com/535503073130320?ref=cr

** This is a no-reply email. Any replies will not be received. **


Thanks,

Facebook

# EXHIBIT B



# Re: Apple Inc. (our ref# APP216657-A)

**From:** Kip Warner <kip@heliosmusic.io>

**To:** App Disputes <AppStoreNotices@apple.com>

**Cc:** phf@westpointlawgroup.com,
appstore@cohesity.com,
corrina.dilloughery@cohesity.com,
kamesh.singh@cohesity.com

**Date:** Tue, 15 Oct 2024 17:09:58 -0700

**Disposition-Notification-To:** kip@heliosmusic.io

**User-Agent:** Evolution 3.52.3-0ubuntu1

**Attachments:** 1

```
On Tue, 2024-10-15 at 13:05 -0700, App
Disputes wrote:
> According to our records, this matter is
unresolved at this time.
> Please update us on the status of your
communications regarding the
> following app:

Hello Barry,
```

The matter appears to still be unresolved, or at least on your
platform. However, we do have several material updates for you since we
last corresponded:

(1) Service of originating process was effectuated on Cohesity,
Inc., on 9 October, 2024. A courtesy copy of that pleading has been
attached with Cartesian Theatre Corp.'s position particularized;

(2) Cohesity, Inc. has not taken any steps that we are aware of to
mitigate the on-going harm caused to Cartesian Theatre Corp.;

(3) We have submitted approximately a thousand take down requests to
various platforms regarding the unauthorized usage of CT's mark. We
have had an approximately 99.79 % success rate as of this writing,
with additional successful confirmations occurring in real-time.
Some of these have included Cohesity's various publications which
have since been removed.

We do not anticipate at this time the

CT_100107

parties coming to a resolution.
Apple's prompt cooperation in this matter
is greatly appreciated.

Yours truly,

--
Kip Warner -- Founder
Cartesian Theatre Corp.
https://www.heliosmusic.io

**Attachments**

| Name | Size |
|---|---|
| 2024-10-08 - Statement of Claim (filed).pdf | 753.7 kB |

CT_100108

# EXHIBIT C

## REDACTED

Deposition of

# Kipling C.S. Warner

August 28, 2025

Cohesity, Inc.

vs.

Cartesian Theatre Corp.

**Highly Confidential**



www.aptusCR.com  |  866.999.8310

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3

 4    COHESITY, INC.,

 5              Plaintiff,

 6       vs.                      CASE NO.
                                  3:24-CV-9104
 7    CARTESIAN THEATRE CORP.,
      and DOES 1 - 25,
 8
                Defendant.
 9    _____

10

11

12

13

14       HIGHLY CONFIDENTIAL REMOTE DEPOSITION OF

15              KIPLING C.S. WARNER

16            Thursday, August 28, 2025

17

18

19

20

21

22

23    Reported by:
      Layli Phillips
24    RPR, CRR, CSR No. 14402

25    Job No. 10171673
```

Page 1

1    Q. What is your current position with CT?

2    A. I'm the principal and founder.

3    Q. What are your job responsibilities for CT?

4    A. I'm the primary operator of the business.

5    Q. What are some of your responsibilities in

6  connection with being the primary operator of the

7  business?

8    A. I administer all of the daily functions of the

9  business.  I'm the primary liaison.  I'm responsible for

10  all research and development that goes on in the

11  company.  Product design, everything.

12    Q. Do you have any direct reports?

13    A. No.

14    Q. Do you have any job titles with any other

15  companies?

16    A. Yes.

17    Q. What other job titles do you have?

18    A. I'm the co-chair of machine learning working

19  group, an AI special interest group.  I forgot the exact

20  acronyms that they use, but that's with the OpenPOWER

21  Foundation.

22    Q. Do you have any job titles with any other

23  company?

24    A. Not that I can think of.

25    Q. Do you have any job responsibilities with any

1       Q. Did you --

2       A. Go ahead.

3       Q. Sorry.  Go ahead.

4       A. There's also a pending PCT application as well.

5       Q. Did you engage a U.S. attorney to file these

6   patents?

7       A. Yes.

8       Q. CT has used a Helios mark in U.S. commerce,

9   correct?

10      A. Yes.

11      Q. We'll put into the chat Cohesity Bates

12   Number 600.

13          (Deposition Exhibit No. 3 was marked for

14           identification.)

15          MR. SHUSTER:  One moment.  Let me get in the

16   chat.  I'll open it in the other.

17          And just while they are doing that, remember

18   that the court reporter has to catch every word, so when

19   you're reading documents, it's really common for

20   witnesses to read way too fast.  Please just take your

21   time reading.

22          THE WITNESS:  Okay.

23          MS. RAIMER:  We'll mark this as Exhibit 3.

24   BY MS. RAIMER:

25      Q. Do you recognize this document?

Kipling C.S. Warner                                                                  Cohesity, Inc. vs.
                                                                          Cartesian Theatre Corp.

```
 1          A. I believe this is my trademark application for
 2   Helios in the U.S. via USPTO.
 3          Q. CT's trademark application for Helios was filed
 4   on August 29th, 2024, correct?
 5          A. Correct.
 6          Q. You engaged the U.S. law firm of Harness,
 7   Dickey & Pierce to file this application; is that right?
 8          A. Yes.
 9          Q. You made the decision to file this application
10   on behalf of CT, correct?
11          A. Yes.
12          Q. And you provided the information regarding CT's
13   use of the Helios mark in commerce as listed in the
14   application to counsel; is that right?
15          A. It may have been Canadian counsel.  I don't
16   recall.
17          Q. You reviewed the Helios application before it
18   was filed, correct?
19          A. Yes.
20          Q. In this application, CT claims that it first
21   used the Helios mark in U.S. commerce in connection with
22   downloadable computer software and databases for use in
23   analyzing music on March 25th, 2016; is that right?
24          A. I'm just verifying the date.
25              MR. SHUSTER:  The witness is looking at the
```

1  exhibit.

2       A. Sorry.  Could you repeat the date?

3  BY MS. RAIMER:

4       **Q. March 25th, 2016.**

5          MR. SHUSTER:  Need me to make that bigger?

6       A. Could you show me what page that's on in the

7  application?

8  BY MS. RAIMER:

9       **Q. COHESITY_600.**

10      A. No, we have the application open.  Oh, okay.

11 That also refers to page --

12      **Q. The first page.**

13      A. First page.

14         And, yes, I see it.  25th of March, 2016.

15      **Q. And turning to the next page, in connection**

16 **with the services, software as a service, services**

17 **featuring computer software for music analysis and**

18 **management advisory services in the field of music and**

19 **software development.**

20         **CT claimed a first use in commerce date at**

21 **least as early as November 29th, 2021; is that right?**

22         MR. SHUSTER:  I'll just object that you -- you

23 misread the -- the document.  There's no "and" between

24 music and software development.

25

Kipling C.S. Warner

Cohesity, Inc. vs.
Cartesian Theatre Corp.

1    BY MS. RAIMER:

2         Q. CT claimed a first use in commerce date for the

3    services in Class 42 at least as early as November 29th,

4    2021, correct?

5         A. Correct.

6         Q. How did you determine the dates of first use in

7    U.S. commerce to provide for this application?

8              MR. SHUSTER:  Objection.  To the extent that

9    this was -- that you learned this through

10   attorney-client communications, please don't share

11   those.

12             THE WITNESS:  Okay.  Sorry.  Are you objecting

13   or --

14             MR. SHUSTER:  Well, the objection is that it

15   calls for attorney-client communications, so please

16   exclude those from your answer.

17             MS. RAIMER:  I'm not asking for attorney-client

18   communications.  I'm asking how he came up with first

19   use dates in this application.

20        A. So there's two.  Are you asking about for

21   Class 42 or for Class 9?

22   BY MS. RAIMER:

23        Q. Let's start with Class 9.

24        A. For Class 9, I believe that is the earliest

25   dated invoice.  There may have been others, but that was

1  platform.  Helios was deployed on AWS.

2        Q. Is AWS a customer of CT?

3        A. AWS is a partner, one of the channels by which

4  Helios would be distributed.

5        Q. Is the deployment on the production server of

6  Amazon the only use in commerce as of the August 2024

7  date?

8        A. I don't recall.  I haven't been keeping logs of

9  every deployment, but there's been quite a few over the

10 years.

11       Q. And what do you mean by "deployment"?

12       A. As in the software has been downloaded and is

13 doing something on a computer somewhere.

14       Q. And in connection with the services, the

15 software as a service services featuring computer

16 software for music analysis and management, what use in

17 commerce of those services was being done as of

18 August 29th, 2024?

19       A. I don't remember.

20       Q. Was any customer employing the software as a

21 service services in the U.S. for Helios as of

22 August 29th, 2024?

23       A. I don't remember.

24       Q. Do you currently have any service -- any

25 customers for which you provide software as a service

**Kipling C.S. Warner**                                        Cohesity, Inc. vs.
                                                  Cartesian Theatre Corp.

1   services featuring computer software for music analysis

2   and management in the United States?

3        A. No.

4        Q. Did you have any such customers in 2024?

5        A. I don't remember.

6        Q. Have you ever had any customers of those

7   services in the United States?

8        A. Yes.

9        Q. How many such customers have you had?

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Highly Confidential

1　████████████████████████████████████

2　████████████████████

3　　　Q. In connection with advisory services in the

4　field of music software development, do you currently

5　have any customers?

6　　　A. In the United States, no.

7　　　Q. In the United States.

8　　　　As of August 29th, 2024, did you ever have any

9　customers for advisory services in the field of music

10　software development?

11　　　A. I don't remember.

12　　　Q. Did you confirm in 2024 whether you actually

13　had customers for those services before this application

14　was signed saying that you did use the mark in

15　connection with such services?

16　　　A. I would have had to.

17　　　Q. So it's been less than a year.  You don't

18　recall whether you've had any customers for those

19　services in the last year?

20　　　A. No.  I have been quite busy on many other

21　administrative tasks with the company.

22　　　Q. If you were making sales in the U.S. in

23　connection with these services, presumably you would

24　have records of doing so, correct?

25　　　A. If the United States is a priority, yes, but it

1  isn't.

2      Q. So you do not keep financial records for your

3  company?

4      A. I keep financial records.  But I don't believe

5  I have any customers right now in the United States, and

6  if I have had them the last few years in the U.S., I

7  don't have anything that immediately comes to mind.

8      Q. You -- so just so we're clear, you have no

9  records of sales from U.S. customers in the United

10  States ever?

11      MR. SHUSTER:  Objection.  Misstates the

12  testimony.

13      A. I agree with what my friend just said.

14  BY MS. RAIMER:

15      Q. Please repeat, then.  I'm trying to understand

16  what -- what is being said here.  You --

17      A. I didn't say that I didn't have any records.  I

18  said I don't have any recollection right now of any

19  recent American companies in 2024 that I've been doing

20  business with.

21      I'm sure I've had some.  Some of those

22  documents, I've already produced with ████, Amazon, and

23  others.  But I don't remember someone paying to use

24  Helios in the United States within the last six months,

25  a year or so.

Kipling C.S. Warner                                     Cohesity, Inc. vs.
                                                 Cartesian Theatre Corp.

1      Q. Do you recall anyone ever paying to use Helios

2   in the United States?

3      A. Yes.

4      Q. Who paid to use Helios in the United States?

5   ████████████████████████████████████████████████

6   ████████████████████████████████████████████████

7   ████████

8      Q. Do you keep sales records?

9      A. Yes.

10     Q. How far back do your sales records go?

11     A. I don't have a formal tracking system.  I'm not

12  that big of a company.  But all the important records

13  that I'm aware of, I've already produced to you.

14     Q. You're aware that a trademark registration

15  should issue soon to CT in connection with the Helios

16  mark, correct?

17     A. I don't know when it's supposed to issue.  But,

18  yes, I have a U.S. application pending.

19     Q. And you're now the correspondent of record for

20  that U.S. application, correct?

21     A. I don't believe so.  I think it's Harness IP,

22  actually.

23     Q. They have not -- Harness IP has not withdrawn

24  from representing you on the trademark application?

25     A. I believe that's the case.  I think they are

1  still the address or correspondent of record.  I don't

2  know what the term is in the United States.

3       **Q. I'm going to turn back to your declaration that**

4  **we previously marked, I believe, as Exhibit 2.**

5           MR. SHUSTER:  Bring that back up.

6       A. Yes.  Go ahead.

7  BY MS. RAIMER:

8       **Q. In that declaration -- let me look for the**

9  **paragraph number.**

10          MR. SHUSTER:  Counsel, while you're looking at

11 that, I suggest that sometime in the next five minutes

12 or so would be a good time for a break because I did get

13 that coffee down before I broke the cup.  So --

14          MS. RAIMER:  Let's go ahead and take a break,

15 Gary.  You want to do five minutes or do you need

16 longer?

17          MR. SHUSTER:  I'm getting older, but I think

18 five minutes is still enough time for me to handle this.

19          MS. RAIMER:  Okay.  We'll be back on the record

20 then.  Thank you.

21          (A short break was taken.)

22 BY MS. RAIMER:

23      **Q. Great.  Let's turn back to Exhibit 2, the**

24 **declaration.**

25          A. Exhibit 2.

1          MR. SHUSTER:  Okay.  We are on the declaration,

2    and which paragraph are we looking at?

3          MS. RAIMER:  Paragraph 6.

4          MR. SHUSTER:  Oh, Exhibit 2 to the declaration.

5          MS. RAIMER:  No, no, we labeled it Exhibit 2,

6    but it's just the declaration, Paragraph 6.

7          MR. SHUSTER:  Sorry.  It's taking me a second.

8          There we go.  Do you want it bigger?

9          THE WITNESS:  Yes.

10         MR. SHUSTER:  You're not old enough to require

11   reading glasses yet.  You should be fine.

12         All right.  There you go.

13         THE WITNESS:  Can you give me a moment to read

14   it?

15         MS. RAIMER:  Yes.

16         I'm focused on the penultimate sentence of that

17   paragraph.

18         MR. SHUSTER:  We're having a technical glitch

19   where the second screen where I'm showing the exhibits

20   turned off.

21   BY MS. RAIMER:

22       Q. I can read this sentence to you.  It says:

23         "If the U.S. filing results in a registered

24   mark issuing over Cohesity's opposition, CT will then

25   have to determine whether it has the resources,

Kipling C.S. Warner                                          Cohesity, Inc. vs.
                                                      Cartesian Theatre Corp.

1    including my time, to evaluate U.S. trademark issues

2    whether with regard to Cohesity or any other party."

3         A. Sorry --

4         Q. Is that still your position?

5         A. Yes.  I was almost done reading it when --

6    Windows is just being a pain.

7             MR. SHUSTER:  You hang around with him long

8    enough, he'll have you on Linux or at least feeling

9    guilty about using Windows.

10        A. Yes.  Go ahead.  What is your question?

11   BY MS. RAIMER:

12        Q. Is that still your position, the sentence I

13   just read?

14        A. Yes.

15        Q. What would you need to evaluate U.S. trademark

16   issues?

17        A. I would have to spend resources thinking about

18   it or having somebody else think about it.

19        Q. You evaluated the trademark issues in Canada

20   and sued Cohesity, correct?

21        A. Yes.

22        Q. And that was based on the same Helios mark,

23   correct?

24        A. No.  It was a different application and

25   registration number in a different jurisdiction.

1      Q. Is it the word "Helios," the same word that you

2  applied to register in the U.S. as you applied to

3  register in Canada?

4      A. It's the same standard characters, these

5  classifications and descriptions, but separate

6  applications and separate jurisdictions.

7      Q. So I want to make sure I got that correct.  You

8  said it's also the same -- same goods and services in

9  CT's application in the U.S. as in the Canadian

10  application, correct?

11      A. If I recall.  I haven't looked at it in quite

12  some time, but if I recall, it's the same language.

13      Q. After CT's registration issues, does CT plan to

14  assert trademark claims against Cohesity?

15      A. I haven't thought about it.  At least not

16  sufficiently to make a decision.

17      Q. What would you need to think about in order to

18  make a decision?

19      A. If I knew that, I would be the expert, but I'm

20  not.  That's why I have to retain them.

21      Q. What do you think would be different about the

22  U.S. proceeding that you would need to consider?

23          MR. SHUSTER:  Objection.  You're asking him to

24  speculate.

25      A. Yeah.  I don't know enough about IP law in the

Kipling C.S. Warner

Cohesity, Inc. vs.
Cartesian Theatre Corp.

1      Q. So -- you mentioned earlier that you were the

2   co-chair of the OpenPOWER Foundation; is that right?

3      A. No, I didn't.

4      Q. What is your role over the OpenPOWER

5   Foundation?

6      A. I'm the co-chair of a technical steering

7   committee, two of them.

8      Q. How long have you been a co-chair of the

9   technical steering committees?

10      A. I don't recall, but several years.  The second

11   one was added later.  But the first one was several

12   years ago.

13      Q. The OpenPOWER Foundation is located in

14   San Francisco, California, correct?

15      A. No.

16      Q. Where is the OpenPOWER Foundation located?

17      A. My understanding is they are in Delaware.

18      Q. And when you say "they are in Delaware," are

19   you talking about their headquarters or their business

20   registration?

21      A. I don't know where their business registration

22   is.  But I believe I saw some corporate documents a

23   while ago that they were in Delaware.  The executive

24   director, I don't know where he is, but I don't think

25   he's in California.

1      Q. OpenPOWER Foundation is identified on CT's

2  website.  Heliosmusic.io is a partner of CT; is that

3  right?

4      A. Yes.

5      Q. What is the nature of the partnership between

6  OpenPOWER Foundation and CT as it relates to Helios?

7      A. Helios is optimized for the Power ISA which is

8  administered by the OpenPOWER Foundation.

9      Q. The OpenPOWER Foundation's website advertises

10  CT's Helios, correct?

11      A. I believe so.  It lists it along its -- its

12  catalogue.

13      Q. We can pull it up.  It's CT122190.  That would

14  be Exhibit 5, we can mark it as.

15          (Deposition Exhibit No. 5 was marked for

16            identification.)

17          THE WITNESS:  We're just opening it.

18          MR. SHUSTER:  I apologize.  I think Kip has a

19  point about Windows and switching to Linux because this

20  is taking forever to open.

21          THE WITNESS:  Okay.  Go ahead.

22  BY MS. RAIMER:

23      Q. Is that the OpenPOWER Foundation website that

24  advertises CT's Helios?

25      A. It appears to be, yes.

Kipling C.S. Warner

Cohesity, Inc. vs.
Cartesian Theatre Corp.

```
 1   Helios?

 2        A. Yes.

 3        Q. Which -- so -- excuse me.  Let's go to the next

 4   sentence:

 5            "Customers have included a multitude of small

 6   firms all the way to Digital Theater Systems, Mozilla,

 7   Google, Wells Fargo, and others."

 8            Is that right?

 9        A. Yes, my customers.  And by "my," I'm not saying

10   specifically whether it's as an employee, as an

11   individual contractor, or through my company, CT.

12        Q. So are all of those customers of the Helios --

13        A. No --

14        Q. -- products?

15        A. -- none of those --

16        Q. Which of those -- turning to the next page,

17   587, where it says "leadership team."

18            MR. SHUSTER:  I'm sorry, what page are we

19   turning to?

20            THE WITNESS:  587.

21            MS. RAIMER:  The next page.

22            THE WITNESS:  Go ahead.

23   BY MS. RAIMER:

24        Q. What does CT mean by "leadership team"?

25        A. These are the people who help me make important
```

Page 82

1  decisions, including myself.  This is not an exclusive

2  list.

3         Q. Who is Dean Becker?

4         A. Dean Becker is or was my chief IP strategist.

5         Q. How long was he your chief IP strategist for?

6         A. He was engaged until more than a year ago.

7  Maybe two years ago.

8         Q. So he's no longer your chief IP strategist?

9         A. No.  That web page needs to be updated.

10 WordPress is difficult to work with.

11        Q. Does Mr. Becker live in the United States?

12        A. I don't know where he lives right now.  But

13 he -- he's very cosmopolitan.

14        Q. He has a U.S. phone number, correct?

15        A. Yes.

16        Q. And is he from the United States?

17        A. I don't know where he was born, but he has a

18 house there or did up until the fires in California.  I

19 don't know if he still does.

20        Q. So at one time he lived in California?

21        A. Yes.

22        Q. The next person listed as founder and director

23 of engineering is you, correct?

24        A. Yes.

25            MR. SHUSTER:  You know that guy?

Kipling C.S. Warner                                    Cohesity, Inc. vs.
Cartesian Theatre Corp.

```
 1            THE WITNESS:  I recognize him.
 2   BY MS. RAIMER:
 3        Q. And then next, we have Mr. Shuster; is that
 4   right?
 5        A. Correct.
 6        Q. It looks like a picture of his beautiful little
 7   girl.
 8            MR. SHUSTER:  That's Belle.
 9   BY MS. RAIMER:
10        Q. This is -- Mr. Shuster is the attorney that's
11   with you today, correct?
12        A. Yes.
13        Q. And on this page he's listed as your U.S.
14   general counsel; is that right?
15        A. Yes.
16        Q. CT doesn't have a Canadian GC; is that right?
17        A. I --
18        Q. And by "GC" I mean general counsel.
19        A. I'm aware.  I have a number of Canadian counsel
20   that I use for different matters.  But at this point in
21   time, I don't have a general counsel that handles all
22   the different types of legal services required in
23   Canada.
24        Q. I'm going to direct your attention to 589, the
25   privacy policy page.
```

**Highly Confidential**

```
 1              MS. MCKEOWN:  I'm dragging it in.
 2              MS. RAIMER:  We'll mark that as Exhibit 7.
 3              (Deposition Exhibit No. 7 was marked for
 4                identification.)
 5              THE WITNESS:  This is the ██████████████
 6      invoice?  Okay.  We have it open.
 7      BY MS. RAIMER:
 8          Q. And you said this is the ███████████████
 9      invoice?
10          A. Yes.
11          Q. And the date of this invoice is February 19th,
12      2016?
13          A. Yes.
14          Q. According to the -- the top, it notes that
15      ████████████████████████████████████████████████████
16      is that correct?
17          A. That was the address I was provided from the
18      customer.
19          Q. And this invoice is for a demonstration of the
20      Helios technology?
21          A. Yes.
22          Q. And that was "using your existing music
23      collection."  Does that mean ███████████████████████
24      existing music collection?
25          A. Yes.
```

Kipling C.S. Warner                                      Cohesity, Inc. vs.
                                                    Cartesian Theatre Corp.

1          Q. It then says:

2              "The arrangement does not include actual

3     production use under any kind of licensing arrangement,

4     including resale or third-party licensing."

5              Is that right?

6          A. Correct.

7          Q. What does "actual production use" mean?

8          A. As in facing their own customers.

9          Q. So looking at the next page, 122231, are these

10    wire payment instructions?

11         A. Gary is just pulling -- okay.  Go ahead.

12         Q. Are these wire payment instructions?

13         A. They are.

14         Q. And the beneficiary is CT?

15         A. Yes.  Well, the beneficiary bank is Citizens

16    Bank of Canada.  That's the intermediary, but the

17    ultimate beneficiary is CT.

18         Q. And that's under "beneficiary name"?

19         A. Yes.

20         Q. And then it's blacked out, but the next line is

21    "beneficiary USD account number"; is that right?

22         A. Yes.

23         Q. Was this invoice paid?

24         A. Yes.

25         Q. Do you have any documents to show the invoice

1    was paid?

2         A. Probably.

3         Q. Was the Helios demonstration performed?

4         A. Yes.

5         Q. This invoice is dated before the prospectus; is

6    that right?

7         A. I don't recall.

8         Q. Was this demonstration still of the

9    experimental version of the Helios software?

10        A. It's always been experimental.

11        Q. Is this the same software provided to ▮▮▮▮▮▮

12    ▮▮▮▮▮▮▮▮▮▮▮ as exists today?

13        A. We're talking about something intangible that's

14   always changing, so I don't know what you mean by "the

15   same."

16        Q. Was it both for software for music analysis in

17   2016?

18        A. At least the goods and services in the Canadian

19   application and the American one.

20        Q. When was the Helios demonstration performed?

21        A. I believe we have that in evidence.  That

22   document was provided to you.

23        Q. We can bring that up, then.  I believe you're

24   talking about CT122232?

25             MR. SHUSTER:  Opening it up.

1      Q. What entities are CT's partners related to

2  Helios?

3      A. There's quite a few.  Do you want me to itemize

4  them?

5      Q. It might be easiest for us to bring up your

6  website because I think some are listed there.  So we

7  can -- that might be the easiest way to look, and then

8  you can think of the other ones that not -- are not on

9  your website.  Would that make sense?

10     A. Yes.  I'll -- what page was that on?

11     Q. It was Exhibit Number 6, and it's page --

12         MR. SHUSTER:  Exhibit 6 is the website.

13         MS. RAIMER:  Yes, so 579 on the website.

14         THE WITNESS:  579.  So right there.

15         Sorry, Anna.  I'm not yawning at you.

16         MS. RAIMER:  I wouldn't blame you if you were.

17         MR. SHUSTER:  Yeah.  You would not be the first

18  person to yawn during a deposition.  I promise.

19         THE WITNESS:  Okay.  We have it up.

20  BY MS. RAIMER:

21     Q. So these are -- the title here is "partners."

22  What do you mean by "partners"?

23     A. I have some formal type of relationship with

24  them, in contract usually.

25     Q. But that's different than a customer?

Highly Confidential

Kipling C.S. Warner                                    Cohesity, Inc. vs.
                                                    Cartesian Theatre Corp.

1        A. Correct.  Although a customer could be a

2   partner as well because Helios is available as a

3   white-label product, too, and so one of these partners

4   could take the technology and rebrand it as something

5   else.

6        **Q. Have any of your partners done that?**

7        A. None of the ones that are listed on the

8   partners section in the website footer that I'm aware

9   of.

10       **Q. Can you think of any other partners that are**

11  **not on here that would have done that?**

12       A. Well, a customer, when they are using the

13  technology, they are not required to disclose that it's

14  Helios behind the scenes.  So in a sense, every customer

15  I've ever had had that option of white-labeling the

16  product.

17          In the case of ████████████████, I don't

18  believe he ever had a customer-facing usage of the

19  product, but even if he had, it probably would not have

20  said that it was powered by Helios.

21       **Q. And I believe we looked at his invoice that**

22  **said he wasn't allowed to have an actual production use.**

23  **Does that sound right?**

24       A. I think that's correct, yes, in his case.

25       **Q. At a high level, what -- how do these**

1  partnerships relate to Helios?

2      A. They are all different, but if you want to ask

3  me about a specific one, I would be happy to do that.

4      Q. Do you know which of your partners are located

5  in California?

6          MR. SHUSTER:  Objection.  It calls for

7  speculation.

8      A. And when you say "located," do you mean

9  headquartered or if they happen to have some?  Because I

10  would imagine most multinational tech companies will

11  have someone in probably every country in the world that

12  does business with them.

13  BY MS. RAIMER:

14      Q. Intel is headquartered in Santa Clara,

15  California; is that right?

16      A. I wouldn't know, but I'll take you at your

17  word.

18      Q. Well, do you know whether any of your partners

19  are headquartered in California?

20      A. I believe Magnatune is or was based out of

21  Berkeley, California.

22      Q. Let's look at Intel.  CT is an Intel partner,

23  Alliance Gold Partner; is that right?

24      A. Yes.

25      Q. How long has CT been an Intel partner, Alliance

1    Partner?

2        A. I don't recall.

3        Q. Let's look at CT100496.

4            MR. SHUSTER:  Do we already have that?  Is that

5    already a marked exhibit?

6            MS. MCKEOWN:  It's in the chat.

7            MR. SHUSTER:  Oh, Exhibit 9.  There you go.

8            (Deposition Exhibit No. 9 was marked for

9              identification.)

10           THE WITNESS:  Okay.  Go ahead.

11   BY MS. RAIMER:

12       Q. So what is Exhibit 9?

13       A. This looks like an email from Intel dated

14   26th of May, 2021, welcoming CT to the Intel Partner

15   Alliance program.

16       Q. What is the Intel Partner Alliance program?

17       A. I think we may actually have a document that

18   specifically outlines what the program entails in

19   evidence.  I'm not a hundred percent sure.

20       Q. Do you recall generally what the program is?

21       A. At a high level, it's a collection of various

22   programs and services for industry partners that have

23   different needs that may be able to mutually benefit

24   each other.

25       Q. Is this partnership related to the Helios

1    technology?

2        A. Yes.

3        **Q. What is the nature of CT's relationship with**

4    **Intel as it relates to Helios?**

5        A. Intel expressed an interest a long time ago in

6    the underlying technology being optimized for Intel CPUs

7    and wants to sell their hardware.

8        **Q. Let's look at CT100469.  We can mark that as**

9    **Exhibit 10.**

10           (Deposition Exhibit No. 10 was marked for

11             identification.)

12           THE WITNESS:  Just opening it up.

13           Okay.  Go ahead.

14   BY MS. RAIMER:

15       **Q. Do you recognize this document?**

16       A. I haven't read it in detail, but it's the Intel

17   Partner Alliance terms and conditions.

18       **Q. Did CT agree to these terms and conditions?**

19       A. It would have had to in order to be admitted

20   into the program.

21       **Q. Let's turn to 100479, Paragraph 715.**

22           MR. SHUSTER:  479.  Sorry.  It takes me longer

23   than I thought.

24           All right.  I have that page up.

25

 1  BY MS. RAIMER:

 2        Q. On Paragraph 715, there's a governing law and

 3  forum provision, correct?

 4        A. Yes.

 5        Q. And in that -- by that provision, CT agreed to

 6  governing law and forum for any dispute regarding this

 7  agreement in the state of Delaware, correct?

 8        A. That's related to the Intel Partner Alliance

 9  trademark license.  I don't know how that relates to the

10  rest of the program.

11        Q. Oh, I think the trademark license is on

12  Page 100494.  So let's start first with the -- well,

13  let's flip to that, 100494.  And Paragraph 9.1.1.

14        A. Okay.  Go ahead.

15        Q. And in this provision, CT agreed or consented

16  to any dispute arising out of the license being under

17  the exclusive jurisdiction and venue of state and

18  federal courts within Santa Clara County, California,

19  correct?

20        A. That appears to be what it says.

21        Q. CT's Helios solution was approved to be part of

22  Intel's Partner Showcase, right?

23        A. Showcase, yes.

24        Q. We'll put a slide up so you can see it.

25  COHESITY_615.  I believe that's Exhibit 11, we can mark

Kipling C.S. Warner                                      Cohesity, Inc. vs.
                                              Cartesian Theatre Corp.

```
 1  it as.
 2          (Deposition Exhibit No. 11 was marked for
 3            identification.)
 4          THE WITNESS:  Gary is just pulling it up.
 5          MR. SHUSTER:  It's amazing how long it takes
 6  these things to load.
 7          THE WITNESS:  Okay.  Go ahead.
 8  BY MS. RAIMER:
 9      Q. Do you recognize this page?
10      A. Yes.
11      Q. Is this an Intel web page that's advertising
12  CT's Helios platform?
13      A. I don't know if it's current, but it appears to
14  be a screenshot.
15      Q. This website is a U.S. website, correct?
16      A. The address is Vancouver, it says.
17      Q. In the domain name, do we see that it's a U.S.
18  website up at the top?
19      A. I can't see.
20          Intel.com, but that doesn't mean U.S.
21      Q. Well, "content/www/us/en"?
22      A. That's just what the language that the browser
23  automatically detects.  The people who wrote the
24  browsers tend to be Americentric, so it automatically
25  defaults to that.
```

Page 100

Highly Confidential
Kipling C.S. Warner                                     Cohesity, Inc. vs.
                                              Cartesian Theatre Corp.

1        Q. The substance on the website reads:

2            "Helios is a powerful Intel AVX optimized on

3    premise or hosted DTB -- B2B technology that allows

4    searching of large commercial music catalogues by using

5    music itself as the search key."

6            Did I read that correctly?

7        A. You did.

8        Q. Is that how you would also characterize Helios?

9        A. Not to everyone, but for those specifically

10   interested in Intel-based offerings, yes.

11       Q. And Intel uses a registration symbol next to

12   Helios in that sentence, correct?

13           MR. SHUSTER:  Where -- it's behind -- it's

14   right below --

15       A. It's tiny, but in the superscript beside

16   Helios, yes, there's a registration symbol for the

17   company, which says it's located in Vancouver.

18   BY MS. RAIMER:

19       Q. So it has the address you just noted, and then

20   it says "regional coverage," and "Americas," and it

21   includes Latin America region and North America region,

22   correct?

23       A. Yes.  I think Intel just sets that on their

24   own.

25       Q. When did Intel start showcasing CT's Helios

1   technology on its website?

2        A. I don't know, but it would be some point in

3   time that postdated whenever the partnership email was

4   sent out to CT.

5        **Q. I think we might have it.  CT124396.  If we can**

6   **mark this one as Exhibit 12.**

7             (Deposition Exhibit No. 12 was marked for

8                identification.)

9   BY MS. RAIMER:

10        **Q. Do you recognize this email?**

11        A. It's not in yet.

12             MR. SHUSTER:  It's still doing the --

13             MS. RAIMER:  Oh.  Getting ahead of myself.

14             MR. SHUSTER:  No, you're just a whole lot

15   faster than my laptop.

16             MS. RAIMER:  That's because I've got it on

17   paper, Gary, old-fashioned.

18             THE WITNESS:  The 24th of March 2025 email?

19             MS. RAIMER:  Yes.

20             THE WITNESS:  Okay.  We have that open.

21   BY MS. RAIMER:

22        **Q. What is this document?**

23        A. That is Helios being admitted to their Partner

24   Showcase Solutions program.

25        **Q. And what is the Partner Solutions program --**

1    Partner Showcase program?

2        A. They showcase various products that are in some

3    way leveraging Intel technology from third parties.

4        Q. Another partner that was listed on your website

5    was NVIDIA; is that right?

6        A. NVIDIA.

7        Q. NVIDIA.

8           Is that correct?

9        A. Yes.

10        Q. When did CT enter its partnership with NVIDIA?

11        A. We should have that in evidence.  There should

12    be an acceptance email somewhere.

13        Q. Okay.  I'll see if I can pull that up as

14    100516.  We'll mark this as Exhibit 13.

15           (Deposition Exhibit No. 13 was marked for

16             identification.)

17           THE WITNESS:  Okay.  Go ahead.

18    BY MS. RAIMER:

19        Q. Do you recognize this document?

20        A. I do.

21        Q. What is it?

22        A. It's an email from NVIDIA dated 23rd of

23    November, 2020, with subject "Congratulations on your

24    acceptance into NVIDIA Inception."

25        Q. Has CT been a partner with NVIDIA since that

1   time?

2        A. Yes.  The message body reads:

3            "We are thrilled to welcome Cartesian Theatre

4   into NVIDIA Inception.  Congratulations on your

5   acceptance into the premier program for AI and data

6   science startups," and then it continues on.

7        **Q. Is CT's partnership with NVIDIA related to**

8   **Helios?**

9        A. Yes.

10        **Q. What is the nature of CT's relationship with**

11   **NVIDIA as it relates to Helios?**

12        A. NVIDIA has been lobbying me for several years

13   to adapt Helios to be dependent on their technology.

14        **Q. Let's bring up CT100512.  We can mark that as**

15   **Exhibit 14.**

16            (Deposition Exhibit No. 14 was marked for

17              identification.)

18            MR. SHUSTER:  I may have double-opened it,

19   so --

20            THE WITNESS:  Okay.  We have it open.  This is

21   the 17th of November 2020 document.  Is that what you're

22   looking at?

23            MR. SHUSTER:  November?

24            MS. RAIMER:  Yes.

25            THE WITNESS:  17th of November, 2020.

Kipling C.S. Warner                                        Cohesity, Inc. vs.
                                                    Cartesian Theatre Corp.

1  BY MS. RAIMER:

2      Q. And this is an email between you and an NVIDIA

3  representative --

4      A. Yes.

5      Q. -- regarding -- it looks like you started the

6  email November 12th, 2020, but there was no -- there's

7  no email there.

8      A. I --

9      Q. And do you recall whether there was just an

10  attachment?

11     A. No.  Sometimes when you're printing out emails,

12  it misinterprets parts of the email as attachments when

13  they weren't really.

14     Q. Do you recall what your email to Mr. Jeremy

15  Krinitt would have said?

16     A. No.  I don't know why it's not displaying, but

17  it just says:

18          "12th of November 2020, external email, use

19  caution opening links for attachments."

20          No idea.  It may have been something to do with

21  a phone call or something like that.  I know we had

22  spoken a number of times by telephone.

23     Q. And Mr. Krinitt notes to you that he would like

24  to introduce you to Matias Serebrinsky; is that right?

25     A. That appears to be what the email says, yes.

Kipling C.S. Warner

Cohesity, Inc. vs.
Cartesian Theatre Corp.

1      Q. Did you have a -- did you ever speak with

2  Mr. Serebrinsky as a result of this email?

3      A. I don't remember.  It was half a decade ago.

4      Q. Is this email referring to Helios?

5      A. My partnership with NVIDIA is related to

6  Helios, yes.

7      Q. Let's bring up CT100350.  Mark this one as

8  Exhibit 15.

9          (Deposition Exhibit No. 15 was marked for

10            identification.)

11          THE WITNESS:  Okay.  Go ahead.

12  BY MS. RAIMER:

13      Q. Do you recognize this document?

14      A. Yes.

15      Q. What is this email?

16      A. This is NVIDIA trying to encourage me to become

17  dependent on some of their commercial offerings.

18      Q. And when you say "become dependent," is -- are

19  you referring to the hundred thousand dollars in AWS

20  credits?

21      A. Yes.  That's part of it.  But there's more to

22  that.

23      Q. Did you use these AWS credits at all?

24      A. I used some of them.  I don't know that I used

25  all of them.  But I decided not to continue using them

**Page 106**

Kipling C.S. Warner                                                    Cohesity, Inc. vs.
                                                              Cartesian Theatre Corp.

```
 1   at some point.

 2          Q. Why did you make that decision?

 3          A. NVIDIA wanted my customers to be dependent on

 4   some very expensive and unnecessary hardware in order to

 5   make my technology work, and I didn't think that was a

 6   good design choice.

 7          Q. Do you continue to partner with NVIDIA?

 8          A. I'm still partnered with NVIDIA in the NVIDIA

 9   Inception program.

10          Q. SiFive is another partner listed on your

11   website; is that correct?

12          A. Yes.

13          Q. They are located in California, correct?

14          A. I don't know where they are located.  I think

15   they are Chinese backed, actually.

16          Q. Let's put in the chat CT100662.

17              (Deposition Exhibit No. 16 was marked for

18               identification.)

19              THE WITNESS:  Okay.  Go ahead.

20   BY MS. RAIMER:

21          Q. Do you recognize this document?

22          A. Yes.

23          Q. What is it?

24          A. It's a mutual NDA between CT and SiFive.

25          Q. And is SiFive's address in this agreement in
```

**Page 107**

Highly Confidential

Kipling C.S. Warner                                          Cohesity, Inc. vs.
                                                      Cartesian Theatre Corp.

1    California?

2         A. No.  It says Delaware.

3         Q. In the top of the document?

4         A. I think it's on the second line of the

5    document.

6         Q. Let's look at the signature page.

7              MR. SHUSTER:  You know, there's no Bates number

8    on this signature page.

9              MS. MCKEOWN:  That's how you produced it, Gary.

10             MR. SHUSTER:  I'm not blaming you.  I'm just

11   saying out loud that that should not have happened.  I

12   apologize.

13   BY MS. RAIMER:

14        Q. Do you see the signature page?

15        A. Yes.

16        Q. And do you see the California address?

17        A. I see a California address.

18        Q. I'm going to direct your attention back to

19   Paragraph 11.

20        A. Yes.

21        Q. For any disputes regarding the agreement, you

22   consented to personal jurisdiction in Santa Clara

23   County, correct?

24        A. Yes.

25        Q. When did CT enter its partnership with SiFive?

Kipling C.S. Warner

1       A. I don't recall the exact date.  We don't have a

2   formal agreement that the parties must do or not do

3   certain things other than an NDA.

4       **Q. Does the partnership relate to Helios?**

5       A. Yes.

6       **Q. What is the nature of the relationship with**

7   **SiFive as it relates to Helios?**

8       A. ███████████████████████████████████

9   ██████████████████████████████████████

10  ██████████████████████████████████████████

11  █████████████████████████████████████

12      **Q. Let's look at CT100660.  This will be**

13  **Exhibit 17.**

14          (Deposition Exhibit No. 17 was marked for

15              identification.)

16          THE WITNESS:  Okay.  Go ahead.

17  BY MS. RAIMER:

18      **Q. Do you recognize this document?**

19      A. Yes.

20      **Q. What is it?**

21  ████████████████████████████████████████

22  █████████████

23      **Q. The invoice identifies SiFive's address in**

24  **California, correct?**

25      A. Well, that's the location that they were

**Highly Confidential**

```
 1   shipping from.  I don't know where they are actually

 2   headquartered.  ███████████████████████████████

 3   ███████████████████████████████████████████████

 4        Q. Let's put up CT100661.  And that's Exhibit 18.

 5           (Deposition Exhibit No. 18 was marked for

 6            identification.)

 7           THE WITNESS:  Okay.  Go ahead.

 8   BY MS. RAIMER:

 9        Q. Do you recognize this document?

10        A. Yes.

11        Q. What is it?

12        A. It's a joint press release dated 6th of

13   December, 2021.

14        Q. And this press release was on the R-S --

15   R-I-S-C-V website; is that right?

16        A. RISC-V is how you pronounce it.

17        Q. So this press release was on the RISC-V

18   website?

19        A. Yes.  I think they are in Switzerland.

20        Q. It notes that:

21           "Helios music recommendation engine successful

22   port to the open and free RISC-V instruction set

23   architecture."

24           Is that right?

25        A. Yes.
```

Kipling C.S. Warner

```
 1        Q. Is -- is RISC-V part of SiFive?

 2        A. RISC-V is a standard, and then different

 3   companies can do things with it.  In the sense that

 4   email is a standard, but Microsoft has an application

 5   and Apple has an application for it.  But this is --

 6        Q. And so the Helios -- so Helios is being able to

 7   be used on the RISC-V application?

 8        A. It's hardware, not software.

 9        Q. Got it.

10           So Helios is available on the RISC-V hardware?

11        A. Yes, from SiFive.

12        Q. Let's turn to Magnatune.  I believe you said

13   Magnatune was headquartered in Berkeley; is that

14   correct?

15        A. I don't know where it's headquartered, but I

16   know that the principal is or was in Berkeley,

17   California.  I don't believe the company is -- the

18   business is still operating anymore.

19        Q. You don't believe Magnatune is still operating

20   anymore?

21        A. This is what I have been told by the principal

22   a while ago.  I don't know the current state of it.

23        Q. When did CT work as a partner with Magnatune?

24        A. Many years ago.  I don't --

25        Q. What was the relationship in connection with
```

1   the Helios technology?

2        A. The principal was interested in the technology,

3   and I purchased a music catalogue from Magnatune to use

4   for research and development purposes and for a demo.

5        Q. Did you have any agreements with Magnatune?

6        A. Informally.

7        Q. Oracle is also listed as one of CT's partners,

8   correct?

9        A. Yes.

10       Q. Let's bring up CT100659 and mark it as

11  Exhibit 19.

12           (Deposition Exhibit No. 19 was marked for

13             identification.)

14       THE WITNESS:  Gary is just closing some of the

15  windows that we've got open of all the exhibits because

16  it's slowing down the computer.

17       MR. SHUSTER:  All right.  We have it open.

18       THE WITNESS:  Go ahead, Anna.

19  BY MS. RAIMER:

20       Q. Do you recognize this document?

21       A. I do.

22       Q. What is it?

23       A. It's an NDA of sorts from Oracle between CT and

24  Oracle.

25       Q. It identifies Oracle's address in Redwood City,

```
 1   California, correct?

 2        A. Yes.

 3        Q. Directing your attention to Paragraph 11, in

 4   this agreement, you agreed to submit to the exclusive

 5   jurisdiction of and venue in the courts in San Francisco

 6   or Santa Clara Counties in California for any disputes

 7   arising out of or relating to this agreement; is that

 8   right?

 9        A. Yes.

10        Q. What is the nature of CT's partnership with

11   Oracle as it relates to Helios?

12   ███████████████████████████████████████

13   ████████████████████████████

14   ████████████████████████████████████████

15   ██████████

16   ████████████████████████

17        Q. Amazon is another partnership with respect to

18   CT; is that right?

19        A. Yes.

20        Q. Amazon is headquartered in the United States,

21   right?

22        A. I don't know where they are headquartered, but

23   I was dealing specifically with AWS Canada.

24        Q. You signed an agreement with AWS, correct?

25        A. Yes.
```

Highly Confidential

**Kipling C.S. Warner**

**Cohesity, Inc. vs.
Cartesian Theatre Corp.**



1    Q. Let's bring up CT100345.  We can mark that as

2  Exhibit 19 -- sorry, Exhibit 20.

3          (Deposition Exhibit No. 20 was marked for

4            identification.)

5          THE WITNESS:  Go ahead.

6  BY MS. RAIMER:

7    Q. Do you recognize this document?

8    A. I do.

9    Q. What is this?

10    A. It's a mutual NDA between AWS and CT.

11    Q. And for AWS is the address identified Seattle,

12  Washington?

13    A. Yes, for Amazon Web Services, Inc.  It's not

14  the company that I do business with, but this is -- this

15  is the NDA.  That's the signing party.

16    Q. Turning to Paragraph 11.4, you agreed to

17  jurisdiction and venue in Washington State in connection

18  with this agreement, correct?

19    A. Yes.

20    Q. What is the nature of your relationship with

21  Amazon Web Services as it relates to Helios?

22  ███████████████████████████████████████████████████

23  ███████████████████████████████████████████████████

24  █████████████████████████████████████████████████

25  ███████████████████████████████████████████

1      Q. So when we were talking about AW -- the Helios

2   being deployed on AWS in connection with Helios in U.S.

3   commerce, was that not the AWS U.S.?

4      A. No.

5      Q. What were you talking about in connection with

6   that comment?

7      A. All the people that I dealt with, they were all

8   Canadian.

9      Q. So AWS is a partner, not a customer; is that

10  right?

11     A. Correct.  And the program specifically that CT

12  was admitted to, I believe, was a Canadian program.

13  ████████████████████████████████████████████████████

14  ████████████

15  ████████████████████████████████████████████████████

16  ███████████████████████████████

17     Q. Do any Helios customers in the U.S. use AWS

18  structure?

19     A. There are no U.S. customers of Helios.

20     Q. Have any customers in the U.S. ever used AWS as

21  a structure?

22     A. I can't know that.  They are using the client

23  utilities of the SDK; they could put it on anywhere they

24  like in the world, and I wouldn't know.

25     Q. The next partner listed on your website is

Kipling C.S. Warner

1   **Microchip.  Do you know -- is that -- is Microchip a**

2   **partner of CT?**

3        A. Well, microchip is a technology; the company is

4   called Microchip Technologies.  That's the actual name

5   of the company.

6        **Q. Are they still a partner of CT?**

7        A. Yes.

8        **Q. Do you know whether they are headquartered in**

9   **the United States?**

10       A. I don't know.  They are a very large

11  international, multinational.

12       **Q. Let's bring up 100508, and we can mark that as**

13  **Exhibit 21.**

14            (Deposition Exhibit No. 21 was marked for

15             identification.)

16            THE WITNESS:  Okay.  Go ahead.

17  BY MS. RAIMER:

18       **Q. Do you recognize this document?**

19       A. I do.

20       **Q. What is this document?**

21       A. It's a mutual NDA between Microchip

22  Technologies and CT.

23       **Q. Microchip's address listed on this agreement is**

24  **Chandler, Arizona; is that correct?**

25       A. That appears to be the case.

```
 1          Q. And in Paragraph 6, governing law, you agreed
 2   to the laws of Arizona with any dispute being subject to
 3   the jurisdiction of the courts in Phoenix, Arizona; is
 4   that correct?
 5          A. Yes.
 6          Q. Does CT have any partners other than those that
 7   I have just -- we have already discussed today?
 8          A. Yes.
 9          Q. What other partners does CT have?
10          A. The most recent one is Arm.
11          Q. What is Arm?
12          A. Arm is a British holding company that is
13   responsible for the Arm Hardware Technology, the IP
14   specifically, which they license out to third-party
15   manufacturers.
16          Q. And what is the relationship of your
17   partnership with Arm in connection with Helios?
18   ████████████████████████████████████████████████████
19   ██████████████████████
20          Q. Does Arm have any locations in the United
21   States?
22          A. I have no idea.
23          Q. Does CT have any other partners aside from Arm
24   and the one we've discussed today?
25          A. Ingram Micro.
```

1        Q. Other than the ones we've discussed today, does

2    CT have any other partners?

3        A. Yes, quite a few.

4        Q. Can you just list those other partners for us?

5        A. There's the ones that are listed on our

6    website.  And then BC Tech, AI Partnerships Corp, IBM,

7    InnoBoost, OVH Cloud, Palo Alto Networks, Qualcomm,

8    StarFive, Sipeed, RED Semiconductors.  There may be

9    others as well.  There's been quite a few over the

10   years.

11       Q. Do you know whether any of those partners are

12   located in California?

13       A. I don't keep track of that.

14       Q. Let's look at CT12214 (sic).

15           (Deposition Exhibit No. 23 was marked for

16             identification.)

17           MR. SHUSTER:  Ms. Phillips, are you doing okay?

18   Do you need a break?  I know we've gotten a lot of

19   transcribing you're doing.

20           THE REPORTER:  I'm okay for now.  Thank you.

21   BY MS. RAIMER:

22       Q. Do you recognize the email at 12214 (sic)?

23       A. We're just trying to open it.

24       Q. Sure.  My apologies.  It's 122214.  I missed a

25   two there.

Kipling C.S. Warner

Cohesity, Inc. vs.
Cartesian Theatre Corp.

1      A. This is why I was saying it's faster if you

2  just share the screen where you got the exhibits there.

3          Okay.  We've got it open.

4      **Q. Do you recognize this email?**

5      A. Yes.

6      **Q. And what is the email?**

7      A. It's an email from Palo Alto Networks to CT

8  dated 22nd of November 2024, subject "Welcome to Palo

9  Alto Networks."

10     **Q. So your partnership with Palo Alto Networks**

11 **began around November 2024?**

12     A. Yes.  That's what it appears.

13     **Q. Palo Alto Networks is in Santa Clara,**

14 **California, right?**

15     A. Probably, based on the name, it's somewhere in

16 California.  Wherever Palo Alto is.

17     **Q. I think it even says at the very bottom, their**

18 **address, Santa Clara, California, of the email.**

19         **What is the nature of your partnership with**

20 **Palo Alto Networks?**

21     A. That's a good question.  I don't remember, to

22 be honest with you.

23     **Q. Is it in relation to the Helios technology?**

24     A. It would be.  I don't remember what their

25 interest was.

Kipling C.S. Warner                                              Cohesity, Inc. vs.
                                                           Cartesian Theatre Corp.

```
 1          Q. Did you activate your account with Palo Alto
 2   Networks with this email?
 3          A. Yes.
 4          Q. You also mentioned IBM.  Let's bring up
 5   CT 36 -- CT100367.  We can mark that as Exhibit 23 --
 6   24.
 7              (Deposition Exhibit No. 24 was marked for
 8                 identification.)
 9              MR. SHUSTER:  Exhibit -- okay.
10              THE WITNESS:  Okay.  Go ahead.
11   BY MS. RAIMER:
12          Q. Do you recognize this document?
13          A. I do.
14          Q. And what is it?
15          A. It's an NDA between CT and IBM.
16          Q. And this agreement was in December 2019; is
17   that right?
18          A. That's what it appears.
19          Q. I'm going to bring up CT100467, which we can
20   mark as Exhibit 25.
21              (Deposition Exhibit No. 25 was marked for
22                 identification.)
23              THE WITNESS:  Okay.  Go ahead.
24   BY MS. RAIMER:
25          Q. Do you recognize this email?
```

Page 121

```
 1          A. Yes.

 2          Q. And this is an email regarding the IBM startups

 3     program from April 2024; is that right?

 4          A. Yes.

 5          Q. So is this a different type of partnership with

 6     IBM than the previous agreement that we looked at?

 7          A. Yes.

 8          Q. What is the nature of the partnership with

 9     respect to the startups program?

10     ███████████████████████████████████████████████

11     ████████████████████████████████████████████████

12     ████████████████████████████████████████████████

13     ████████████████████████████████████████████████

14     ██████████████████████████████████████████████

15     ███████████████████████

16     █████████████████████████████████████

17     ███████████████████████████████████████

18     ████████████████████████████████████████████

19     ██████████

20          THE WITNESS:  Megan, can you help us?

21          MS. RAIMER:  Let's look at CT100390.

22          MS. MCKEOWN:  That's Exhibit 26.

23          (Deposition Exhibit No. 26 was marked for

24            identification.)

25          THE WITNESS:  No.  That's not it.
```

```
 1   BY MS. RAIMER:

 2         Q. Do you recognize this document?

 3         A. Yes.

 4         Q. So this is an IBM agreement for cloud for

 5   enablement and co-creation; is that correct?

 6         A. Yes.

 7         Q. And what's the nature of this agreement with

 8   IBM, between CT and IBM?

 9         A. I don't know.  I haven't read it in a long

10   time.

11         Q. Has IBM ever shipped hardware to CT for Helios

12   use?

13         A. Yes.

14         Q. And why did they ship hardware to CT?

15         A. As I said, if you could pull up the letter from

16   22nd of June 2020, that answers the question you had

17   before this one as well, the nature of the relationship

18   between the two businesses.

19         Q. We'll look for that.  But just from your

20   recollection, what is the nature -- or what is the

21   reason that they shipped CT hardware?

22   ███████████████████████████████████████████████

23   ███████████████████████████████████████████████

24   ███████████████████████████

25         Q. I think the letter you're talking about is at
```

Highly Confidential

```
 1   CT122189.

 2            So we can mark this document as Exhibit 27.

 3            (Deposition Exhibit No. 27 was marked for

 4              identification.)

 5   BY MS. RAIMER:

 6        Q. Is this the letter you're referencing?

 7        A. Just a moment.  We're still loading.

 8           Yes.

 9        Q. ████████████████████████████████████████

10   ███████████████████████████████████████████████████

11        A. Yes.

12        Q. And it's dated June 22nd, 2020?

13        A. Yes.

14        Q. Why was this letter written to CT?

15           ██████████████████████████████████

16   ███████████████████████████████████████████████████

17   ██████████████████████████████████████████████

18   ███████████████████████████████████████████████████

19   ████████████████████████████████████

20   ██████████████████████████████████████████

21   ████████████████████████████████████████████████

22   ██████████████████████

23   █████████████████████████████████████████

24   ██████████████████

25   ████████████████
```

Highly Confidential

**Kipling C.S. Warner**



22    Q. What does it mean for CT's technology -- for

23 Helios to be OpenPOWER ready?

24    A. OpenPOWER Foundation was created originally by

25 IBM to promote their products and services that run on

1    sound right?

2         A. Yes.

3         Q. And you knew Ms. Kiedrowski was a U.S. lawyer

4    when you sent your email to her; is that right?

5         A. I don't know that I knew that.  I just saw that

6    she was listed as a contact in the Canadian application.

7         Q. You were aware that Cohesity was located in

8    California when you reached out to Cohesity's counsel,

9    correct?

10        A. Yes.

11        Q. Do you recall holding a telephone call with

12   Cohesity's counsel in September 2024?

13        A. I don't remember the exact date, but it was

14   sometime in 2024, late 2024.

15        Q. Do you recall during a phone call with

16   Cohesity's counsel claiming to have ready-to-file

17   affidavits and documents to support the first use dates

18   that CT asserted in its U.S. trademark application for

19   Helios?

20        A. No, I didn't say that.  What I said was I have

21   documents that we could use to prove prior use.  You

22   can't have an affidavit without a proceeding, which

23   didn't exist at that point in time.

24        Q. Do you recall during your phone call that you

25   advised that Cohesity is infringing CT's rights in

 1  by Cohesity's counsel, I'm referring to both Monique

 2  Couture and Carrie Kiedrowski.  So you have not had a

 3  phone call with either of them?

 4       A. I've never had a phone call with them.  I don't

 5  know if my counsel has.

 6       Q. You're aware that Cohesity doesn't have a

 7  separate Canadian company in Canada, right?

 8       A. It did.

 9       Q. What company is that?

10       A. One moment.

11       Q. Actually, let me ask a different question.

12          You're aware that Cohesity, Inc., the U.S.

13  company, has employees located in Canada, right?

14       A. Just a moment, please.

15       Q. I can withdraw the other question.  I don't

16  want you to waste time on it.

17          You're aware that Cohesity, Inc., the U.S.

18  company, has employees located in Canada, right?

19       A. I don't keep track of where all their employees

20  are.

21       Q. You've heard of Cohesity's DataProtect

22  offering, right?

23       A. Yes.

24       Q. And you are aware that Cohesity's DataProtect

25  offering is integrated with Cohesity's Helios offering?

Kipling C.S. Warner

Cohesity, Inc. vs.
Cartesian Theatre Corp.

```
 1          A. I think it's the other way around.

 2          Q. But you're aware that DataProtect has a

 3     relationship with the Helios of Cohesity?

 4          A. Yes.

 5          Q. Do you recall emailing Cohesity's employer --

 6     employees in September of 2024 regarding the adoption of

 7     Cohesity's DataProtect platform in Canada?

 8          A. Yes.

 9          Q. You emailed 13 Cohesity employees on

10     September 3rd, 2024, regarding the adoption of

11     Cohesity's DataProtect platform in Canada, right?

12          A. Yes.  I don't remember where they are

13     physically located, but I do recall emailing them.

14          Q. Okay.  Megan will put into the chat

15     COHESITY_000012 to 24, which we can mark as

16     Exhibit 30 -- 31.  I'm just going to be behind all day.

17              (Deposition Exhibit No. 31 was marked for

18                 identification.)

19              THE WITNESS:  Okay.  Go ahead.

20     BY MS. RAIMER:

21          Q. Do you recognize these emails?

22          A. Yes.

23          Q. Are these emails that you sent to Cohesity's

24     employees?

25          A. Yes.  I'm just looking at the first page, but
```

Highly Confidential

Kipling C.S. Warner                                    Cohesity, Inc. vs.
                                              Cartesian Theatre Corp.

1  if this is a bundle of the similar correspondence with

2  Cohesity, yes, these are all sent.

3      **Q. Why did you email each of these Cohesity**

4  **employees on September 3rd, 2024?**

5      A. I wanted to better understand the usage of the

6  product, which I take the position is infringing on my

7  mark in Canada.

8      **Q. Were you making sales-related product inquiries**

9  **to Cohesity?**

10      A. Well, I wasn't interested in purchasing or

11  licensing their product.  I was more interested in the

12  harm it might be causing to my own.

13      **Q. Did you receive any responses to these emails?**

14      A. I don't think so.  I'm pretty sure I didn't.

15      **Q. How many trips have you taken to the United**

16  **States?**

17      A. Trips?

18      **Q. Yes, trips from Canada.**

19      A. I haven't counted.  But most of my travel to

20  the United States has been when I was a teenager and

21  just over the border into Washington State.

22      **Q. Would you say more than 10 times?**

23      A. Yes.

24      **Q. More than 20 times?**

25      A. Yes.

1        Q. More than 30 times?

2        A. Yes.

3        Q. More than 50 times?

4        A. However often a churchgoer frequents, which

5    would be, at most, once a week to Unitarian Church in

6    Blaine.

7        Q. Okay.  Aside from the churchgoing, would you

8    say more than 30 times?

9        A. I don't know.

10       Q. When was your last trip to the United States?

11   That was the one that was 10 years ago that we discussed

12   earlier?

13       A. I don't remember, but it would have been a long

14   time ago.

15       Q. You mentioned driving over the border.  Have

16   you also flown into the United States before?

17       A. Yes.

18       Q. How many times would you have taken a flight

19   into the United States?

20       A. I don't know.  I had family that lived down

21   there a long time ago.  But they live in Point Roberts,

22   which is -- you won't know this, but it's a small island

23   just off -- tangential to British Columbia.  You don't

24   need to fly.  You just drive over.

25       Q. Sounds lovely.

1          Do you think you would have been on more than

2    10 flights to the United States from Canada?

3         A. I haven't been counting.  It's certainly less

4    than a hundred, though.

5         Q. Do you have any plans to fly to the United

6    States?

7         A. No.

8         Q. Have you ever been denied entry into the United

9    States?

10        A. Yes.

11        Q. When were you denied entry into the United

12   States?

13        A. Probably early 2000s.

14        Q. What was the basis for that denial?

15        A. I was on my way to help my uncle build some

16   furniture, Ikea furniture at his office in Point

17   Roberts.  The customs official, American of course, was

18   satisfied that I would be taking an American's job by

19   volunteering my afternoon to assemble the Ikea

20   furniture, and I was denied entry into your country.

21        Q. Have you ever been denied entry in an airport?

22        A. I'm sorry?

23        Q. Have you ever been denied entry into the U.S.

24   at an airport?

25        A. No.

Kipling C.S. Warner                                  Cohesity, Inc. vs.
                                              Cartesian Theatre Corp.

1         Q. When was the last time you applied for a visa

2     to enter the United States?

3         A. I don't remember, but when I did, it was at the

4     airport.

5         Q. Have you ever been denied a visa into the

6     United States?

7         A. Not through the airport.

8         Q. You have not made any attempt to apply for a

9     visa of any kind to the United States in connection with

10    this case, right?

11        A. No.

12        Q. You have received no indication from the U.S.

13    government that any visa application would be denied,

14    correct?

15        A. No.  That's not correct.

16        Q. What -- has the U.S. government sent you a

17    letter that advised a visa application would be denied?

18        A. It has not sent me personally a letter.

19        Q. Have you ever been asked by a U.S. Customs and

20    Border Protection officer about your cannabis use?

21        A. Yes.

22        Q. When did that occur?

23        A. Whenever it was the last time I tried to go

24    over the border many years ago, whenever that was.

25        Q. Have you ever been asked about your cannabis

1  use by a U.S. Customs and Border Protection officer at

2  the airport?

3       A. I don't remember, but I think it is commonplace

4  that they ask that through all points of entry.

5       Q. Why do you think that's commonplace?

6       A. Because the United States is very strict on its

7  drug policy.

8       Q. Are you aware that cannabis is legal in

9  California for adult recreational use and medical use?

10      MR. SHUSTER:  Objection.  Misstates the law.

11 BY MS. RAIMER:

12      Q. Are you aware that you can purchase cannabis

13 legally in California?

14      A. I haven't tried to purchase cannabis in the

15 state of California, so I wouldn't know.

16      Q. Has U.S. Customs and Border Protection ever

17 racially profiled you when you were applying to enter

18 the United States?

19      A. How would I know?

20      Q. Are you aware of whether U.S. Customs and

21 Border Protection has ever racially profiled you when

22 you were applying to enter the United States?

23      A. No, I'm not aware that they did.

24      Q. What Canadian government officials would you

25 coordinate with before filing an infringement suit in

Case 4:24-cv-09104-JST    Document 48-2    Filed 09/15/25    Page 83 of 182

Highly Confidential
Kipling C.S. Warner                                        Cohesity, Inc. vs.
                                                    Cartesian Theatre Corp.

1    the U.S. against Cohesity?

2        A. I would have to think further about that.  But

3    there are a number.

4        **Q. You're not required, though, to ask permission**

5    **from Canadian government officials before filing suit**

6    **against a U.S. company in the U.S., correct?**

7        A. Correct.

8        **Q. You did not have to coordinate with any**

9    **government official in Canada before suing Cohesity in**

10   **Canada, correct?**

11       A. Correct.

12       **Q. If this case goes to trial, does CT intend to**

13   **ask the court to appear at trial by videoconference?**

14       A. I haven't thought about that.  I wasn't aware

15   that was even an option.

16       MS. RAIMER:  I'm going to -- I just want to

17   turn and talk about the infringement notices for a

18   little bit.  But I just want to make sure nobody needs a

19   break before I do so, and that way we can just keep the

20   infringement notices in one section.  I promise we're

21   getting toward the end here.

22       THE WITNESS:  If you want to send it to Gary,

23   and I'll run to the washroom, and we'll have it open

24   when I am back.  Does that sound good, five minutes?

25       MS. RAIMER:  Sure.  Sounds great.

1   it's saying that what you tried to do was take down

2   information that was available to consumers in the

3   United States.

4           But let's go ahead and turn to our Apple

5   takedown notices.

6       A. Sure.

7       Q. That's CT100106.

8           (Deposition Exhibit No. 37 was marked for

9             identification.)

10          MS. MCKEOWN:  (Inaudible.)

11          (Reporter interrupts for clarification of the

12            record.)

13  BY MS. RAIMER:

14      Q. Do you recall submitting a report to Apple in

15  October of 2024?

16      A. Yes.

17          MR. SHUSTER:  We don't have that document yet.

18  I mean, if you want him to just answer questions, that's

19  fine.  But I don't have an exhibit up.  It did just get

20  here, though.

21          MS. RAIMER:  We'll put up CT100106.

22          MS. MCKEOWN:  That's Exhibit 37.

23          MS. RAIMER:  We'll mark this one as Exhibit 37.

24  BY MS. RAIMER:

25      Q. Do you have this document up yet?

1        A. Yes.  Go ahead.

2        Q. Do you recognize this email?

3        A. Yes, I did.

4        Q. And did you send this email to

5    appstorenotices@apple.com?

6        A. Yes.

7        Q. And it looks like you cc'd some Cohesity email

8    addresses on here as well; is that right?

9        A. These were the same addresses that were already

10   copied when Apple sent out the email that I was

11   responding to, and they said that you need to copy the

12   opposing party.

13       Q. In Point Number 3 on CT100107, you note that:

14           "We have submitted approximately a thousand

15   takedown requests to various platforms regarding the

16   unauthorized usage of CT's marks."

17       A. Yes.

18       Q. Is that an accurate statement?

19       A. It's close to that.  It's around 98,

20   99 percent.  At the time that that email was sent, that

21   was exactly what it was.

22       Q. And then it says:

23           "Some of these have included Cohesity's various

24   publications which have since been removed."

25       A. That's correct.

1    Q. Is that right?

2    A. Yes.

3    Q. Which Cohesity publications were removed?

4    A. So Amazon, I don't know what, if anything, that

5  they did.  But Apple and Google both removed the Helios

6  application from their stores, but they did not

7  communicate to me that that was directly a result of

8  CT's complaints.  I believe Meta also took down

9  publications in direct response to CT's complaint that

10  they were directed towards the Canadian geographical

11  region.

12    Q. Do you know whether that resulted in the

13  publications coming down in the United States as well?

14    A. Sorry.  You're asking about which publication?

15  Or which publisher or platform?

16    Q. Cohesity's various publications which have

17  since been removed.  Were those removed in the United

18  States as well?

19    A. I don't know.  I know that Apple and Google

20  appear to have taken down your app outside of Canada as

21  well, but I had nothing to do with that.

22    Q. So you -- you do not know what resulted in the

23  app no longer being available on the Apple or Google

24  store, correct?

25    A. No.  They never gave me a straight answer.  But

1    "Where is the trademark registered?"  And it -- it asks

2    for that.

3            And I say, "Canada."

4        **Q. Let's bring up CT100264.**

5            MS. MCKEOWN:  44.

6            (Deposition Exhibit No. 44 was marked for

7              identification.)

8            THE WITNESS:  Okay.  Go ahead.  15th of

9    October, 2024.

10   BY MS. RAIMER:

11       **Q. Is this a response that you received from**

12   **Facebook?**

13       A. It appears to be, yes.

14       **Q. And in the response, it says:**

15           **"Thanks for contacting us.  We've reviewed your**

16   **report, and it's not clear that the reported content**

17   **infringes your trademark rights.  In particular, the**

18   **reported content doesn't appear to be directed at the**

19   **geographic locations where you claim trademark rights."**

20           **Is that right?**

21       A. That's not the whole email, but that's part of

22   it.

23       **Q. Right.**

24           **And then it lists some links.  And let's go**

25   **to --**

1        A. It says:

2            "We removed the content you reported for

3    violating Facebook's terms of service or Instagram's

4    terms of service.  We understand this action to resolve

5    your intellectual property issue."

6            And then it lists -- I guess it's eight posts

7    and ten photos that were removed.

8        **Q. And those are the ones on CT100268**

9    **through 100270; is that right?**

10       A. It's hard to read the Bates number.  It's very

11   small.  But it's in that email, that same document.

12       **Q. And these links that Facebook removed in**

13   **response to the reports, they related to Cohesity's**

14   **Helios; is that right?**

15       A. Yes.

16       **Q. Facebook is headquartered in California, right?**

17       A. I don't know where they are headquartered, but

18   that wouldn't surprise me.  I think the company isn't

19   Facebook.  I think it's Meta now.

20       **Q. CT knew that the removal of Helios' photos and**

21   **content on Facebook as a result of these infringement**

22   **reports would cause harm to Cohesity in California;**

23   **isn't that right?**

24       A. I can't speculate, but I didn't ask them to

25   remove publications directed towards the United States.

1  I asked them to remove publications directed towards the

2  Canadian geographical region.

3       **Q. And do you know whether that's possible for**

4  **Facebook to do that?**

5       A. It's not my responsibility to know that.  I

6  don't.

7       **Q. Did you also file a takedown report with**

8  **Instagram?**

9       A. I don't remember.  If I did, I would have

10  produced that to you.

11       **Q. Let's look at CT100326.**

12            MR. SHUSTER:  We're up to Exhibit 45?

13            MS. MCKEOWN:  That's correct.

14            MS. RAIMER:  So we'll mark this one as

15  Exhibit 45.

16            (Deposition Exhibit No. 45 was marked for

17               identification.)

18            MS. MCKEOWN:  And just for the record,

19  Exhibit 44 was CT100264.

20            THE WITNESS:  Okay.  Go ahead.

21  BY MS. RAIMER:

22       **Q. Do you recognize this trademark report form?**

23       A. I don't see a trademark report form.  It's an

24  email.  But this subject is "Trademark report form."

25  And then there's an identifying unique number.

Highly Confidential

Kipling C.S. Warner                                    Cohesity, Inc. vs.
                                                   Cartesian Theatre Corp.

1        Q. And is this email to you?

2        A. Yes.

3        Q. And from Instagram?

4        A. Yes, which is Meta, I believe.

5        Q. And it also notes that:

6            "It's not clear that the reported content

7    infringes your trademark rights, and the reported

8    content doesn't appear to be directed at the geographic

9    locations where you claim trademark rights."

10           Is that right?

11       A. That's what it says.  I think it's a form

12   letter from a bot.

13       Q. Instagram is headquartered in California; isn't

14   that right?

15       A. I don't know.  I don't know that Instagram is a

16   company.  Isn't it owned by Meta?  It's a brand of Meta?

17       Q. Is Meta headquartered in California?

18       A. Probably.

19       Q. Did you also file a takedown report with

20   Twitter or X, formerly known as Twitter?

21       A. Yes.  I don't know who owns that, or I think it

22   is its own company.

23       Q. At the time of your report, X was also located

24   in California, right?

25       A. I don't know.  Probably.

Kipling C.S. Warner

Cohesity, Inc. vs.
Cartesian Theatre Corp.

1      Q. Did you also submit a trademark complaint to

2  YouTube?

3      A. I think so.

4      Q. Do you recall whether that trademark complaint

5  was successful?

6      A. I don't.  I figured that, because I was dealing

7  with a lot of bots, the best process would be to just

8  get a court order in Canada, which is what I'm doing.

9      Q. YouTube is also headquartered in California,

10  right?

11      A. I think they are owned by Google, which is the

12  Alphabet company, and I think they are headquartered in

13  California.

14      Q. So other than the infringement reports we

15  talked about -- Apple, Amazon, Google, Facebook, GitHub,

16  Instagram, YouTube -- do you recall any other

17  infringement reports or takedown notices that you issued

18  to U.S. service providers?

19      A. I don't recall.

20      MR. SHUSTER:  Objection.  It's a little bit

21  late, but it's vague and ambiguous.  You're talking

22  about reports about Cohesity, right?

23      MS. RAIMER:  Yes.  About Cohesity's Helios

24  specifically.

25      A. Yes.  I think we've gone over most, if not all,

Kipling C.S. Warner

 1  Helios software --

 2         THE WITNESS:  I've never -- but I don't deny

 3  communicating with lots of people in this case.  That

 4  particular name doesn't ring a bell.  But if we put that

 5  in the privileged log, then it's probably someone by

 6  that name.  I don't know if that's the same person,

 7  though, that you're referring to.  Did you check the

 8  email address?  Or I don't remember if there were names

 9  or email addresses in there or what.

10         MS. RAIMER:  I believe they were just names, so

11  we can send that information to Mr. Shuster.

12         MR. SHUSTER:  Yeah, we'll get to the bottom of

13  it.

14         THE WITNESS:  All right.

15  BY MS. RAIMER:

16     **Q. I think that you have noted during our**

17  **deposition that CT does not currently have U.S.**

18  **customers.  I don't want to misstate; is that correct?**

19     A. That's correct.

20     **Q. Has CT had any U.S. customers in 2025 at all?**

21     A. No.  I don't think so.

22     **Q. Did CT have any U.S. customers in 2024?**

23     A. I don't remember.  I'm not just saying that.

24  It's just I have to wear 20, 30 different hats as a

25  founder, and sometimes in that trade shows, sometimes in

1   writing emails, and I don't remember the current state

2   of things for every single administrative task that I

3   did specifically when it was done.

4         Q. Do you have the ability to pull information on

5   U.S. customers?

6         A. It's not consolidated in one place.  As with a

7   lot of other records, the documents that we produced

8   were quite onerous and labor intensive to compile, and

9   anything beyond that would be probably quite demanding

10  on me because I don't have someone to delegate to.

11        Q. Are you aware of any customer names other than

12  ████████████████████ located in the United States for

13  Helios?

14        A. Not off the top of my head, no.  You're talking

15  about customers who have actually licensed Helios?

16        Q. Yes, actually licensed Helios.

17        A. Yes, off the top of my head, no.  And that's

18  because the United States is not really a primary focus

19  for me.  I have various partnerships down there.  That's

20  just because that's where they are located, but that's

21  not really the industry I am courting for my customer

22  base at this time.

23        Q. Are you aware of any licenses other than that

24  with ████████████████ with U.S. consumers for Helios?

25        A. No, not off the top of my head.  It's not to

 1  say there weren't any.  I just don't remember them.

 2      **Q. Does CT plan to counterclaim against Cohesity**

 3  **for trademark infringement once its trademark**

 4  **registration issues --**

 5          MR. SHUSTER:  Objection --

 6  BY MS. RAIMER:

 7      **Q. -- in the United States?**

 8          MR. SHUSTER:  Objection.  Calls for

 9  attorney-client privileged communications.

10          So don't repeat anything we discussed.  If

11  there's not privileged material, you can testify to it,

12  but things from our discussions, don't, or your

13  discussions with Polina.

14      A. So I don't have anything else to add, Anna.  I

15  think he answered that.

16          MS. RAIMER:  Okay.  I think that's all the

17  questions I have.

18          Do you want to do any redirect, Mr. Shuster?

19          MR. SHUSTER:  No.  You know, I think it's late

20  enough there, and the record is, you know, hopefully

21  clear enough that I'll take a pass.

22          THE WITNESS:  There's no smoking gun.

23          THE REPORTER:  And then can I get your order on

24  the record, Mr. Shuster?  Do you want a copy?

25          MR. SHUSTER:  The client has to be sent a copy

Highly Confidential

Kipling C.S. Warner                                         Cohesity, Inc. vs.
                                                    Cartesian Theatre Corp.

1          I, the undersigned, a Certified Shorthand

2   Reporter of the State of California, do hereby certify:

3          That the foregoing proceedings were taken

4   before me at the time and place herein set forth; that

5   any witnesses in the foregoing proceedings, prior to

6   testifying, were duly sworn; that a record of the

7   proceedings was made by me using machine shorthand,

8   which was thereafter transcribed by me; that the

9   foregoing is a true record of the testimony given.

10         Further, that if the foregoing pertains to

11  the original transcript of a deposition in a federal

12  case, before completion of the proceedings, review of

13  the transcript [X] was [ ] was not requested.

14         I further certify I am neither financially

15  interested in the action nor a relative or employee of

16  any attorney or party to this action.

17         IN WITNESS WHEREOF, I have this date

18  subscribed my name.

19

20

21  Dated:  August 28, 2025

22

23

24  _____

    Layli Phillips
25  RPR, CRR, CSR No. 14402

# EXHIBIT D



**Exhibit 36**

Warner, K.

08/28/25

optus.



**DLA Piper LLP (US)**
500 Eighth Street, NW
Washington, DC 20004
www.dlapiper.com

J. Kevin Fee
Kevin.Fee@us.dlapiper.com
T  202.799.4441
F  202.799.5441

October 14, 2024

*VIA E-MAIL*

Kip Warner
Cartesian Theatre Corp.
108 - 2115 Cypress Street
Vancouver, BC V6J 3M3, Canada

**Re:    The HELIOS Trademark**

Dear Mr. Warner:

I write on behalf of Amazon Web Services ("AWS") in response to your October 7, 2024 email on behalf of Cartesian Theatre Corp. ("CT") directed to Monica Podgorny. Please direct all future communications regarding this matter to my attention.

In your email, you allege that Cohesity's use of HELIOS in connection with data management as a service infringes CT's Canadian trademark in HELIOS for music analysis software and related services. AWS takes trademark infringement claims such as CT's claim seriously, and it values its relationships with CT and Cohesity.

After reviewing your email, it is apparent that CT's complaint regarding Cohesity's adoption of the HELIOS trademark is properly directed to Cohesity—not AWS. AWS did not play any role in Cohesity's decision to adopt the HELIOS trademark and does not have the ability to compel Cohesity to stop using the HELIOS trademark.

In any event, each of the allegedly infringing uses of the HELIOS trademark that you identified in your email targets consumers in the United States. As you presumably know, Cohesity has a United States trademark registration for HELIOS that covers, among other things, "software-as-a-service (SAAS) services featuring software for use in data management, data storage, data backup, data protection, data migration, data archival, [and] data analytics," *see* U.S. Reg. No. 7,095,707. That registration entitles Cohesity to a presumption that it has the "exclusive right to use the registered mark in [United States] commerce on or in connection with the goods or services specified in the certificate," 15 U.S.C. § 1057(b), and each of the uses identified in your email involves those services.

We also understand that CT sued Cohesity for infringement of CT's Canadian trademark rights in the Federal Court of Canada and that the litigation in Canada is ongoing. Please let me know when that litigation is resolved, and AWS will take appropriate action, if necessary.

CT_100033



October 14, 2024
Page Two


AWS sincerely hopes that CT and Cohesity are able to quickly and efficiently resolve their dispute regarding the HELIOS trademarks, and it looks forward to continuing to work with both of you in the future.

Sincerely,

J. Kevin Fee

CT_100034

# EXHIBIT E

**Exhibit 45**

**Warner, K.**
08/28/25
aptus.

# Trademark Report Form #1594408984810031

**Date:** Tue, 15 Oct 2024 08:10:10 -0700

**To:** kip@heliosmusic.io

**X-Priority:** 3

**X-Mailer:** ZuckMail [version 1.00]

**From:** Instagram <case++aazr5tnxhba2w7@support.instagram.com>

**Reply-To:** Instagram <case++aazr5tnxhba2w7@support.instagram.com>

Hi,


Thanks for contacting us. We've reviewed your report, and it's not clear that the reported content infringes your trademark rights. In particular, the reported content doesn't appear to be directed at the geographic location(s) where you claim trademark rights. For this reason, we're unable to act on your report.

If you have trademark rights in the sa

CT_100326

geographic location as the reported content, you may reply to this message with that information, and we'll continue to look into your report.

To learn more about intellectual property, please visit the Intellectual Property section of the Help Center: https://www.facebook.com/help/intellectual_property?ref=cr

Thanks,

Conor
Instagram

# EXHIBIT F

**Exhibit 3**

Warner, K.
08/28/25
aptus.

PTO- 1478
Approved for use through 10/31/2024. OMB 0851-0009
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number

# Trademark/Service Mark Application, Principal Register

**Serial Number: 98724373**
**Filing Date: 08/29/2024**

## The table below presents the data as entered.

| Input Field | Entered |
|---|---|
| **SERIAL NUMBER** | 98724373 |
| **MARK INFORMATION** | |
| *MARK | HELIOS |
| **STANDARD CHARACTERS** | YES |
| **USPTO-GENERATED IMAGE** | YES |
| **LITERAL ELEMENT** | HELIOS |
| **MARK STATEMENT** | The mark consists of standard characters, without claim to any particular font style, size, or color. |
| **REGISTER** | Principal |
| **APPLICANT INFORMATION** | |
| *OWNER OF MARK | Cartesian Theatre Corp. |
| *MAILING ADDRESS | 108 - 2115 Cypress St. |
| *CITY | Vancouver |
| *COUNTRY/REGION/JURISDICTION/U.S. TERRITORY | Canada |
| *ZIP/POSTAL CODE (Required for U.S. and certain international addresses) | V6J3M3 |
| *EMAIL ADDRESS | XXXX |
| **LEGAL ENTITY INFORMATION** | |
| TYPE | corporation |
| STATE/COUNTRY/REGION/JURISDICTION/U.S. TERRITORY OF INCORPORATION | Canada |
| **GOODS AND/OR SERVICES AND BASIS INFORMATION** | |
| INTERNATIONAL CLASS | 009 |
| *IDENTIFICATION | Downloadable computer software and databases for use in analyzing music |
| FILING BASIS | SECTION 1(a) |
| FIRST USE ANYWHERE DATE | At least as early as 03/25/2016 |
| FIRST USE IN COMMERCE DATE | At least as early as 03/25/2016 |
| SPECIMEN FILE NAME(S) | |
| JPG FILE(S) | \\TICRS\EXPORT18\IMAGEOUT 18\987\243\98724373\xml1 \ APP0006.JPG |
| | SPE0-7420466100-202408291 44704486168_._Class_9_Spe |

COHESITY_000600

| | |
|---|---|
| ORIGINAL PDF FILE | cimen.pdf |
| CONVERTED PDF FILE(S) (3 pages) | \\TICRS\EXPORT18\IMAGEOUT 18\987\243\98724373\xml1\ APP0003.JPG |
| | \\TICRS\EXPORT18\IMAGEOUT 18\987\243\98724373\xml1\ APP0004.JPG |
| | \\TICRS\EXPORT18\IMAGEOUT 18\987\243\98724373\xml1\ APP0005.JPG |
| SPECIMEN DESCRIPTION | Printout and screenshot of website showing use of the mark in connection with the goods |
| WEBPAGE URL | https://heliosmusic.io/pages/download/ |
| WEBPAGE DATE OF ACCESS | 08/29/2024 |
| INTERNATIONAL CLASS | 042 |
| *IDENTIFICATION | Software as a service (SaaS) services featuring computer software for music analysis and management; advisory services in the field of music software development |
| FILING BASIS | SECTION 1(a) |
| FIRST USE ANYWHERE DATE | At least as early as 11/29/2021 |
| FIRST USE IN COMMERCE DATE | At least as early as 11/29/2021 |
| SPECIMEN FILE NAME(S) | \\TICRS\EXPORT18\IMAGEOUT 18\987\243\98724373\xml1 \ APP0007.JPG |
| | \\TICRS\EXPORT18\IMAGEOUT 18\987\243\98724373\xml1 \ APP0008.JPG |
| SPECIMEN DESCRIPTION | Screenshots of website showing use of the mark in connection with the services |
| WEBPAGE URL | https://demo.heliosmusic.io |
| WEBPAGE DATE OF ACCESS | 08/29/2024 |
| ATTORNEY INFORMATION | |
| NAME | Jessica S. Sachs |
| ATTORNEY DOCKET NUMBER | 19143M-2-2 |
| ATTORNEY BAR MEMBERSHIP NUMBER | XXX |
| YEAR OF ADMISSION | XXXX |
| U.S. STATE/ COMMONWEALTH/ TERRITORY | XX |
| FIRM NAME | Harness, Dickey & Pierce, PLC |
| STREET | 5445 Corporate Drive, Suite 200 |
| CITY | Troy |
| STATE | Michigan |
| COUNTRY/REGION/JURISDICTION/U.S. TERRITORY | United States |
| ZIP/POSTAL CODE | 48098 |
| PHONE | 248-641-1600 |
| EMAIL ADDRESS | troymailroom@harnessip.com |
| | Bryant E. Wade and all other attorneys associated with |

COHESITY_000601

| OTHER APPOINTED ATTORNEY | Harness, Dickey & Pierce, PLC |
|---|---|
| **DOMESTIC REPRESENTATIVE INFORMATION** | |
| NAME | Jessica S. Sachs |
| FIRM NAME | Harness, Dickey & Pierce, PLC |
| STREET | 5445 Corporate Drive, Suite 200 |
| CITY | Troy |
| STATE | Michigan |
| COUNTRY/REGION/JURISDICTION/U.S. TERRITORY | United States |
| ZIP CODE | 48098 |
| PHONE | 248-641-1600 |
| EMAIL ADDRESS | troymailroom@harnessip.com |
| **CORRESPONDENCE INFORMATION** | |
| NAME | Jessica S. Sachs |
| PRIMARY EMAIL ADDRESS FOR CORRESPONDENCE | troymailroom@harnessip.com |
| SECONDARY EMAIL ADDRESS(ES) (COURTESY COPIES) | jsachs@harnessip.com; hrowe@harnessip.com; agrubb@harnessip.com |
| **FEE INFORMATION** | |
| APPLICATION FILING OPTION | TEAS Standard |
| NUMBER OF CLASSES | 2 |
| APPLICATION FOR REGISTRATION PER CLASS | 350 |
| *TOTAL FEES DUE | 700 |
| *TOTAL FEES PAID | 700 |
| **SIGNATURE INFORMATION** | |
| SIGNATURE | /JSS/ |
| SIGNATORY'S NAME | Jessica S. Sachs |
| SIGNATORY'S POSITION | Attorney for Applicant, Michigan Bar Member, Attorney at Harness, Dickey & Pierce, PLC |
| SIGNATORY'S PHONE NUMBER | 248-641-1600 |
| DATE SIGNED | 08/29/2024 |
| SIGNATURE METHOD | Sent to third party for signature |

COHESITY_000602

PTO- 1478
Approved for use through 10/31/2024. OMB 0651-0009
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number

## Trademark/Service Mark Application, Principal Register

**Serial Number: 98724373**
**Filing Date: 08/29/2024**

### To the Commissioner for Trademarks:

**MARK:** HELIOS (Standard Characters, see mark)
The literal element of the mark consists of HELIOS. The mark consists of standard characters, without claim to any particular font style, size, or color.
The applicant, Cartesian Theatre Corp., a corporation of Canada, having an address of

   108 - 2115 Cypress St.
   Vancouver V6J3M3
   Canada
   XXXX

requests registration of the trademark/service mark identified above in the United States Patent and Trademark Office on the Principal Register established by the Act of July 5, 1946 (15 U.S.C. Section 1051 et seq.), as amended, for the following:

International Class 009:  Downloadable computer software and databases for use in analyzing music

In International Class 009, the mark was first used by the applicant or the applicant's related company or licensee or predecessor in interest at least as early as 03/25/2016, and first used in commerce at least as early as 03/25/2016, and is now in use in such commerce. The applicant is submitting one(or more) specimen(s) showing the mark as used in commerce on or in connection with any item in the class of listed goods/services, consisting of a(n) Printout and screenshot of website showing use of the mark in connection with the goods.
**JPG file(s):**
Specimen File1
**Original PDF file:**
SPE0-7420466100-202408291 44704486168  .  Class_9_Spe cimen.pdf
**Converted PDF file(s)** (3 pages)
Specimen File1
Specimen File2
Specimen File3
Webpage URL: https://heliosmusic.io/pages/download/
Webpage Date of Access: 08/29/2024

International Class 042:  Software as a service (SaaS) services featuring computer software for music analysis and management; advisory services in the field of music software development

In International Class 042, the mark was first used by the applicant or the applicant's related company or licensee or predecessor in interest at least as early as 11/29/2021, and first used in commerce at least as early as 11/29/2021, and is now in use in such commerce. The applicant is submitting one(or more) specimen(s) showing the mark as used in commerce on or in connection with any item in the class of listed goods/services, consisting of a(n) Screenshots of website showing use of the mark in connection with the services.
Specimen File1
Specimen File2
Webpage URL: https://demo.heliosmusic.io
Webpage Date of Access: 08/29/2024

The owner's/holder's proposed attorney information: Jessica S. Sachs. Other appointed attorneys are Bryant E. Wade and all other attorneys associated with Harness, Dickey & Pierce, PLC. Jessica S. Sachs of Harness, Dickey & Pierce, PLC, is a member of the XX bar, admitted to the bar in XXXX, bar membership no. XXX, and the attorney(s) is located at

   5445 Corporate Drive, Suite 200
   Troy, Michigan 48098
   United States

COHESITY_000603

248-641-1600(phone)
troymailroom@harnessip.com

The docket/reference number is 19143M-2-2.

Jessica S. Sachs submitted the following statement: The attorney of record is an active member in good standing of the bar of the highest court of a U.S. state, the District of Columbia, or any U.S. Commonwealth or territory.

The applicant hereby appoints Jessica S. Sachs of Harness, Dickey & Pierce, PLC

5445 Corporate Drive, Suite 200
Troy Michigan 48098
United States
248-641-1600(phone)
troymailroom@harnessip.com

as applicant's representative upon whom notice or process in the proceedings affecting the mark may be served.

The applicant's current Correspondence Information:

Jessica S. Sachs
PRIMARY EMAIL FOR CORRESPONDENCE: troymailroom@harnessip.com
SECONDARY EMAIL ADDRESS(ES) (COURTESY COPIES): jsachs@harnessip.com; hrowe@harnessip.com; agrubb@harnessip.com

**Requirement for Email and Electronic Filing:** I understand that a valid email address must be maintained by the applicant owner/holder and the applicant owner's/holder's attorney, if appointed, and that all official trademark correspondence must be submitted via the Trademark Electronic Application System (TEAS).

A fee payment in the amount of $700 has been submitted with the application, representing payment for 2 class(es).

**Declaration**

☑ **Basis:**

**If the applicant is filing the application based on use in commerce under 15 U.S.C. § 1051(a):**

- The signatory believes that the applicant is the owner of the trademark/service mark sought to be registered;
- The mark is in use in commerce and was in use in commerce as of the filing date of the application on or in connection with the goods/services in the application;
- The specimen(s) shows the mark as used on or in connection with the goods/services in the application and was used on or in connection with the goods/services in the application as of the application filing date; and
- To the best of the signatory's knowledge and belief, the facts recited in the application are accurate.

**And/Or**

**If the applicant is filing the application based on an intent to use the mark in commerce under 15 U.S.C. § 1051(b), § 1126(d), and/or § 1126(e):**

- The signatory believes that the applicant is entitled to use the mark in commerce;
- The applicant has a bona fide intention to use the mark in commerce and had a bona fide intention to use the mark in commerce as of the application filing date on or in connection with the goods/services in the application; and
- To the best of the signatory's knowledge and belief, the facts recited in the application are accurate.

☑ To the best of the signatory's knowledge and belief, no other persons, except, if applicable, concurrent users, have the right to use the mark in commerce, either in the identical form or in such near resemblance as to be likely, when used on or in connection with the goods/services of such other persons, to cause confusion or mistake, or to deceive.

☑ To the best of the signatory's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, the allegations and other factual contentions made above have evidentiary support.

☑ The signatory being warned that willful false statements and the like are punishable by fine or imprisonment, or both, under 18 U.S.C. § 1001, and that such willful false statements and the like may jeopardize the validity of the application or submission or any registration resulting therefrom, declares that all statements made of his/her own knowledge are true and all statements made on information and belief are believed to be true.

**Declaration Signature**

Signature: /JSS/   Date: 08/29/2024
Signatory's Name: Jessica S. Sachs
Signatory's Position: Attorney for Applicant, Michigan Bar Member, Attorney at Harness, Dickey & Pierce, PLC

COHESITY_000604

Signatory's Phone Number: 248-641-1600
Signature method: Sent to third party for signature
Payment Sale Number: 98724373
Payment Accounting Date: 08/29/2024

Serial Number: 98724373
Internet Transmission Date: Thu Aug 29 15:31:53 ET 2024
TEAS Stamp: USPTO/BAS-XX.XXX.XX.XXX-2024082915315405
0123-98724373-87024438dde23d82fa6423d695
566823b9c918b2d6117e9167f21f3f03b9cd890-
DA-31538223-20240829152548295698

COHESITY_000605

# HELIOS

COHESITY_000606

# Download

## Helios Server

To obtain either an on-premise or hosted Helios server,  please contact sales (mailto:sales@heliosmusic.io).

Installation with default out of the box configuration usually takes under a minute to get up and running. Simply run the following on the installation target which has access to the server package repository:

```
$ sudo apt install helios
```

This will download, configure, and install the server as a normal system service.

## Helios Client Utilities

This is a set of command line utilities for interacting with a Helios server. You can use them to manage your music catalogue as well as perform similarity matches. They use the Helios Python SDK (https://github.com/cartesiantheatre/python-helios-client) and can be used as examples for developing your own applications that use the Helios REST API.

To install run the following on Ubuntu Mantic (23.10) or later:

COHESITY_000607

```
$ sudo add-apt-repository ppa:kip/helios-public
$ sudo apt install helios-client-utilities
```

The utilities are fully documented and each come with their own manual. Try running the following:

```
$ man helios
```

The module's source code is fully available (https://github.com/cartesiantheatre/python-helios-client) gratis under the terms of the GNU Lesser General Public License (LGPL) (https://www.gnu.org/licenses/lgpl-3.0.html) for use, study, redistribution, or modification within any commercial product.

# Helios Python SDK

A client side Helios software development kit (SDK) has already been prepared for you to enable rapidly integrating Helios into your own platform in the form of an easy to use pure Python module. It is pre-packaged for Ubuntu Hirsute (21.04) and later.

The purpose of the module is to provide an API to Python applications to communicate with a remote Helios server. In only a few lines of code you can manage your music catalogue and perform similarity matches.

To install it in seconds simply run the following:

```
$ sudo add-apt-repository ppa:kip/helios-public
$ sudo apt install python3-helios-client
```

To use the module, it's as simple as:

```
$ python3
>>> import helios
```

COHESITY_000608

```
>>> from pprint import pprint
>>> client = helios.client(host="your_server_hostname")
>>> status = client.get_server_status()
>>> pprint(status)
```

The module's source code is fully available (https://github.com/cartesiantheatre/python-helios-client) gratis under the terms of the GNU Lesser General Public License (LGPL) (https://www.gnu.org/licenses/lgpl-3.0.html) for use, study, redistribution, or modification within any commercial product.

# REST API Documentation

The Helios server sports a simple to use industry-standard REST API. You can find documentation available here (https://www.heliosmusic.io/api.html).

COPYRIGHT © 2015-2024 CARTESIAN THEATRE CORP., PATENT PROTECTED WITH ADDITIONAL PENDING.



(https://www.cartesiantheatre.com)

COHESITY_000609







COHESITY_000612

# EXHIBIT G



# EXHIBIT H

**FILED UNDER SEAL**

# EXHIBIT I

**Exhibit 31**

**Warner, K.**

08/28/25

aptus.

| | |
|---|---|
| **From:** | Kip Warner <kip@thevertigo.com> |
| **Sent time:** | 09/03/2024 02:44:47 PM |
| **To:** | Ali Kadavala <ali.kadavala@cohesity.com> |
| **Subject:** | Cohesity's DataProtect in Canada |
| **Attachments:** | signature.asc |

Hello Ali,

My name's Kip Warner and I run a Vancouver based ISV. I am writing you because I see that you are a Senior Sales Development Representative for Cohesity in Canada.

I am doing some quantitative research on the adoption of Cohesity's DataProtect platform in Canada. Do you know approximately how widely it is currently used in Canada?

Yours truly,

--
Kip Warner
OpenPGP signed/encrypted mail preferred
https://www.thevertigo.com

| | |
|---|---|
| **From:** | Kip Warner <kip@thevertigo.com> |
| **Sent time:** | 09/03/2024 02:48:03 PM |
| **To:** | Don Kaus <don.kaus@cohesity.com> |
| **Subject:** | Cohesity's DataProtect in Canada |
| **Attachments:** | signature.asc |

Hello Don,

My name's Kip Warner and I run a Vancouver based ISV. I am writing you because I see that you are a Senior Account Executive for Cohesity in Canada.

I am doing some quantitative research on the adoption of Cohesity's DataProtect platform in Canada. Do you know approximately how widely it is currently used in Canada?

Yours truly,

--
Kip Warner
OpenPGP signed/encrypted mail preferred
https://www.thevertigo.com

| From: | Kip Warner <kip@thevertigo.com> |
| Sent time: | 09/03/2024 02:51:42 PM |
| To: | Trevor Millious <trevor.millius@cohesity.com> |
| Subject: | Cohesity's DataProtect in Canada |
| Attachments: | signature.asc |

Hello Trevor,

My name's Kip Warner and I run a Vancouver based ISV. I am writing you because I see that you are a Senior Account Manager for Cohesity in Canada.

I am doing some quantitative research on the adoption of Cohesity's DataProtect platform in Canada. Do you know approximately how widely it is currently used in Canada?

Yours truly,

--
Kip Warner
OpenPGP signed/encrypted mail preferred
https://www.thevertigo.com

COHESITY_000014

| | |
|---|---|
| **From:** | Kip Warner <kip@thevertigo.com> |
| **Sent time:** | 09/03/2024 02:52:50 PM |
| **To:** | Robert Yelenich <robert.yelenich@cohesity.com> |
| **Subject:** | Cohesity's DataProtect in Canada |
| **Attachments:** | signature.asc |

Hello Robert,

My name's Kip Warner and I run a Vancouver based ISV. I am writing you because I see that you are a VP for Cohesity in Canada.

I am doing some quantitative research on the adoption of Cohesity's DataProtect platform in Canada. Do you know approximately how widely it is currently used in Canada?

Yours truly,

--
Kip Warner
OpenPGP signed/encrypted mail preferred
https://www.thevertigo.com

COHESITY_000015

| | |
|---|---|
| **From:** | Kip Warner <kip@thevertigo.com> |
| **Sent time:** | 09/03/2024 02:54:05 PM |
| **To:** | Bill Economopoulos <bill.economopoulos@cohesity.com> |
| **Subject:** | Cohesity's DataProtect in Canada |
| **Attachments:** | signature.asc |

Hello Bill,

My name's Kip Warner and I run a Vancouver based ISV. I am writing you because I see that you are a Senior Account Executive for Cohesity in Canada.

I am doing some quantitative research on the adoption of Cohesity's DataProtect platform in Canada. Do you know approximately how widely it is currently used in Canada?

Yours truly,

--
Kip Warner
OpenPGP signed/encrypted mail preferred
https://www.thevertigo.com

COHESITY_000016

| | |
|---|---|
| **From:** | Kip Warner <kip@thevertigo.com> |
| **Sent time:** | 09/03/2024 02:55:45 PM |
| **To:** | James Aitken <james.aitken@cohesity.com> |
| **Subject:** | Cohesity's DataProtect in Canada |
| **Attachments:** | signature.asc |

Hello James,

My name's Kip Warner and I run a Vancouver based ISV. I am writing you because I see that you are an Account Executive for Cohesity in Canada.

I am doing some quantitative research on the adoption of Cohesity's DataProtect platform in Canada. Do you know approximately how widely it is currently used in Canada?

Yours truly,

--
Kip Warner
OpenPGP signed/encrypted mail preferred
https://www.thevertigo.com

COHESITY_000017

| | |
|---|---|
| **From:** | Kip Warner <kip@thevertigo.com> |
| **Sent time:** | 09/03/2024 02:58:30 PM |
| **To:** | Eleonor Lee <eleonor.lee@cohesity.com> |
| **Subject:** | Cohesity's DataProtect in Canada |
| **Attachments:** | signature.asc |

Hello Eleonor,

My name's Kip Warner and I run a Vancouver based ISV. I am writing you because I see that you are a Senior Product Marketing Manager for Cohesity in Canada.

I am doing some quantitative research on the adoption of Cohesity's DataProtect platform in Canada. Do you know approximately how widely it is currently used in Canada?

Yours truly,

--
Kip Warner
OpenPGP signed/encrypted mail preferred
https://www.thevertigo.com

| | |
|---|---|
| **From:** | Kip Warner <kip@thevertigo.com> |
| **Sent time:** | 09/03/2024 02:59:14 PM |
| **To:** | Patrick King <patrick.king@cohesity.com> |
| **Subject:** | Cohesity's DataProtect in Canada |
| **Attachments:** | signature.asc |

Hello Patrick,

My name's Kip Warner and I run a Vancouver based ISV. I am writing you because I see that you are a Major Account Executive for Cohesity in Canada.

I am doing some quantitative research on the adoption of Cohesity's DataProtect platform in Canada. Do you know approximately how widely it is currently used in Canada?

Yours truly,

--
Kip Warner
OpenPGP signed/encrypted mail preferred
https://www.thevertigo.com

| | |
|---|---|
| **From:** | Kip Warner <kip@thevertigo.com> |
| **Sent time:** | 09/03/2024 03:02:42 PM |
| **To:** | Jonathon Mancini <jonathon.mancini@cohesity.com> |
| **Subject:** | Cohesity's DataProtect in Canada |
| **Attachments:** | signature.asc |

Hello Jonathan,

My name's Kip Warner and I run a Vancouver based ISV. I am writing you because I see that you are quoted by Cohesity in respect to services provided to the City of Hamilton:

  https://www.cohesity.com/solutions/technology-partners/hpe/

  https://www.cohesity.com/press/city-of-hamilton-realizes-massive-efficiencies-with-integrated-solution-from-cohesity-and-hpe/

I am doing some quantitative research on the adoption of Cohesity's DataProtect platform in Canada. Do you know approximately how widely it is currently used in Canada?

Yours truly,

--
Kip Warner
OpenPGP signed/encrypted mail preferred
https://www.thevertigo.com

COHESITY_000020

| | |
|---|---|
| **From:** | Kip Warner <kip@thevertigo.com> |
| **Sent time:** | 09/03/2024 03:04:30 PM |
| **To:** | Zain Lalani <zain.lalani@cohesity.com> |
| **Subject:** | Cohesity's DataProtect in Canada |
| **Attachments:** | signature.asc |

Hello Zain,

My name's Kip Warner and I run a Vancouver based ISV. I am writing you because I see that you are a Senior Customer Experience Manager for Cohesity in Canada.

I am doing some quantitative research on the adoption of Cohesity's DataProtect platform in Canada. Do you know approximately how widely it is currently used in Canada?

Yours truly,

--
Kip Warner
OpenPGP signed/encrypted mail preferred
https://www.thevertigo.com

| | |
|---|---|
| **From:** | Kip Warner <kip@thevertigo.com> |
| **Sent time:** | 09/03/2024 03:05:38 PM |
| **To:** | Frank Smolinger <frank.smolinger@cohesity.com> |
| **Subject:** | Cohesity's DataProtect in Canada |
| **Attachments:** | signature.asc |

Hello Frank,

My name's Kip Warner and I run a Vancouver based ISV. I am writing you because I see that you are the OEM Alliance Manager for Cohesity in Canada.

I am doing some quantitative research on the adoption of Cohesity's DataProtect platform in Canada. Do you know approximately how widely it is currently used in Canada?

Yours truly,

--
Kip Warner
OpenPGP signed/encrypted mail preferred
https://www.thevertigo.com

COHESITY_000022

| | |
|---|---|
| **From:** | Kip Warner <kip@thevertigo.com> |
| **Sent time:** | 09/03/2024 03:03:25 PM |
| **To:** | Ryan Clark <ryan.clark@cohesity.com> |
| **Subject:** | Cohesity's DataProtect in Canada |
| **Attachments:** | signature.asc |

Hello Ryan,

My name's Kip Warner and I run a Vancouver based ISV. I am writing you because I see that you are a Sales Engineering Leader for Cohesity in Canada.

I am doing some quantitative research on the adoption of Cohesity's DataProtect platform in Canada. Do you know approximately how widely it is currently used in Canada?

Yours truly,

--
Kip Warner
OpenPGP signed/encrypted mail preferred
https://www.thevertigo.com

COHESITY_000023

| From: | Kip Warner <kip@thevertigo.com> |
|---|---|
| Sent time: | 09/03/2024 03:28:31 PM |
| To: | Mike Whitfield <mwhitfield@cohesity.com> |
| Subject: | Cohesity DataProtect adoption in Canada |
| Attachments: | signature.asc |

Hello Michael,

My name is Kip Warner and I run a Vancouver based ISV. I tried your line just now at (604) 250-1718. I was referred to you this afternoon by CDW Canada who is partnered with Cohesity.

I am trying to perform some quantitative research on the adoption of Cohesity's DataProtect product in Canada. Do you know approximately how widely it is adopted in Canada and if there are any publicly available metrics?

Yours truly,

--
Kip Warner
OpenPGP signed/encrypted mail preferred
https://www.thevertigo.com

COHESITY_000024

# EXHIBIT J

**Exhibit 9**

Warner, K.

08/28/25

optus.

# Welcome to Intel® Partner Alliance

**Date:** Wed, 26 May 2021 17:10:30 +0000 (GMT) (*05/26/2021 10:10:30 AM*)

**From:** Intel Corporation-NoReply <wsm-postmaster@intel.com>

**To:** kip@thevertigo.com <kip@thevertigo.com>

**X-Priority:** 3

---

Welcome to Intel® Partner Alliance                                    intel

Kip,

Welcome! CARTESIAN THEATRE CORP. is now an Intel® Partner Alliance partner.

Start growing your business by taking advantage of program benefits, including:

- Intel customer support with global assistance for all technical, warranty and partner program issues
- Intel® Partner University online training and webinars with industry-leading curriculum
- A vast partner network and marketplace to collaborate on data-centric solutions
- Marketing made easy with customizable materials and sales tools

Log in to https://www.intel.com/libs/apps/intel/logout.json/deletesecuritytoken?target=https://partner.intel.com/s/post-launch-non-primary to view and manage your benefits.

Intel partners have a long history of innovation, and with Intel® Partner Alliance, we'll help you accelerate building solutions for the data centric economy. Together, we can connect, innovate, and grow, making extraordinary opportunities possible.

Visit https://www.intel.com/content/www/us/en/secure/partner-alliance/help/overview.html for more help on getting started.

Thank you,

Your Intel® Partner Alliance team

This message was sent to you as an important business communication related to your current relationship with Intel® Partner Alliance

© 2020 Intel Corporation

Intel Corporation, 2200 Mission College Blvd., M/S RNB4-145, Santa Clara, CA 95054 USA. www.intel.com

CT_100496

CT_100497

# EXHIBIT K

**FILED UNDER SEAL**

# EXHIBIT L

**Exhibit 11**
Warner, K.
08/28/25
aptus.





# EXHIBIT M

**Exhibit 12**

Warner, K.
08/28/25
optus.

# Approved: Your Helios® Solution

| | |
|---|---|
| **Date:** | Mon, 24 Mar 2025 06:13:20 +0000 (GMT) (*2025-03-23 11:13:20 PM*) |
| **From:** | Intel® Partner Alliance <intel-partner-alliance@intel.com> |
| **To:** | kip@thevertigo.com <kip@thevertigo.com> |
| **X-Priority:** | 3 |

## Congratulations, Your Solution is Approved

intel.

Hello,

Congratulations, your solution, Helios®, has been approved for:
Partner Solutions

If you are new to the Intel® Partner Showcase, you will receive a series of emails within 3 business days, guiding you through the onboarding process. If you do not receive information within the 3 business days, please contact programs@intel.com for assistance.

If you already have a storefront on the Intel® Partner Showcase, you will receive an email asking you to review your draft offering.

CT124396

If your solution qualifies for Intel® Partner Alliance Select Benefits, you will receive details on how to access these benefits.

We are thrilled your solution is part of Intel® Partner Showcase, we look forward to accelerating your solution together.

Sincerely,

Your Intel® Partner Alliance team

This email may be shared with others in your organization. You may see the full list of who the solution is shared with in the Solution Summary page.
[View Solution Summary](#)

If you have any questions, please contact us at [programs@intel.com](mailto:programs@intel.com).

For FAQs and helpful information, please visit [Intel® Partner Alliance Help](#).

This message was sent to you as an important business communication related to your current relationship with Intel® Partner Alliance.

© 2025 Intel Corporation
Intel Corporation, 2200 Mission College Blvd., M/S RNB4-145, Santa Clara, CA 95054 USA. [www.intel.com](http://www.intel.com)

[Privacy](#) | [Cookies](#)

CT124397

# EXHIBIT N

# Congratulations on Your Acceptance into NVIDIA Inception

**Exhibit 13**

Warner, K.

08/28/25

optus.

**Date:** Mon, 23 Nov 2020 18:50:56 +0000 (GMT) (*11/23/2020 10:50:56 AM*)
**From:** Alexander Martynau <amartynau@nvidia.com>
**To:** info@cartesiantheatre.com <info@cartesiantheatre.com>,
amartynau@nvidia.com <amartynau@nvidia.com>



## WELCOME TO NVIDIA INCEPTION

We are thrilled to welcome Cartesian Theatre into NVIDIA Inception! Congratulations on your acceptance into the premier program for AI and data science startups.

From this point forward, the NVIDIA Inception portal will be your home base to discover the latest Inception program benefits, news, and upcoming events.

**EXPLORE THE INCEPTION PORTAL**

## NVIDIA Developer Program

The Dev Program provides access to over 100K SDKs and performance tools, forums monitored by NVIDIA solutions architects, and members-only discounts and speaking opportunities.

CT_100516



LEARN MORE

## Maximize Your Benefits



On the last Tuesday of every month, we host a live webinar with an NVIDIA Inception Program Manager who will review your program benefits, show you how to redeem them, and answer any questions you may have about your membership.Watch our most recent webinar using password NVaiSTARTUPS

WELCOME WEBINAR



unsubscribe

# EXHIBIT O

Exhibit 5
Warner, K.
08/28/25
aptus.

# Helios Music

https://heliosmusic.io/

Helios is a powerful B2B technology to allow searching of large commercial music libraries by using music itself as the search key. There are many uses for Helios. Here are a few examples.

- You have a digital jukebox in bars, restaurants, and pubs. You want venue patrons to be able to play more music like whatever they just paid to hear.
- You have a music catalogue management platform that publishers and labels use to track their digital assets. Your customers want to be able to search within their own catalogue using your slick platform.
- You have an online digital music store and you'd like to be able to make intelligent product recommendations to your customers based on what songs they've already got in their shopping cart before they check out.
- You have a streaming music service whose DJs need inspiration for coming up with either channel based or custom curated playlists faster.
- You market software for DJs, such as plugins to manage their library. While they're playing live a plugin in their favourite software suggests some tracks to mix or play next.
- You have a commercial music library of any size. Perhaps you are a major record label, perhaps independent, or maybe you've amalgamated music from multiple labels, independent artists, or publishers. You need to assist your clients obtain synchronization licenses quickly for appropriate pieces of music for their film, TV, documentary, commercials, video games, or some other context.

There are countless other examples, but let's talk about this last one. Nearly always your client approaches you with samples already in hand. "Hey, do you have anything like this?" This could be an MP3 or a YouTube video URL. Because Helios allows you to search the catalogue using music itself as the search key, you could use the customer's samples directly to help them find what they're looking for.

Traditionally, in the absence of such technology, the way this has been done for decades may surprise many. It is both costly and involves many hours or even days of manual human labour which delays the business process. The business must manually search, usually using textual tags, and listen to a great deal of irrelevant music in the hopes of finding the one the client is actually willing to spend money on.

**Vendor :** Cartesian Theatre

**Criteria Version :** 2

**Date Added :** 26 September 2019

**Tags**

software

OpenPOWER Foundation
Main Office
548 Market Street, PMB 57274
San Francisco, California 94194-5401 US
Phone/Fax: +1 415 723 9709

Policy
- Cookie Policy
- Privacy Policy
- Terms of Use
- Logo Policy
- Trademark Policy

Governance
- Certificate of Incorporation
- Bylaws
- IP Rights Policy
- Anti Trust Guidelines

Stay in touch, follow us
- Social Links
- Discussion Links
- Code Links






CT122190

# EXHIBIT P

**FILED UNDER SEAL**

# EXHIBIT Q

**Exhibit 23**

Warner, K.
08/28/25
optus.

# Welcome to Palo Alto Networks!

**Date:** Fri, 22 Nov 2024 15:54:31 +0000 (*11/22/2024 07:54:31 AM*)

**From:** Palo Alto Networks <noreply@paloaltonetworks.com>

**To:** kip@heliosmusic.io

**X-Gnd-Status:** ACCOUNT

## Palo Alto Networks Support



Hello Kip,

You have been granted access to Palo Alto Networks Partner Portal. Before signing in, you must first activate your account.

UserName: kip@heliosmusic.io

Please click the button below to activate your account:

[ Activate Account ]

This link expires in 7 days. If the link expires, please request another reset link and a new link will be emailed to you.

After activating your account, you may log in to the Palo Alto Networks Partner Portal here and then click on LOGIN. If you experience log in issues, please try a Private or Incognito browser session. If you continue to have log in issues, please reach out to NextWave@paloaltonetworks.com

Thank You,
Palo Alto Networks



©Palo Alto Networks, Inc. All rights reserved.
3000 Tannery Way, Santa Clara, CA 95054.
Palo Alto Networks and the Palo Alto Networks logo
are registered trademarks of Palo Alto Networks, Inc.
**Privacy Policy** | **Terms of Use**
www.paloaltonetworks.com

CT122214

# EXHIBIT R

**FILED UNDER SEAL**

# EXHIBIT S

Exhibit 6
Warner, K.
08/28/25
aptus.



COHESITY_000578

supervisors, publishers, agencies, artists, managers,            on your catalogue remains yours. Period.                    as you'd like to continue using it.
studios, public libraries, and more.

## Partners



HELIOS® IS A REGISTERED TRADEMARK OF CARTESIAN THEATRE CORP. PATENTS PENDING AND GRANTED.
COPYRIGHT © 2015-2024.

◈helios        HOME    PRODUCT    COMPANY    DEMO    API    CONTACT US    FAQ    🔍

**Helios: Music recommendation engine explained.**
Helios

The Helios music discovery engine is a powerful B2B technology to allow searching of large commercial music libraries by using music itself as the search key. Here are a few of the many possible uses for Helios:



You have a streaming music service. The listener asked to skip the current track, but they also *never want to hear anything similar again.*



Your business receives a new supply of music each month from artists. You need to be *able* to predict which new music is more likely to generate revenue based on how existing music in your catalogue already performed.



You have a digital jukebox in bars, restaurants, and pubs. You want venue patrons to be able to play more music like the music they just paid to hear.



You have a *music catalogue management platform* that publishers and labels use to track their digital assets. Your customers want to be able to search within their own catalogue using your slick platform.



An online *digital music store* needs to make intelligent recommendations to shoppers based on songs already in their cart before check out.



You have a streaming music service for different venues or channels. You have in-house DJs that custom curate the playlists. You want to reduce the work as they create new ones.



You have a *commercial music library* of any size. Your clients want sync licenses fast for music for their film, TV, documentary, commercials, or video game.



You market *software* for film studios, such as plugins for major multimedia applications like Adobe Premier. Use the Helios API to augment its capabilities.

Nearly always clients approach you with samples already in hand, possibly from your own catalogue. *"Hey, do you have anything else like this?"* This could be an MP3 or a YouTube video URL. Use the customer's samples directly with Helios to help them find what they're looking for.

Traditionally, in the absence of such technology, the way this has been done for decades may surprise many. It is both costly and involves many hours or even days of manual human labour which delays the business process. The business must manually search, usually using *textual tags*, and listen to a great deal of irrelevant music in the hopes of finding the one the client is actually willing to spend money on.

## How does it work?

Helios works by analyzing the actual sound of each audio track it's provided. This is called sub-symbolic analysis. It does this by performing a complex digital signal processing analysis on both time and spectral domains. It actually listens to your music rather than just guessing what you want based on what it thinks someone like you listened to before. The scientific research Helios was based on is extensive and draws upon topics in physics, mathematics, and computing science.

HELIOS® IS A REGISTERED TRADEMARK OF CARTESIAN THEATRE CORP. PATENTS PENDING AND GRANTED.
COPYRIGHT © 2015-2024.



COHESITY_000581





HELIOS® IS A REGISTERED TRADEMARK OF CARTESIAN THEATRE CORP. PATENTS PENDING AND GRANTED.
COPYRIGHT © 2015-2024.



https://heliosmusic.io/pages/download/                                      October 19, 2024 at 6:00 PM EDT

# Download

## Helios Server

To obtain either an on-premise or hosted Helios server,  please contact sales.

Installation with default out of the box configuration usually takes under a minute to get up and running. Simply run the following on the installation target which has access to the server package repository:

```
$ sudo apt install helios
```

This will download, configure, and install the server as a normal system service.

## Helios Client Utilities

This is a set of command line utilities for interacting with a Helios server. You can use them to manage your music catalogue as well as perform similarity matches. They use the Helios Python SDK and can be used as examples for developing your own applications that use the Helios REST API.

To install run the following on Ubuntu Noble (24.04.1) or later:

```
$ sudo add-apt-repository ppa:kip/helios-public
$ sudo apt install helios-client-utilities
```

The utilities are fully documented and each come with their own manual. Try running the following:

```
$ man helios
```

The module's source code is fully available gratis under the terms of the GNU Lesser General Public License (LGPL) for use, study, redistribution, or modification within any commercial product.

## Helios Python SDK

A client side Helios software development kit (SDK) has already been prepared for you to enable rapidly integrating Helios into your own platform in the form of an easy to use pure Python module. It is pre-packaged for Ubuntu Noble (24.04.1) and later.

The purpose of the module is to provide an API to Python applications to communicate with a remote Helios server. In only a few lines of code you can manage your music catalogue and perform similarity matches.

To install it in seconds simply run the following:

```
$ sudo add-apt-repository ppa:kip/helios-public
$ sudo apt install python3-helios-client
```

To use the module, it's as simple as:

```
$ python3
>>> import helios
>>> from pprint import pprint
>>> client = helios.client(host="your_server_hostname")
>>> status = client.get_server_status()
>>> pprint(status)
```

The module's source code is fully available gratis under the terms of the GNU Lesser General Public License (LGPL) for use, study, redistribution, or modification within any commercial product.

COHESITY_000584



### REST API Documentation

The Helios server sports a simple to use industry-standard REST API. You can find documentation available here.

HELIOS® IS A REGISTERED TRADEMARK OF CARTESIAN THEATRE CORP. PATENTS PENDING AND GRANTED.
COPYRIGHT © 2015-2024.

cartesiantheatre

COHESITY_000585



https://heliosmusic.io/pages/about-us/                                                    October 19, 2024 at 6:01 PM EDT

## Studio History

Cartesian Theatre is a Vancouver, British Columbia, based private software company. It was federally incorporated in Canada in 2009.

The studio's roots predated its incorporation as an extension of the founder's private sector consulting work for industry, predominantly in the United States.

The studio has obtained expertise over more than a decade in a wide range of diverse software problem domains. These have included aerospace, artificial intelligence, gaming, bio-technology, digital audio, cryptography, distributed systems, simulation, and space science to name a few.

Engineering services have been provided in Canada, the United States, and abroad in China. Customers have included a multitude of small firms all the way to Digital Theatre Systems, Mozilla, Google, Wells Fargo and others.

In late 2013 the studio developed the technology to recover substantial portions of NASA's billion dollar mission data from the first successful mission to the surface of Mars. The technology was subsequently cited by NASA's Jet Propulsion Laboratory, the Committee on Data for Science and Technology, and the last mission director of NASA's Viking program mission.

In 2015 some of the studio's technology for ultra high definition digital surround sound was showcased internationally at the Consumer Electronics Show in Vegas, the premier venue for some of the world's most sophisticated next generation technology.

In 2017 the studio collaborated with the National Research Council of Canada to develop agent based social simulation technology to simulate artificial life in large cities to model traffic flow, crime, pollution, gentrification, education, economy, and more.

The company's name is borrowed from philosopher Daniel Dennett's contribution to the field of philosophy of mind. It serves as a reminder that the outstanding and most interesting problems of artificial intelligence remain interdisciplinary in nature and are not limited to computing science.

HELIOS® IS A REGISTERED TRADEMARK OF CARTESIAN THEATRE CORP. PATENTS PENDING AND GRANTED.
COPYRIGHT © 2015-2024.

helios

HOME     PRODUCT     COMPANY     DEMO     API     CONTACT US     FAQ     🔍

# Leadership Team



### Dean Becker | Chief IP Strategist

Dean Becker is Vice Chairman of the ROKIT Group where he is globally recognized as a pioneer in the wireless industry. He has extensive experience as a principal in venture capital and private equity funded transactions with a focus in the telecommunications industry.

Dean has been involved in over $8 billion USD of intellectual property based transactions. Dean's market-making experience extends back more than 30 years across several technologies. He founded 422 Inc., an innovative wireless directory assistance service. He also served as the Chairman and CEO of eWireless, a patent-based abbreviated dial service across all major wireless carriers that enabled direct response consumer marketing for participating radio advertisers.

Dean served previously as the Chairman and CEO of Becker Beeper until it was acquired by Arch Telecommunications (a NASDAQ company). He also served as CEO of ICAP IP & ICAP Media when ICAP was a FTSE 100 company.



### Kip Warner | Founder | Director of Engineering

Kip holds a Bachelors of Science in Artificial Intelligence (Cognitive Systems: Computational Intelligence and Design) from the University of British Columbia's Department of Computer Science. He is currently co-chairman of the OpenPOWER Foundation's AI Special Interest Group. He can be reached at kip at heliosmusic dot io.



### Gary Shuster, Esq. | US General Counsel

Gary graduated *magna cum laude* from Harvard Law School and *summa cum laude* from UCLA. After practicing law for a decade, representing Fortune 50 companies and internet start-ups, he transitioned an increasing amount of his time to innovation and invention. Gary continues to provide legal representation to select clients, with a particular focus on start-ups, technology, internet, and general litigation.

Gary is a highly prolific independent inventor, receiving more than 200 issued United States patents since 2004. Gary is also an innovation speaker, writer, coach, attorney and consultant. Gary's patents cover a wide range of technologies, including such diverse areas as distributed computing, aviation safety, identity theft prevention, encryption, casino games, copyright enforcement, photography, e-mail authentication, batteries, smart phones, geo-location, search engine technology and bandwidth management.

COHESITY_000587



### Gary Bizzo | Business Development Advisor

Gary has mentored over a 1,000 business leaders, investors and entrepreneurs. His book, *How to Start a Successful Business – The First Time!* is on Amazon. He was a National Finalist in the *2014 Business Development Bank of Canada Mentorship Award.*

Forbes said Bizzo was #9 of the *Top 25 Small Business* accounts on Twitter. London-based Richtopia listed Bizzo on the *Top 200 Philanthropists and Social Influencers in the World for 2017.* Entrepreneur Magazine, in 2014, said Bizzo was one of "17 Masters of Marketing & PR Entrepreneurs Can Learn From."

Bizzo is a Social Media 'Agent of Change' and Global Influencer with several hundred thousand followers on Twitter, LinkedIn and Facebook. His clients include Microsoft, 3M, US Cobalt, IBM and PayPal. He is an Elite Weekly writer for Equities.com the largest platform for emerging growth companies as well as Stockhouse.com, Canada's #1 financial portal and one of North America's largest small cap investor communities. He is a Partner at Equifaira Advisors Inc. – Liquidity Event Planners. Equifaira are specialists in strategy & execution, corporate finance, capital formation & investor relations. His latest book, *Social Media RockStar – Social Media Marketing for Entrepreneur & Business* is on Amazon and *Startups – From Early Stage to Early Growth!* will be in stores in October 2018.

Gary is an Adjunct Professor at New York Institute of Technology and a Business Mentor at the Richard Branson Center for Entrepreneurship.

HELIOS® IS A REGISTERED TRADEMARK OF CARTESIAN THEATRE CORP. PATENTS PENDING AND GRANTED.
COPYRIGHT © 2015-2024.





COHESITY_000589

example if you make an order through the Site), or otherwise to pursue our legitimate business interests listed above. Additionally, please note that your information will be transferred outside of Europe, including to Canada and the United States.

## DATA RETENTION

When you place an order through the Site, we will maintain your Order Information for our records unless and until you ask us to delete this information.

## CHANGES

We may update this privacy policy from time to time in order to reflect, for example, changes to our practices or for other operational, legal or regulatory reasons.

## CONTACT US

For more information about our privacy practices, if you have questions, or if you would like to make a complaint, please contact us by e-mail at legal@heliosmusic.io.

HELIOS® IS A REGISTERED TRADEMARK OF CARTESIAN THEATRE CORP. PATENTS PENDING AND GRANTED.
COPYRIGHT © 2015-2024.





COHESITY_000591



COHESITY_000592

world which has been under continuous development for nearly two decades. It is used in hundreds of operating systems.

Once installed Helios runs as a system service exporting a RESTful API. Helios will even take care of configuring your router automatically via UPnP if you ask it to.

If your IT is experienced with standard server environments, there is a very good chance they will be required to learn little to nothing that is new to them in order to install Helios.

## — Can I host Helios within a container or hypervisor?

Yes and no, but mostly yes.

Users are strongly discouraged from trying to run Helios in a type-2 or *hosted* hypervisor like VMWare Workstation or VirtualBox. These are not appropriate to host *any* kind of high performance application or system service in a production environment. That's not to say it wouldn't work, but you are putting a high performance application in an environment with a very limited capacity.

Having said that, virtualisation or type-1 *native* hypervisors are perfectly acceptable like KVM. This is common place in data centres around the world. This is probably what you want. You must ensure, however, that AVX / AVX2 and FMA hardware acceleration is available if running on 64-bit x86 hardware.

System administrators need to manage large infrastructures by abstracting customer needs from the underlying hardware that may need to change from time to time. Software engineers require the efficiencies of high performance computing that must have direct access to hardware to be useful in some circumstance. A type-1 hypervisor reconciles these needs.

Docker containers should be fine too, though they may need some tweaking.

## — Which Init system does Helios support?

Helios runs as a system service where it services incoming client requests. It integrates into your environment like any other system service.

There are different competing Init systems that have been proposed over the years. In striking the balance between different needs Helios supports both legacy SysV Init and the industry standard systemd(1). Most major distributions support the latter. You can verify here.

## — What kind of equipment do I need? Do I need a large costly data centre?

Potentially nothing on site is required to host Helios if you'd prefer to not host it yourself and have us host it for you.

But if you've already got infrastructure, great. Helios is designed for flexibility. It can be deployed in large scale data centres with distributed environments right down to the small scale off the shelf commodity hardware of a single machine.

Experienced system administrators familiar with standard GNU/Linux environments will have no difficulty at all deploying Helios.

## — How hard is it to integrate into an existing platform?

Helios exports a RESTful API which is very simple to use and cross platform. As a result there are an infinite number of contexts in terms of websites, mobile, embedded, and desktop applications.

Helios ships with a pure Python module and a library of sample code out of the box to get you up and running as quickly as possible.

To simply add a button in your catalogue next to a song to search for others similar to it is very easy to do.

## — What audio formats does it support?

Helios supports WAV, FLAC, Ogg/Vorbis, Speex, WMA, MP3, M4A, AAC, Dolby Digital, DTS, Apple Lossless, Dolby TrueHD, Monkey's Audio, Opus, RealAudio 1/2, WavPack, WMA Lossless / Professional, and many others. If you're not sure, just ask.

## — What about tagging?

Helios allows customers the freedom from the archaic bondage of textual tags to describe things like "melancholy", "dramatic", and other labels. Textual tags are not only labour intensive to manually generate, but even if generated automatically they have many serious problems.

Consider a thought experiment in another world. Imagine you were not searching for music, but instead were looking for a picture. You use a system that contains a catalogue of pictures. Each picture has been manually tagged by someone with a smell they recorded of the object in the picture. You can directly experience the smell when you click a button in the catalogue next to the picture. That is, one set of symbols (smells) is used to find objects in another set (pictures).

The people in that world figured out how to make their computers work with smells long before they figured out how to get them to understand pictures. Eventually they figure out the latter so that they can search for pictures with pictures.

Unfortunately the same social inertia in that world still encouraged some people to search for pictures using smells because that's what they've been accustomed to do for a really long time. Of course, they forgot that what they were really looking for was a picture and not a smell.

But there's other problems with textual tags. Imagine you have a customer on the other side of the planet looking for a song in your catalogue. You've got the perfect song for them, but the keywords the customer uses aren't appropriate.

Perhaps your tags are in English, but they speak something else. Or maybe they understand English, or you've managed to have your tags translated into a language they're familiar with. There's still a problem. Merely translating the semantics perfectly from one language to another, when possible, still doesn't mean that they become equally useful. Consider your customer might have thought, dramatic too instead

COHESITY_000593

of *melancholy* - what the perfect song buried in your catalogue was tagged with.

In our experience, the customer almost always comes already with music samples in hand that describe the perfect tune to accompany their commercial, documentary, or other medium. Just use the music, save yourself the trouble, and make the sale in a fraction of the time.

— **Can I search using a URL to YouTube, Bandcamp, SoundCloud, etc.?**

You can use URLs as search keys for Bandcamp, Mixcloud, SoundCloud, Vimeo, YouTube, and many others.

— **Can I use Helios in a language other than English?**

Helios was designed from inception to be translatable into any human language you care to name because it complies with the NLS standard (Native Language Support).

If it has not already been translated into your preferred language, please contact us and we'll do our best to accommodate.

— **What if something catastrophic happens?**

The likelihood of Helios actually causing any kind of loss to your digital music assets or any other kind of major business disruption is astronomically small.

— **What hardware is supported?**

Helios was designed from the ground up to be portable. It will take advantage of specialized hardware to increase its performance where available to make the best use of your existing infrastructure. It is currently ported to:

- 64-bit PC (*amd64*);
- 64-bit ARM (*arm64*);
- POWER9 / POWER10 (*ppc64el*);
- RISC-V (*riscv64*).

Partial progress has been made to port Helios to:

- IBM System z mainframe (*s390x*);
- 32-bit ARM with hardware floating point unit (*armhf*).

For *amd64* AVX / AVX2 support must be present. Any Intel® Core™ Haswell, AMD Excavator, or later processors should be fine. If Helios is running within a type-1 hypervisor, the host AVX / AVX2 / FMA features must be available within the container.

For *ppc64el* AltiVec / VMX hardware acceleration is used.

For *riscv64* a SiFive HiFive Unmatched development board was used, courtesy of SiFive.

— **What about security?**

All communication with your Helios server, whether on site or hosted elsewhere, can optionally be encrypted using industry standard Transport Layer Security (TLS). You may use either your own self-signed certificate or one issued by any certificate authority.

Encryption ensures that all of your digital assets cannot be intercepted by an unauthorized third party.

— **Where can I read your patent filings and related IP?**

Multiple patent filings have been submitted to USPTO. As of this writing, all of them remain subject to 35 U.S.C. 122(b)(2)(B)(i) publication bans. They may only be examined under NDA with the company's prior written authorization. Registered trademark and copyright filings have also been submitted to CIPO.

— **Our music can't leave our network for legal reasons. Can we still use it?**

Yes! Please see the next question.

— **Who wants it and for what?**

There are many uses for Helios. Here are a few examples.

You have a *digital jukebox* in bars, restaurants, and pubs. You want venue patrons to be able to play more music like whatever they just paid to hear.

You have a *music catalogue management platform* that publishers and labels use to track their digital assets. Your customers want to be able to search within their own catalogue using your slick platform.

You have an online *digital music store* and you'd like to be able to make intelligent product recommendations to your customers based on what songs they've already got in their shopping cart before they check out.

You have a *streaming music service* whose DJs need inspiration for coming up with either channel based or custom curated playlists faster.

You market *software for DJs*, such as plugins to manage their library. While they're playing live a plugin in their favourite software suggests some tracks to mix or play next.

You have a *commercial music library* of any size. Perhaps you are a major record label, perhaps independent, or maybe you've amalgamated music from multiple labels, independent artists, or publishers. You need to assist your clients obtain synchronization licenses quickly for appropriate pieces of music for their film, TV, documentary, commercials, video games, or some other context.

There are countless other examples, but let's talk about this last one. Nearly always your client approaches you with samples already in hand. "*Hey, do you have anything like this?*" This could be an MP3 or a YouTube video URL. Because Helios allows you to search the catalogue using music itself as the search key, you could use the customer's samples directly to help them find what they're looking for.

Traditionally, in the absence of such technology, the way this has been done for decades may surprise many. It is both costly and involves many hours or even days of manual human labour which delays the business process. The business must manually search, usually using textual tags, and listen to a great deal of irrelevant music in the hopes of finding the one the client is actually willing to spend money on.

— **How does it work?**

Helios works by analyzing the actual sound of each audio track it's provided. This is called sub-symbolic analysis. It does this by performing a complex digital signal processing analysis on both time and spectral domains.

It actually listens to your music rather than just guessing what you want based on what it thinks someone like you listened to before.

The scientific research Helios based on is extensive and draws upon topics in physics, mathematics, and computing science.

— **What is sub-symbolic analysis? Aren't song ratings data a lot easier to use?**

Sub-symbolic audio analysis is a kind of analysis that listens to the actual audio itself. A sub-symbolic music similarity engine makes recommendations to help users discover music based on what a given song actually sounds like.

The statistical method is an alternative and traditional approach. It is 'tone deaf' in the sense that it has no idea what any of your music actually sounds like. If Bob likes songs A, B, and C; and Sue likes A and B too; and the system thinks Bob and Sue are pretty similar, it will suggest song C to Sue.

The system doesn't listen to the song, but it still might have made a relevant recommendation. This works to a certain extent, but quickly starts to fall apart due to the cold start problem.

If a song is new to the system and nobody has rated it yet, it can't recommend it to anyone. Or, if a user is new, it can't make a recommendation either because the user hasn't listened to any music yet.

— **So it fingerprints music?**

Not quite. Fingerprinting is a term used by music *identification* services like SoundHound or Shazam. These platforms are used primarily for music *identification*, not music *discovery*. That's an interesting problem, and although Helios can do that too, this was not the primary problem the studio was concerned with.

What industry asked for was a method to find similar music based on music itself. That is, not using statistical tricks like trying to correlate user generated song ratings with predictions for a given user, but actual sub-symbolic analysis of the song's objective traits.

— **Isn't this like Shazam?**

No. Shazam is a music identification service. Give it a song and it *identifies* it. Give Helios a song and it finds others *similar* to it.

— **So it's like Spotify?**

Spotify is a music *discovery* service because it does help users find *similar* music, except that it is limited to Spotify's catalogue. That means you cannot use it with your own catalogue.

Consider that most of the world's music is not on Spotify, but even if it was, Spotify does not allow you to use its service for either non-personal or commercial purposes.

— **What is the quality of your recommendation engine's results?**

SoundCloud has a mostly great platform for what it aims to do. It has a music recommendation feature called Autoplay. Autoplay makes an automated recommendation for the next song to play based on the one you are currently listening to.

Unfortunately despite SoundCloud's best efforts, it's users have been lamenting for years what they believe are poor quality recommendations.

*Based on extensive experimentation and observation on how SoundCloud's Autoplay feature appears to work, Helios greatly outperforms it in terms of the quality of its recommendations and the broad versatility of its applications.*

On the latter point, SoundCloud's Autoplay is not reusable. This means it cannot be integrated into another music related product or service outside of SoundCloud's own platform.

— **Do customers really get their own copy of the software?**

Yes! Helios does not require you to upload or send your music anywhere to be analyzed. You can have your own local installation.

Analysis of your commercial music catalogue never require any of it to leave your network. To do otherwise is reckless and would invite customers to get sued by whomever owns the rights to your digital assets.

COHESITY_000595

— **So Helios allows me to run my own cloud?**

If you're asking whether you can run your own Helios server, the answer is yes. But try to avoid using the term "cloud" because it is a marketing buzzword with no coherent meaning that spreads confusion.

Although Helios is proprietary, it is not a Service as a Software Substitute (SaaSS) because you are allowed and encouraged to host your own server. SaaSS denies you the right to run your own copy of the server software.

— **Who was consulted in the design of Helios?**

Many different organizations were consulted throughout the design of Helios. Since the technology began development in 2015 it was accompanied with regular and lengthy and industry consultations with key stakeholders.

These stakeholders included regulatory bodies, legal experts, commercial broadcasters, streaming services, record labels, recording artists, songwriters, one of the world's largest digital music stores, and many others.

— **Why is having our own Helios server so important?**

One of the recurring themes that came up over the studio's many industry consultations over the years was a major restriction not well understood outside of industry. *Catalogue digital assets must not leave the internal network for legal reasons.* This is a deal breaker for many.

The Helios architecture factored this otherwise catastrophic legal constraint into its architectural design from inception. Customers get their own copy to run locally on their own network and, if they choose, to serve requests inside or outside of it.

Besides the legal reason, there are a number of other technical and financial reasons. If you needed to send your music outside of your network, you would normally be expected to pay hosting fees to a third party to "manage" redundant data you already have.

For many, such as digital music libraries and record labels as examples, as if the legalities weren't already reason enough, uploading tens of terabytes or petabytes of digital audio over the internet to a third party's storage facility is simply not practical. The fastest commercial broadband connections available can still only control the width of the pipe between you and your ISP. What's beyond that is entirely beyond your ISP's control.

When your costly digital assets do not need to leave your network any good insurer worth their salt will reduce your premiums because the architecture is a wonderful risk mitigation strategy when your entire business revolves around your digital assets.

If the service you built around Helios instead required access to a centralized hosted platform we controlled and there were internet connectivity issues one day that were not your fault, your system would be crippled. Your customers would not be able to find the music they need.

Further, consider the scenario where internet connectivity wasn't an issue, but for whatever reason the centralized hosted solution is taken offline at our end for any reason. The entire service would be rendered useless, not simply localized to a single business.

— **What is the pricing?**

Pricing varies based on a number of factors, but the studio is confident it can eventually undercut any competitor's pricing – if not already. Please get in touch with us and request a quotation if you haven't already.

— **Can I use it with Amazon Web Services?**

Yes! But we recommend asking us about more secure next-generation alternatives to AWS.

— **Can you host our Helios server for us?**

Yes! But first you must make sure you are allowed to redistribute your digital audio assets outside of your network. In many cases you may be legally restricted from doing so.

But if that is not an issue, there will be an additional reasonable monthly fee for renting and maintaining your server. If at a later date your organization decides it would like to host within its own data centre, that isn't a problem and this fee will be waived.

— **Is there a limit to the amount of music Helios can handle?**

There is no theoretical limit, but practical limitations are governed only by the hardware you run it on. Helios will take advantage of specialized hardware acceleration whenever available, such as MMX, Streaming SIMD Extensions, and multi-core parallel computing.

Helios was designed to scale. In particular, for very large catalogues in the hundreds of thousands to millions of songs.

— **Haven't other companies already done this?**

The studio hears regularly that vendors X or Y are allegedly already doing the same thing. Nine times out of ten they are not, and the remaining minority of the time they are (or were), but there was a major limitation that made it unusable for many.

To build something like Helios is not a casual undertaking and requires a significant scientific, financial, and technological investment.

— **How many audio features does your DSP engine process?**

COHESITY_000596

The short answer is *just enough*. The longer answer is its possible to add hundreds more, but that would only make for an interesting academic endeavour, increase processing time, and without necessarily improving the accuracy of the generated results.

### Does Helios use TensorFlow?

Helios does not use TensorFlow. All of its core algorithms are implemented directly within its own code base.

### Does Helios use Python?

Helios ships with an SDK that is written in Python to expedite integration into existing applications. However, Helios itself is not written in Python. Although Python is a popular choice, it is far too slow for any high performance computing application. This is why most of Helios is written in portable high performance native C++17.

### Do you have a source code level license available?

The short answer is yes. For the longer answer please contact us and ask us about our *Helios Source Code Limited License Program*. This is somewhat similar to the Unreal Enterprise Program which provides full source code access to the Unreal Engine.

Eligible vendors receive a branding kit for permitted use within their own promotional material. But more importantly, they receive a royalty free limited source code license enabling them to perform benchmarking, optimization, and integration within their own offerings. These could be for embedded use, enterprise systems, hosted services, or other use cases. This program is available internationally and applies to all eligible independent hardware vendors (IHVs), various resellers, and other firms.

There are several eligibility requirements that need to be met, including executing a licence agreement, an NDA, and a valid certificate of insurance.

Helios customers that intend to host on-premise will be provided with a specification sheet of your various relevant offerings, benchmarks, pricing, region of distribution, and point of contact to direct all customer related inquiries to.

We don't take royalties from your offering that supports our customer's use case. Our intention is to streamline the customer's deployment as efficiently as possible to get them the hosting or hardware solution they need, wherever it is in the world that they operate.

HELIOS® IS A REGISTERED TRADEMARK OF CARTESIAN THEATRE CORP. PATENTS PENDING AND GRANTED.
COPYRIGHT © 2015-2024.



COHESITY_000597

# EXHIBIT T

**FILED UNDER SEAL**

# EXHIBIT U

**FILED UNDER SEAL**

# EXHIBIT V

**FILED UNDER SEAL**

# EXHIBIT W

**FILED UNDER SEAL**

# EXHIBIT X

**Exhibit 25**
**Warner, K.**
08/28/25
aptus.

# Welcome to IBM for Startups!

**Date:** Sun, 07 Apr 2024 19:08:51 +0000 (*04/07/2024 12:08:51 PM*)

**From:** IBM for Startups (via Airtable) <noreply+automations@airtableemail.com>

**To:** kip@heliosmusic.io

**X-Gnd-** ACCOUNT

**Status:**

Dear Kip,

We are happy to welcome you to the IBM for Startups Program! IBM for Startups is the place to start your journey with us and innovate and enhance your solution with IBM AI.

Please log in to the IBM for Startups web portal using your IBMid. In the portal, you will find more details on technological and business partnership with IBM.

We will also be happy to invite you to dedicated sessions with leading experts and help you scale and grow your startup.

Welcome to IBM for Startups!

CT_100467

Sent via Automations on 🔲 Airtable

Unsubscribe

©2024 Airtable

# EXHIBIT Y

RISC-V®

About RISC-V  Membership  RISC-V Exchange  Technical  News & Events  Community

Exhibit 18
Warner, K.
08/28/25
aptus.

Blog

# Next generation music AI engine available for RISC-V

By Kim McMahon  •  December 6, 2021  •  No Comments

Vancouver based software studio Cartesian Theatre Corp. and SiFive, Inc., the founder and leader in RISC-V computing, are excited to announce CT's Helios music recommendation engine's successful port to the open and free RISC-V instruction set architecture.



Helios is an advanced patent-protected AI music recommendation engine that can be used to search commercial music catalogues using music itself as the search key. Applications are wide ranging, such as production studios seeking synchronization licenses from record labels, streaming services, online music stores, and much more.

The engine's debut on RISC-V opens a goldmine of new commercial opportunities in the embedded space for digital jukeboxes, IoT, in-flight entertainment, and luxury vehicles to name a few.



"The SiFive HiFive Unmatched developer board and comprehensive software development kit, SiFive Freedom Studio, enables applications of all types to be simply implemented using the RISC-V instruction set architecture," said Chris Jones, Vice President, Product Marketing, SiFive. "RISC-V has no limits, and the successful implementation of CT's Helios application on RISC-V hardware is proof of the features, support, and quality of RISC-V from SiFive."

"SiFive's hardware, engineering expertise, and a clean Helios code base made for an elegant port. I am excited to see the novel applications of Helios on RISC-V," said Kip Warner, CT's Director of Engineering.

"This feat is another testament to how the openness, simplicity, modularity, and extensibility of RISC-V makes the ISA ideal for any type of application you can think of," said Calista Redmond, CEO of RISC-V International. "We look forward to seeing how this collaboration will unlock exciting new entertainment experiences."

"Microchip's PolarFire SoC FPGA is truly an innovation platform that brings the richness of Linux to a deterministic real-time system. The PolarFire SoC Icicle kit and the suite of development tools from Microchip and the Mi-V RISC-V Ecosystem make it quick and easy to develop and head to mass production," said Krishnakumar, Senior Product Marketing Manager at Microchip Technology. "The latest addition to RISC-V solutions portfolio, CT's Helios, further extends the quality of solutions and support available from the RISC-V ecosystem."

The joint undertaking was completed with technical assistance from SiFive and Microchip Technology. The engine and a commercial music catalogue were successfully deployed and tested on the SiFive HiFive Unmatched board. Introduced in October 2020, the developer-focused board has ushered in a new era of RISC-V software with a platform powered by the SiFive Essential™ 7-Series processor cores inside the SiFive FU740 SoC.

SiFive business inquiries may be submitted here. Helios related business inquiries may be directed to Dean Becker at (251) 262-0000 or by email to dean@heliosmusic.io.

Previous Post
RISC-V Celebrates Incredible Year of Growth and Progress, Ratifying Multiple Technical Specifications, Launching New Education Programs, and Accelerating Broad Industry Adoption

Next Post
Ventana Micro Systems Inc. Joins RISC-V International's Board of Directors

## Stay Connected With RISC-V

We send occasional news about RISC-V technical progress, news, and events.

First name*

Last name*

Email*

☐ In addition, I would like to receive marketing emails about news, events and training from The Linux Foundation and its Projects. I understand that I can unsubscribe at any time.

By submitting this form, I acknowledge that my information is subject to The Linux Foundation's Privacy Policy.

Submit

Copyright © 2021 RISC-V International®. All rights reserved. RISC-V, RISC-V International, and the RISC-V logos are trademarks of RISC-V International. For trademark usage guidelines, please see our Brand Guidelines and Privacy Policy.

Follow us!

Twitter  LinkedIn  YouTube  Flickr

CT_10661