# EXHIBIT C

## REDACTED

Deposition of

# Kipling C.S. Warner

August 28, 2025

Cohesity, Inc.

vs.

Cartesian Theatre Corp.

**Highly Confidential**



www.aptusCR.com | 866.999.8310

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3

4     COHESITY, INC.,

5              Plaintiff,

6        vs.                    CASE NO.
                                3:24-CV-9104
7     CARTESIAN THEATRE CORP.,
      and DOES 1 – 25,

8

              Defendant.
9     _____

10

11

12

13

14       HIGHLY CONFIDENTIAL REMOTE DEPOSITION OF

15              KIPLING C.S. WARNER

16            Thursday, August 28, 2025

17

18

19

20

21

22

23   Reported by:
     Layli Phillips
24   RPR, CRR, CSR No. 14402

25   Job No. 10171673

Highly Confidential

Kipling C.S. Warner                                    Cohesity, Inc. vs.
                                              Cartesian Theatre Corp.

1        Q. What is your current position with CT?

2        A. I'm the principal and founder.

3        Q. What are your job responsibilities for CT?

4        A. I'm the primary operator of the business.

5        Q. What are some of your responsibilities in

6    connection with being the primary operator of the

7    business?

8        A. I administer all of the daily functions of the

9    business.  I'm the primary liaison.  I'm responsible for

10   all research and development that goes on in the

11   company.  Product design, everything.

12       Q. Do you have any direct reports?

13       A. No.

14       Q. Do you have any job titles with any other

15   companies?

16       A. Yes.

17       Q. What other job titles do you have?

18       A. I'm the co-chair of machine learning working

19   group, an AI special interest group.  I forgot the exact

20   acronyms that they use, but that's with the OpenPOWER

21   Foundation.

22       Q. Do you have any job titles with any other

23   company?

24       A. Not that I can think of.

25       Q. Do you have any job responsibilities with any

1          Q. Did you --

2          A. Go ahead.

3          Q. Sorry.  Go ahead.

4          A. There's also a pending PCT application as well.

5          Q. Did you engage a U.S. attorney to file these

6     patents?

7          A. Yes.

8          Q. CT has used a Helios mark in U.S. commerce,

9     correct?

10         A. Yes.

11         Q. We'll put into the chat Cohesity Bates

12    Number 600.

13             (Deposition Exhibit No. 3 was marked for

14               identification.)

15         MR. SHUSTER:  One moment.  Let me get in the

16    chat.  I'll open it in the other.

17         And just while they are doing that, remember

18    that the court reporter has to catch every word, so when

19    you're reading documents, it's really common for

20    witnesses to read way too fast.  Please just take your

21    time reading.

22         THE WITNESS:  Okay.

23         MS. RAIMER:  We'll mark this as Exhibit 3.

24    BY MS. RAIMER:

25         Q. Do you recognize this document?

1         A. I believe this is my trademark application for

2    Helios in the U.S. via USPTO.

3         Q. CT's trademark application for Helios was filed

4    on August 29th, 2024, correct?

5         A. Correct.

6         Q. You engaged the U.S. law firm of Harness,

7    Dickey & Pierce to file this application; is that right?

8         A. Yes.

9         Q. You made the decision to file this application

10   on behalf of CT, correct?

11        A. Yes.

12        Q. And you provided the information regarding CT's

13   use of the Helios mark in commerce as listed in the

14   application to counsel; is that right?

15        A. It may have been Canadian counsel.  I don't

16   recall.

17        Q. You reviewed the Helios application before it

18   was filed, correct?

19        A. Yes.

20        Q. In this application, CT claims that it first

21   used the Helios mark in U.S. commerce in connection with

22   downloadable computer software and databases for use in

23   analyzing music on March 25th, 2016; is that right?

24        A. I'm just verifying the date.

25             MR. SHUSTER:  The witness is looking at the

Highly Confidential

Kipling C.S. Warner                                   Cohesity, Inc. vs.
                                            Cartesian Theatre Corp.

1  exhibit.

2       A. Sorry.  Could you repeat the date?

3  BY MS. RAIMER:

4       **Q. March 25th, 2016.**

5          MR. SHUSTER:  Need me to make that bigger?

6       A. Could you show me what page that's on in the

7  application?

8  BY MS. RAIMER:

9       **Q. COHESITY_600.**

10      A. No, we have the application open.  Oh, okay.

11  That also refers to page --

12      **Q. The first page.**

13      A. First page.

14         And, yes, I see it.  25th of March, 2016.

15      **Q. And turning to the next page, in connection**

16  **with the services, software as a service, services**

17  **featuring computer software for music analysis and**

18  **management advisory services in the field of music and**

19  **software development.**

20         **CT claimed a first use in commerce date at**

21  **least as early as November 29th, 2021; is that right?**

22         MR. SHUSTER:  I'll just object that you -- you

23  misread the -- the document.  There's no "and" between

24  music and software development.

25

 1   BY MS. RAIMER:

 2        Q. CT claimed a first use in commerce date for the

 3   services in Class 42 at least as early as November 29th,

 4   2021, correct?

 5        A. Correct.

 6        Q. How did you determine the dates of first use in

 7   U.S. commerce to provide for this application?

 8             MR. SHUSTER:  Objection.  To the extent that

 9   this was -- that you learned this through

10   attorney-client communications, please don't share

11   those.

12             THE WITNESS:  Okay.  Sorry.  Are you objecting

13   or --

14             MR. SHUSTER:  Well, the objection is that it

15   calls for attorney-client communications, so please

16   exclude those from your answer.

17             MS. RAIMER:  I'm not asking for attorney-client

18   communications.  I'm asking how he came up with first

19   use dates in this application.

20        A. So there's two.  Are you asking about for

21   Class 42 or for Class 9?

22   BY MS. RAIMER:

23        Q. Let's start with Class 9.

24        A. For Class 9, I believe that is the earliest

25   dated invoice.  There may have been others, but that was

1  platform.  Helios was deployed on AWS.

2       Q. Is AWS a customer of CT?

3       A. AWS is a partner, one of the channels by which

4  Helios would be distributed.

5       Q. Is the deployment on the production server of

6  Amazon the only use in commerce as of the August 2024

7  date?

8       A. I don't recall.  I haven't been keeping logs of

9  every deployment, but there's been quite a few over the

10 years.

11      Q. And what do you mean by "deployment"?

12      A. As in the software has been downloaded and is

13 doing something on a computer somewhere.

14      Q. And in connection with the services, the

15 software as a service services featuring computer

16 software for music analysis and management, what use in

17 commerce of those services was being done as of

18 August 29th, 2024?

19      A. I don't remember.

20      Q. Was any customer employing the software as a

21 service services in the U.S. for Helios as of

22 August 29th, 2024?

23      A. I don't remember.

24      Q. Do you currently have any service -- any

25 customers for which you provide software as a service

1  services featuring computer software for music analysis

2  and management in the United States?

3       A. No.

4       Q. Did you have any such customers in 2024?

5       A. I don't remember.

6       Q. Have you ever had any customers of those

7  services in the United States?

8       A. Yes.

9       Q. How many such customers have you had?

10  ████████████████████████████████████████

11  ████████████████████████████████████

12  ████████████████████████████████████

13  ██████████████████

14  ████████████████████████████████████

15  ██████████████████████████████████████████

16  ███████████████████████

17  ████████████████████████████████████

18  ██████████████████████████████████████

19  █████████████████

20  ██████████████████████████████████████

21  ████████████████████████████████

22  ██████

23  ████████████████████████████████

24  ████████████████████████████████████████

25  ████████████████████████████████

 1 ███████████████████████████████████████████

 2 ██████████████████████████

 3        Q. In connection with advisory services in the

 4  field of music software development, do you currently

 5  have any customers?

 6        A. In the United States, no.

 7        Q. In the United States.

 8           As of August 29th, 2024, did you ever have any

 9  customers for advisory services in the field of music

10  software development?

11        A. I don't remember.

12        Q. Did you confirm in 2024 whether you actually

13  had customers for those services before this application

14  was signed saying that you did use the mark in

15  connection with such services?

16        A. I would have had to.

17        Q. So it's been less than a year.  You don't

18  recall whether you've had any customers for those

19  services in the last year?

20        A. No.  I have been quite busy on many other

21  administrative tasks with the company.

22        Q. If you were making sales in the U.S. in

23  connection with these services, presumably you would

24  have records of doing so, correct?

25        A. If the United States is a priority, yes, but it

1  isn't.

2       Q. So you do not keep financial records for your

3  company?

4       A. I keep financial records.  But I don't believe

5  I have any customers right now in the United States, and

6  if I have had them the last few years in the U.S., I

7  don't have anything that immediately comes to mind.

8       Q. You -- so just so we're clear, you have no

9  records of sales from U.S. customers in the United

10  States ever?

11       MR. SHUSTER:  Objection.  Misstates the

12  testimony.

13       A. I agree with what my friend just said.

14  BY MS. RAIMER:

15       Q. Please repeat, then.  I'm trying to understand

16  what -- what is being said here.  You --

17       A. I didn't say that I didn't have any records.  I

18  said I don't have any recollection right now of any

19  recent American companies in 2024 that I've been doing

20  business with.

21       I'm sure I've had some.  Some of those

22  documents, I've already produced with ███, Amazon, and

23  others.  But I don't remember someone paying to use

24  Helios in the United States within the last six months,

25  a year or so.

Highly Confidential

Kipling C.S. Warner                                 Cohesity, Inc. vs.
                                            Cartesian Theatre Corp.

1          Q. Do you recall anyone ever paying to use Helios

2    in the United States?

3          A. Yes.

4          Q. Who paid to use Helios in the United States?

5    ████████████████████████████████████████████████

6    ████████████████████████████████████████████████

7    ████████

8          Q. Do you keep sales records?

9          A. Yes.

10         Q. How far back do your sales records go?

11         A. I don't have a formal tracking system.  I'm not

12   that big of a company.  But all the important records

13   that I'm aware of, I've already produced to you.

14         Q. You're aware that a trademark registration

15   should issue soon to CT in connection with the Helios

16   mark, correct?

17         A. I don't know when it's supposed to issue.  But,

18   yes, I have a U.S. application pending.

19         Q. And you're now the correspondent of record for

20   that U.S. application, correct?

21         A. I don't believe so.  I think it's Harness IP,

22   actually.

23         Q. They have not -- Harness IP has not withdrawn

24   from representing you on the trademark application?

25         A. I believe that's the case.  I think they are

```
 1   still the address or correspondent of record.  I don't

 2   know what the term is in the United States.

 3        Q. I'm going to turn back to your declaration that

 4   we previously marked, I believe, as Exhibit 2.

 5            MR. SHUSTER:  Bring that back up.

 6        A. Yes.  Go ahead.

 7   BY MS. RAIMER:

 8        Q. In that declaration -- let me look for the

 9   paragraph number.

10            MR. SHUSTER:  Counsel, while you're looking at

11   that, I suggest that sometime in the next five minutes

12   or so would be a good time for a break because I did get

13   that coffee down before I broke the cup.  So --

14            MS. RAIMER:  Let's go ahead and take a break,

15   Gary.  You want to do five minutes or do you need

16   longer?

17            MR. SHUSTER:  I'm getting older, but I think

18   five minutes is still enough time for me to handle this.

19            MS. RAIMER:  Okay.  We'll be back on the record

20   then.  Thank you.

21            (A short break was taken.)

22   BY MS. RAIMER:

23        Q. Great.  Let's turn back to Exhibit 2, the

24   declaration.

25        A. Exhibit 2.
```

1          MR. SHUSTER:  Okay.  We are on the declaration,

2   and which paragraph are we looking at?

3          MS. RAIMER:  Paragraph 6.

4          MR. SHUSTER:  Oh, Exhibit 2 to the declaration.

5          MS. RAIMER:  No, no, we labeled it Exhibit 2,

6   but it's just the declaration, Paragraph 6.

7          MR. SHUSTER:  Sorry.  It's taking me a second.

8          There we go.  Do you want it bigger?

9          THE WITNESS:  Yes.

10         MR. SHUSTER:  You're not old enough to require

11  reading glasses yet.  You should be fine.

12         All right.  There you go.

13         THE WITNESS:  Can you give me a moment to read

14  it?

15         MS. RAIMER:  Yes.

16         I'm focused on the penultimate sentence of that

17  paragraph.

18         MR. SHUSTER:  We're having a technical glitch

19  where the second screen where I'm showing the exhibits

20  turned off.

21  BY MS. RAIMER:

22      Q. I can read this sentence to you.  It says:

23         "If the U.S. filing results in a registered

24  mark issuing over Cohesity's opposition, CT will then

25  have to determine whether it has the resources,

 1   including my time, to evaluate U.S. trademark issues

 2   whether with regard to Cohesity or any other party."

 3        A. Sorry --

 4        Q. Is that still your position?

 5        A. Yes.  I was almost done reading it when --

 6   Windows is just being a pain.

 7             MR. SHUSTER:  You hang around with him long

 8   enough, he'll have you on Linux or at least feeling

 9   guilty about using Windows.

10        A. Yes.  Go ahead.  What is your question?

11   BY MS. RAIMER:

12        Q. Is that still your position, the sentence I

13   just read?

14        A. Yes.

15        Q. What would you need to evaluate U.S. trademark

16   issues?

17        A. I would have to spend resources thinking about

18   it or having somebody else think about it.

19        Q. You evaluated the trademark issues in Canada

20   and sued Cohesity, correct?

21        A. Yes.

22        Q. And that was based on the same Helios mark,

23   correct?

24        A. No.  It was a different application and

25   registration number in a different jurisdiction.

1      Q. Is it the word "Helios," the same word that you

2   applied to register in the U.S. as you applied to

3   register in Canada?

4      A. It's the same standard characters, these

5   classifications and descriptions, but separate

6   applications and separate jurisdictions.

7      Q. So I want to make sure I got that correct.  You

8   said it's also the same -- same goods and services in

9   CT's application in the U.S. as in the Canadian

10  application, correct?

11     A. If I recall.  I haven't looked at it in quite

12  some time, but if I recall, it's the same language.

13     Q. After CT's registration issues, does CT plan to

14  assert trademark claims against Cohesity?

15     A. I haven't thought about it.  At least not

16  sufficiently to make a decision.

17     Q. What would you need to think about in order to

18  make a decision?

19     A. If I knew that, I would be the expert, but I'm

20  not.  That's why I have to retain them.

21     Q. What do you think would be different about the

22  U.S. proceeding that you would need to consider?

23        MR. SHUSTER:  Objection.  You're asking him to

24  speculate.

25     A. Yeah.  I don't know enough about IP law in the

1     Q. So -- you mentioned earlier that you were the

2  co-chair of the OpenPOWER Foundation; is that right?

3     A. No, I didn't.

4     Q. What is your role over the OpenPOWER

5  Foundation?

6     A. I'm the co-chair of a technical steering

7  committee, two of them.

8     Q. How long have you been a co-chair of the

9  technical steering committees?

10    A. I don't recall, but several years.  The second

11 one was added later.  But the first one was several

12 years ago.

13    Q. The OpenPOWER Foundation is located in

14 San Francisco, California, correct?

15    A. No.

16    Q. Where is the OpenPOWER Foundation located?

17    A. My understanding is they are in Delaware.

18    Q. And when you say "they are in Delaware," are

19 you talking about their headquarters or their business

20 registration?

21    A. I don't know where their business registration

22 is.  But I believe I saw some corporate documents a

23 while ago that they were in Delaware.  The executive

24 director, I don't know where he is, but I don't think

25 he's in California.

Highly Confidential

Kipling C.S. Warner                                    Cohesity, Inc. vs.
                                              Cartesian Theatre Corp.

1          Q. OpenPOWER Foundation is identified on CT's

2     website.   Heliosmusic.io is a partner of CT; is that

3     right?

4          A. Yes.

5          Q. What is the nature of the partnership between

6     OpenPOWER Foundation and CT as it relates to Helios?

7          A. Helios is optimized for the Power ISA which is

8     administered by the OpenPOWER Foundation.

9          Q. The OpenPOWER Foundation's website advertises

10    CT's Helios, correct?

11         A. I believe so.  It lists it along its -- its

12    catalogue.

13         Q. We can pull it up.  It's CT122190.  That would

14    be Exhibit 5, we can mark it as.

15              (Deposition Exhibit No. 5 was marked for

16                identification.)

17              THE WITNESS:  We're just opening it.

18              MR. SHUSTER:  I apologize.  I think Kip has a

19    point about Windows and switching to Linux because this

20    is taking forever to open.

21              THE WITNESS:  Okay.  Go ahead.

22    BY MS. RAIMER:

23         Q. Is that the OpenPOWER Foundation website that

24    advertises CT's Helios?

25         A. It appears to be, yes.

Highly Confidential

Kipling C.S. Warner                                             Cohesity, Inc. vs.
                                                        Cartesian Theatre Corp.

```
 1   Helios?

 2        A. Yes.

 3        Q. Which -- so -- excuse me.  Let's go to the next

 4   sentence:

 5            "Customers have included a multitude of small

 6   firms all the way to Digital Theater Systems, Mozilla,

 7   Google, Wells Fargo, and others."

 8            Is that right?

 9        A. Yes, my customers.  And by "my," I'm not saying

10   specifically whether it's as an employee, as an

11   individual contractor, or through my company, CT.

12        Q. So are all of those customers of the Helios --

13        A. No --

14        Q. -- products?

15        A. -- none of those --

16        Q. Which of those -- turning to the next page,

17   587, where it says "leadership team."

18            MR. SHUSTER:  I'm sorry, what page are we

19   turning to?

20            THE WITNESS:  587.

21            MS. RAIMER:  The next page.

22            THE WITNESS:  Go ahead.

23   BY MS. RAIMER:

24        Q. What does CT mean by "leadership team"?

25        A. These are the people who help me make important
```

 1   decisions, including myself.  This is not an exclusive

 2   list.

 3          Q. Who is Dean Becker?

 4          A. Dean Becker is or was my chief IP strategist.

 5          Q. How long was he your chief IP strategist for?

 6          A. He was engaged until more than a year ago.

 7   Maybe two years ago.

 8          Q. So he's no longer your chief IP strategist?

 9          A. No.  That web page needs to be updated.

10   WordPress is difficult to work with.

11          Q. Does Mr. Becker live in the United States?

12          A. I don't know where he lives right now.  But

13   he -- he's very cosmopolitan.

14          Q. He has a U.S. phone number, correct?

15          A. Yes.

16          Q. And is he from the United States?

17          A. I don't know where he was born, but he has a

18   house there or did up until the fires in California.  I

19   don't know if he still does.

20          Q. So at one time he lived in California?

21          A. Yes.

22          Q. The next person listed as founder and director

23   of engineering is you, correct?

24          A. Yes.

25              MR. SHUSTER:  You know that guy?

Case 4:24-cv-09011-JST    Document 456-2    Filed 09/05/25    Page 42 of 72

Highly Confidential
Kipling C.S. Warner                                    Cohesity, Inc. vs.
                                                 Cartesian Theatre Corp.

```
 1              THE WITNESS:  I recognize him.
 2   BY MS. RAIMER:
 3        Q. And then next, we have Mr. Shuster; is that
 4   right?
 5        A. Correct.
 6        Q. It looks like a picture of his beautiful little
 7   girl.
 8              MR. SHUSTER:  That's Belle.
 9   BY MS. RAIMER:
10        Q. This is -- Mr. Shuster is the attorney that's
11   with you today, correct?
12        A. Yes.
13        Q. And on this page he's listed as your U.S.
14   general counsel; is that right?
15        A. Yes.
16        Q. CT doesn't have a Canadian GC; is that right?
17        A. I --
18        Q. And by "GC" I mean general counsel.
19        A. I'm aware.  I have a number of Canadian counsel
20   that I use for different matters.  But at this point in
21   time, I don't have a general counsel that handles all
22   the different types of legal services required in
23   Canada.
24        Q. I'm going to direct your attention to 589, the
25   privacy policy page.
```

Kipling C.S. Warner

```
 1            MS. MCKEOWN:  I'm dragging it in.

 2            MS. RAIMER:  We'll mark that as Exhibit 7.

 3            (Deposition Exhibit No. 7 was marked for

 4              identification.)

 5            THE WITNESS:  This is the ████████████

 6   invoice?  Okay.  We have it open.

 7   BY MS. RAIMER:

 8        Q. And you said this is the ██████████████

 9   invoice?

10        A. Yes.

11        Q. And the date of this invoice is February 19th,

12   2016?

13        A. Yes.

14        Q. According to the -- the top, it notes that

15   ████████████████████████████████████████████████

16   is that correct?

17        A. That was the address I was provided from the

18   customer.

19        Q. And this invoice is for a demonstration of the

20   Helios technology?

21        A. Yes.

22        Q. And that was "using your existing music

23   collection."  Does that mean ████████████████████

24   existing music collection?

25        A. Yes.
```

Highly Confidential

Kipling C.S. Warner                                      Cohesity, Inc. vs.
                                                    Cartesian Theatre Corp.

1          Q. It then says:

2              "The arrangement does not include actual

3     production use under any kind of licensing arrangement,

4     including resale or third-party licensing."

5              Is that right?

6          A. Correct.

7          Q. What does "actual production use" mean?

8          A. As in facing their own customers.

9          Q. So looking at the next page, 122231, are these

10    wire payment instructions?

11         A. Gary is just pulling -- okay.  Go ahead.

12         Q. Are these wire payment instructions?

13         A. They are.

14         Q. And the beneficiary is CT?

15         A. Yes.  Well, the beneficiary bank is Citizens

16    Bank of Canada.  That's the intermediary, but the

17    ultimate beneficiary is CT.

18         Q. And that's under "beneficiary name"?

19         A. Yes.

20         Q. And then it's blacked out, but the next line is

21    "beneficiary USD account number"; is that right?

22         A. Yes.

23         Q. Was this invoice paid?

24         A. Yes.

25         Q. Do you have any documents to show the invoice

 1  was paid?

 2        A. Probably.

 3        Q. Was the Helios demonstration performed?

 4        A. Yes.

 5        Q. This invoice is dated before the prospectus; is

 6  that right?

 7        A. I don't recall.

 8        Q. Was this demonstration still of the

 9  experimental version of the Helios software?

10        A. It's always been experimental.

11        Q. Is this the same software provided to ████

12  ███████████  as exists today?

13        A. We're talking about something intangible that's

14  always changing, so I don't know what you mean by "the

15  same."

16        Q. Was it both for software for music analysis in

17  2016?

18        A. At least the goods and services in the Canadian

19  application and the American one.

20        Q. When was the Helios demonstration performed?

21        A. I believe we have that in evidence.  That

22  document was provided to you.

23        Q. We can bring that up, then.  I believe you're

24  talking about CT122232?

25            MR. SHUSTER:  Opening it up.

Highly Confidential

Kipling C.S. Warner                                    Cohesity, Inc. vs.
                                              Cartesian Theatre Corp.

1          Q. What entities are CT's partners related to

2     Helios?

3          A. There's quite a few.  Do you want me to itemize

4     them?

5          Q. It might be easiest for us to bring up your

6     website because I think some are listed there.  So we

7     can -- that might be the easiest way to look, and then

8     you can think of the other ones that not -- are not on

9     your website.  Would that make sense?

10         A. Yes.  I'll -- what page was that on?

11         Q. It was Exhibit Number 6, and it's page --

12             MR. SHUSTER:  Exhibit 6 is the website.

13             MS. RAIMER:  Yes, so 579 on the website.

14             THE WITNESS:  579.  So right there.

15             Sorry, Anna.  I'm not yawning at you.

16             MS. RAIMER:  I wouldn't blame you if you were.

17             MR. SHUSTER:  Yeah.  You would not be the first

18     person to yawn during a deposition.  I promise.

19             THE WITNESS:  Okay.  We have it up.

20     BY MS. RAIMER:

21         Q. So these are -- the title here is "partners."

22     What do you mean by "partners"?

23         A. I have some formal type of relationship with

24     them, in contract usually.

25         Q. But that's different than a customer?

1       A.  Correct.  Although a customer could be a

2  partner as well because Helios is available as a

3  white-label product, too, and so one of these partners

4  could take the technology and rebrand it as something

5  else.

6       **Q.  Have any of your partners done that?**

7       A.  None of the ones that are listed on the

8  partners section in the website footer that I'm aware

9  of.

10      **Q.  Can you think of any other partners that are**

11 **not on here that would have done that?**

12      A.  Well, a customer, when they are using the

13 technology, they are not required to disclose that it's

14 Helios behind the scenes.  So in a sense, every customer

15 I've ever had had that option of white-labeling the

16 product.

17           In the case of ███████████████, I don't

18 believe he ever had a customer-facing usage of the

19 product, but even if he had, it probably would not have

20 said that it was powered by Helios.

21      **Q.  And I believe we looked at his invoice that**

22 **said he wasn't allowed to have an actual production use.**

23 **Does that sound right?**

24      A.  I think that's correct, yes, in his case.

25      **Q.  At a high level, what -- how do these**

1 | partnerships relate to Helios?

2 |     A. They are all different, but if you want to ask

3 | me about a specific one, I would be happy to do that.

4 |     **Q. Do you know which of your partners are located**

5 | **in California?**

6 |         MR. SHUSTER: Objection. It calls for

7 | speculation.

8 |     A. And when you say "located," do you mean

9 | headquartered or if they happen to have some? Because I

10 | would imagine most multinational tech companies will

11 | have someone in probably every country in the world that

12 | does business with them.

13 | BY MS. RAIMER:

14 |     **Q. Intel is headquartered in Santa Clara,**

15 | **California; is that right?**

16 |     A. I wouldn't know, but I'll take you at your

17 | word.

18 |     **Q. Well, do you know whether any of your partners**

19 | **are headquartered in California?**

20 |     A. I believe Magnatune is or was based out of

21 | Berkeley, California.

22 |     **Q. Let's look at Intel. CT is an Intel partner,**

23 | **Alliance Gold Partner; is that right?**

24 |     A. Yes.

25 |     **Q. How long has CT been an Intel partner, Alliance**

```
 1    Partner?

 2         A.  I don't recall.

 3         Q.  Let's look at CT100496.

 4             MR. SHUSTER:  Do we already have that?  Is that

 5    already a marked exhibit?

 6             MS. MCKEOWN:  It's in the chat.

 7             MR. SHUSTER:  Oh, Exhibit 9.  There you go.

 8             (Deposition Exhibit No. 9 was marked for

 9                identification.)

10             THE WITNESS:  Okay.  Go ahead.

11    BY MS. RAIMER:

12         Q.  So what is Exhibit 9?

13         A.  This looks like an email from Intel dated

14    26th of May, 2021, welcoming CT to the Intel Partner

15    Alliance program.

16         Q.  What is the Intel Partner Alliance program?

17         A.  I think we may actually have a document that

18    specifically outlines what the program entails in

19    evidence.  I'm not a hundred percent sure.

20         Q.  Do you recall generally what the program is?

21         A.  At a high level, it's a collection of various

22    programs and services for industry partners that have

23    different needs that may be able to mutually benefit

24    each other.

25         Q.  Is this partnership related to the Helios
```

 1   technology?

 2       A. Yes.

 3       **Q. What is the nature of CT's relationship with**

 4   **Intel as it relates to Helios?**

 5       A. Intel expressed an interest a long time ago in

 6   the underlying technology being optimized for Intel CPUs

 7   and wants to sell their hardware.

 8       **Q. Let's look at CT100469.  We can mark that as**

 9   **Exhibit 10.**

10           (Deposition Exhibit No. 10 was marked for

11             identification.)

12           THE WITNESS:  Just opening it up.

13           Okay.  Go ahead.

14   BY MS. RAIMER:

15       **Q. Do you recognize this document?**

16       A. I haven't read it in detail, but it's the Intel

17   Partner Alliance terms and conditions.

18       **Q. Did CT agree to these terms and conditions?**

19       A. It would have had to in order to be admitted

20   into the program.

21       **Q. Let's turn to 100479, Paragraph 715.**

22           MR. SHUSTER:  479.  Sorry.  It takes me longer

23   than I thought.

24           All right.  I have that page up.

25

 1  BY MS. RAIMER:

 2       Q. On Paragraph 715, there's a governing law and

 3  forum provision, correct?

 4       A. Yes.

 5       Q. And in that -- by that provision, CT agreed to

 6  governing law and forum for any dispute regarding this

 7  agreement in the state of Delaware, correct?

 8       A. That's related to the Intel Partner Alliance

 9  trademark license.  I don't know how that relates to the

10  rest of the program.

11       Q. Oh, I think the trademark license is on

12  Page 100494.  So let's start first with the -- well,

13  let's flip to that, 100494.  And Paragraph 9.1.1.

14       A. Okay.  Go ahead.

15       Q. And in this provision, CT agreed or consented

16  to any dispute arising out of the license being under

17  the exclusive jurisdiction and venue of state and

18  federal courts within Santa Clara County, California,

19  correct?

20       A. That appears to be what it says.

21       Q. CT's Helios solution was approved to be part of

22  Intel's Partner Showcase, right?

23       A. Showcase, yes.

24       Q. We'll put a slide up so you can see it.

25  COHESITY_615.  I believe that's Exhibit 11, we can mark

```
 1   it as.
 2              (Deposition Exhibit No. 11 was marked for
 3                identification.)
 4              THE WITNESS:  Gary is just pulling it up.
 5              MR. SHUSTER:  It's amazing how long it takes
 6   these things to load.
 7              THE WITNESS:  Okay.  Go ahead.
 8   BY MS. RAIMER:
 9        Q. Do you recognize this page?
10        A. Yes.
11        Q. Is this an Intel web page that's advertising
12   CT's Helios platform?
13        A. I don't know if it's current, but it appears to
14   be a screenshot.
15        Q. This website is a U.S. website, correct?
16        A. The address is Vancouver, it says.
17        Q. In the domain name, do we see that it's a U.S.
18   website up at the top?
19        A. I can't see.
20           Intel.com, but that doesn't mean U.S.
21        Q. Well, "content/www/us/en"?
22        A. That's just what the language that the browser
23   automatically detects.  The people who wrote the
24   browsers tend to be Americentric, so it automatically
25   defaults to that.
```

Page 100

Kipling C.S. Warner

 1        Q. The substance on the website reads:

 2            "Helios is a powerful Intel AVX optimized on

 3   premise or hosted DTB -- B2B technology that allows

 4   searching of large commercial music catalogues by using

 5   music itself as the search key."

 6            Did I read that correctly?

 7        A. You did.

 8        Q. Is that how you would also characterize Helios?

 9        A. Not to everyone, but for those specifically

10   interested in Intel-based offerings, yes.

11        Q. And Intel uses a registration symbol next to

12   Helios in that sentence, correct?

13            MR. SHUSTER:  Where -- it's behind -- it's

14   right below --

15        A. It's tiny, but in the superscript beside

16   Helios, yes, there's a registration symbol for the

17   company, which says it's located in Vancouver.

18   BY MS. RAIMER:

19        Q. So it has the address you just noted, and then

20   it says "regional coverage," and "Americas," and it

21   includes Latin America region and North America region,

22   correct?

23        A. Yes.  I think Intel just sets that on their

24   own.

25        Q. When did Intel start showcasing CT's Helios

 1  technology on its website?

 2      A. I don't know, but it would be some point in

 3  time that postdated whenever the partnership email was

 4  sent out to CT.

 5      **Q. I think we might have it.  CT124396.  If we can**

 6  **mark this one as Exhibit 12.**

 7          (Deposition Exhibit No. 12 was marked for

 8            identification.)

 9  BY MS. RAIMER:

10      **Q. Do you recognize this email?**

11      A. It's not in yet.

12          MR. SHUSTER:  It's still doing the --

13          MS. RAIMER:  Oh.  Getting ahead of myself.

14          MR. SHUSTER:  No, you're just a whole lot

15  faster than my laptop.

16          MS. RAIMER:  That's because I've got it on

17  paper, Gary, old-fashioned.

18          THE WITNESS:  The 24th of March 2025 email?

19          MS. RAIMER:  Yes.

20          THE WITNESS:  Okay.  We have that open.

21  BY MS. RAIMER:

22      **Q. What is this document?**

23      A. That is Helios being admitted to their Partner

24  Showcase Solutions program.

25      **Q. And what is the Partner Solutions program --**

Highly Confidential

Kipling C.S. Warner                                    Cohesity, Inc. vs.
                                              Cartesian Theatre Corp.

1    Partner Showcase program?

2         A. They showcase various products that are in some

3    way leveraging Intel technology from third parties.

4         Q. Another partner that was listed on your website

5    was NVIDIA; is that right?

6         A. NVIDIA.

7         Q. NVIDIA.

8             Is that correct?

9         A. Yes.

10        Q. When did CT enter its partnership with NVIDIA?

11        A. We should have that in evidence.  There should

12   be an acceptance email somewhere.

13        Q. Okay.  I'll see if I can pull that up as

14   100516.  We'll mark this as Exhibit 13.

15            (Deposition Exhibit No. 13 was marked for

16             identification.)

17            THE WITNESS:  Okay.  Go ahead.

18   BY MS. RAIMER:

19        Q. Do you recognize this document?

20        A. I do.

21        Q. What is it?

22        A. It's an email from NVIDIA dated 23rd of

23   November, 2020, with subject "Congratulations on your

24   acceptance into NVIDIA Inception."

25        Q. Has CT been a partner with NVIDIA since that

**Highly Confidential**

1    time?

2         A. Yes.  The message body reads:

3            "We are thrilled to welcome Cartesian Theatre

4    into NVIDIA Inception.  Congratulations on your

5    acceptance into the premier program for AI and data

6    science startups," and then it continues on.

7         **Q. Is CT's partnership with NVIDIA related to**

8    **Helios?**

9         A. Yes.

10        **Q. What is the nature of CT's relationship with**

11   **NVIDIA as it relates to Helios?**

12        A. NVIDIA has been lobbying me for several years

13   to adapt Helios to be dependent on their technology.

14        **Q. Let's bring up CT100512.  We can mark that as**

15   **Exhibit 14.**

16            (Deposition Exhibit No. 14 was marked for

17             identification.)

18            MR. SHUSTER:  I may have double-opened it,

19   so --

20            THE WITNESS:  Okay.  We have it open.  This is

21   the 17th of November 2020 document.  Is that what you're

22   looking at?

23            MR. SHUSTER:  November?

24            MS. RAIMER:  Yes.

25            THE WITNESS:  17th of November, 2020.

Kipling C.S. Warner

 1 | BY MS. RAIMER:

 2 |     **Q. And this is an email between you and an NVIDIA**

 3 | **representative --**

 4 |     A. Yes.

 5 |     **Q. -- regarding -- it looks like you started the**

 6 | **email November 12th, 2020, but there was no -- there's**

 7 | **no email there.**

 8 |     A. I --

 9 |     **Q. And do you recall whether there was just an**

10 | **attachment?**

11 |     A. No.  Sometimes when you're printing out emails,

12 | it misinterprets parts of the email as attachments when

13 | they weren't really.

14 |     **Q. Do you recall what your email to Mr. Jeremy**

15 | **Krinitt would have said?**

16 |     A. No.  I don't know why it's not displaying, but

17 | it just says:

18 |         "12th of November 2020, external email, use

19 | caution opening links for attachments."

20 |         No idea.  It may have been something to do with

21 | a phone call or something like that.  I know we had

22 | spoken a number of times by telephone.

23 |     **Q. And Mr. Krinitt notes to you that he would like**

24 | **to introduce you to Matias Serebrinsky; is that right?**

25 |     A. That appears to be what the email says, yes.

**Page 105**

Highly Confidential

Kipling C.S. Warner                                      Cohesity, Inc. vs.
                                                    Cartesian Theatre Corp.

1      Q. Did you have a -- did you ever speak with

2  Mr. Serebrinsky as a result of this email?

3      A. I don't remember.  It was half a decade ago.

4      Q. Is this email referring to Helios?

5      A. My partnership with NVIDIA is related to

6  Helios, yes.

7      Q. Let's bring up CT100350.  Mark this one as

8  Exhibit 15.

9          (Deposition Exhibit No. 15 was marked for

10              identification.)

11         THE WITNESS:  Okay.  Go ahead.

12  BY MS. RAIMER:

13     Q. Do you recognize this document?

14     A. Yes.

15     Q. What is this email?

16     A. This is NVIDIA trying to encourage me to become

17  dependent on some of their commercial offerings.

18     Q. And when you say "become dependent," is -- are

19  you referring to the hundred thousand dollars in AWS

20  credits?

21     A. Yes.  That's part of it.  But there's more to

22  that.

23     Q. Did you use these AWS credits at all?

24     A. I used some of them.  I don't know that I used

25  all of them.  But I decided not to continue using them

```
 1  at some point.
 2       Q. Why did you make that decision?
 3       A. NVIDIA wanted my customers to be dependent on
 4  some very expensive and unnecessary hardware in order to
 5  make my technology work, and I didn't think that was a
 6  good design choice.
 7       Q. Do you continue to partner with NVIDIA?
 8       A. I'm still partnered with NVIDIA in the NVIDIA
 9  Inception program.
10       Q. SiFive is another partner listed on your
11  website; is that correct?
12       A. Yes.
13       Q. They are located in California, correct?
14       A. I don't know where they are located.  I think
15  they are Chinese backed, actually.
16       Q. Let's put in the chat CT100662.
17          (Deposition Exhibit No. 16 was marked for
18            identification.)
19          THE WITNESS:  Okay.  Go ahead.
20  BY MS. RAIMER:
21       Q. Do you recognize this document?
22       A. Yes.
23       Q. What is it?
24       A. It's a mutual NDA between CT and SiFive.
25       Q. And is SiFive's address in this agreement in
```

1  California?

2       A. No.  It says Delaware.

3       **Q. In the top of the document?**

4       A. I think it's on the second line of the

5  document.

6       **Q. Let's look at the signature page.**

7            MR. SHUSTER:  You know, there's no Bates number

8  on this signature page.

9            MS. MCKEOWN:  That's how you produced it, Gary.

10           MR. SHUSTER:  I'm not blaming you.  I'm just

11  saying out loud that that should not have happened.  I

12  apologize.

13  BY MS. RAIMER:

14       **Q. Do you see the signature page?**

15       A. Yes.

16       **Q. And do you see the California address?**

17       A. I see a California address.

18       **Q. I'm going to direct your attention back to**

19  **Paragraph 11.**

20       A. Yes.

21       **Q. For any disputes regarding the agreement, you**

22  **consented to personal jurisdiction in Santa Clara**

23  **County, correct?**

24       A. Yes.

25       **Q. When did CT enter its partnership with SiFive?**

 1          A. I don't recall the exact date.  We don't have a

 2   formal agreement that the parties must do or not do

 3   certain things other than an NDA.

 4          **Q. Does the partnership relate to Helios?**

 5          A. Yes.

 6          **Q. What is the nature of the relationship with**

 7   **SiFive as it relates to Helios?**

 8          A. ███████████████████████████████████████

 9   ████████████████████████████████████████████████

10   ███████████████████████████████████████████████████

11   ██████████████████████████████████████

12          **Q. Let's look at CT100660.  This will be**

13   **Exhibit 17.**

14              (Deposition Exhibit No. 17 was marked for

15                identification.)

16          THE WITNESS:  Okay.  Go ahead.

17   BY MS. RAIMER:

18          **Q. Do you recognize this document?**

19          A. Yes.

20          **Q. What is it?**

21   ████████████████████████████████████████████████

22   ███████████████████

23          **Q. The invoice identifies SiFive's address in**

24   **California, correct?**

25          A. Well, that's the location that they were

1   shipping from.  I don't know where they are actually

2   headquartered.  ███████████████████████████████

3   ████████████████████████████████████████████████

4        Q. Let's put up CT100661.  And that's Exhibit 18.

5           (Deposition Exhibit No. 18 was marked for

6            identification.)

7           THE WITNESS:  Okay.  Go ahead.

8   BY MS. RAIMER:

9        Q. Do you recognize this document?

10       A. Yes.

11       Q. What is it?

12       A. It's a joint press release dated 6th of

13  December, 2021.

14       Q. And this press release was on the R-S --

15  R-I-S-C-V website; is that right?

16       A. RISC-V is how you pronounce it.

17       Q. So this press release was on the RISC-V

18  website?

19       A. Yes.  I think they are in Switzerland.

20       Q. It notes that:

21          "Helios music recommendation engine successful

22  port to the open and free RISC-V instruction set

23  architecture."

24          Is that right?

25       A. Yes.

Highly Confidential

Kipling C.S. Warner                                    Cohesity, Inc. vs.
                                            Cartesian Theatre Corp.

1    Q. Is -- is RISC-V part of SiFive?

2        A. RISC-V is a standard, and then different

3   companies can do things with it.  In the sense that

4   email is a standard, but Microsoft has an application

5   and Apple has an application for it.  But this is --

6        Q. And so the Helios -- so Helios is being able to

7   be used on the RISC-V application?

8        A. It's hardware, not software.

9        Q. Got it.

10       So Helios is available on the RISC-V hardware?

11       A. Yes, from SiFive.

12       Q. Let's turn to Magnatune.  I believe you said

13  Magnatune was headquartered in Berkeley; is that

14  correct?

15       A. I don't know where it's headquartered, but I

16  know that the principal is or was in Berkeley,

17  California.  I don't believe the company is -- the

18  business is still operating anymore.

19       Q. You don't believe Magnatune is still operating

20  anymore?

21       A. This is what I have been told by the principal

22  a while ago.  I don't know the current state of it.

23       Q. When did CT work as a partner with Magnatune?

24       A. Many years ago.  I don't --

25       Q. What was the relationship in connection with

 1  the Helios technology?

 2      A. The principal was interested in the technology,

 3  and I purchased a music catalogue from Magnatune to use

 4  for research and development purposes and for a demo.

 5      Q. Did you have any agreements with Magnatune?

 6      A. Informally.

 7      Q. Oracle is also listed as one of CT's partners,

 8  correct?

 9      A. Yes.

10      Q. Let's bring up CT100659 and mark it as

11  Exhibit 19.

12          (Deposition Exhibit No. 19 was marked for

13           identification.)

14      THE WITNESS:  Gary is just closing some of the

15  windows that we've got open of all the exhibits because

16  it's slowing down the computer.

17          MR. SHUSTER:  All right.  We have it open.

18          THE WITNESS:  Go ahead, Anna.

19  BY MS. RAIMER:

20      Q. Do you recognize this document?

21      A. I do.

22      Q. What is it?

23      A. It's an NDA of sorts from Oracle between CT and

24  Oracle.

25      Q. It identifies Oracle's address in Redwood City,

1  California, correct?

2        A. Yes.

3        Q. Directing your attention to Paragraph 11, in

4  this agreement, you agreed to submit to the exclusive

5  jurisdiction of and venue in the courts in San Francisco

6  or Santa Clara Counties in California for any disputes

7  arising out of or relating to this agreement; is that

8  right?

9        A. Yes.

10        Q. What is the nature of CT's partnership with

11  Oracle as it relates to Helios?

12  ████████████████████████████████████████

13  ████████████████████████████

14  █████████████████████████████████████████

15  ███████████

16  ████████████████████████

17        Q. Amazon is another partnership with respect to

18  CT; is that right?

19        A. Yes.

20        Q. Amazon is headquartered in the United States,

21  right?

22        A. I don't know where they are headquartered, but

23  I was dealing specifically with AWS Canada.

24        Q. You signed an agreement with AWS, correct?

25        A. Yes.

Highly Confidential

Kipling C.S. Warner                                          Cohesity, Inc. vs.
                                                         Cartesian Theatre Corp.

1          Q. Let's bring up CT100345.  We can mark that as

2     Exhibit 19 -- sorry, Exhibit 20.

3               (Deposition Exhibit No. 20 was marked for

4                identification.)

5               THE WITNESS:  Go ahead.

6     BY MS. RAIMER:

7          Q. Do you recognize this document?

8          A. I do.

9          Q. What is this?

10         A. It's a mutual NDA between AWS and CT.

11         Q. And for AWS is the address identified Seattle,

12    Washington?

13         A. Yes, for Amazon Web Services, Inc.  It's not

14    the company that I do business with, but this is -- this

15    is the NDA.  That's the signing party.

16         Q. Turning to Paragraph 11.4, you agreed to

17    jurisdiction and venue in Washington State in connection

18    with this agreement, correct?

19         A. Yes.

20         Q. What is the nature of your relationship with

21    Amazon Web Services as it relates to Helios?

22    ████████████████████████████████████████████

23    ██████████████████████████████████████████████

24    ████████████████████████████████████████████

25    ████████████████████████████████████

Page 114

Kipling C.S. Warner

1      Q. So when we were talking about AW -- the Helios

2  being deployed on AWS in connection with Helios in U.S.

3  commerce, was that not the AWS U.S.?

4      A. No.

5      Q. What were you talking about in connection with

6  that comment?

7      A. All the people that I dealt with, they were all

8  Canadian.

9      Q. So AWS is a partner, not a customer; is that

10  right?

11      A. Correct.  And the program specifically that CT

12  was admitted to, I believe, was a Canadian program.

13  ████████████████████████████████████████████████████

14  ███████████

15  ████████████████████████████████████████████████████

16  ████████████████████████████████

17      Q. Do any Helios customers in the U.S. use AWS

18  structure?

19      A. There are no U.S. customers of Helios.

20      Q. Have any customers in the U.S. ever used AWS as

21  a structure?

22      A. I can't know that.  They are using the client

23  utilities of the SDK; they could put it on anywhere they

24  like in the world, and I wouldn't know.

25      Q. The next partner listed on your website is

**Page 115**

1 **Microchip.  Do you know -- is that -- is Microchip a**

2 **partner of CT?**

3 　　　A. Well, microchip is a technology; the company is

4 called Microchip Technologies.  That's the actual name

5 of the company.

6 　　　**Q. Are they still a partner of CT?**

7 　　　A. Yes.

8 　　　**Q. Do you know whether they are headquartered in**

9 **the United States?**

10 　　　A. I don't know.  They are a very large

11 international, multinational.

12 　　　**Q. Let's bring up 100508, and we can mark that as**

13 **Exhibit 21.**

14 　　　　　(Deposition Exhibit No. 21 was marked for

15 　　　　　　identification.)

16 　　　　　THE WITNESS:  Okay.  Go ahead.

17 BY MS. RAIMER:

18 　　　**Q. Do you recognize this document?**

19 　　　A. I do.

20 　　　**Q. What is this document?**

21 　　　A. It's a mutual NDA between Microchip

22 Technologies and CT.

23 　　　**Q. Microchip's address listed on this agreement is**

24 **Chandler, Arizona; is that correct?**

25 　　　A. That appears to be the case.

```
 1        Q. And in Paragraph 6, governing law, you agreed
 2   to the laws of Arizona with any dispute being subject to
 3   the jurisdiction of the courts in Phoenix, Arizona; is
 4   that correct?
 5        A. Yes.
 6        Q. Does CT have any partners other than those that
 7   I have just -- we have already discussed today?
 8        A. Yes.
 9        Q. What other partners does CT have?
10        A. The most recent one is Arm.
11        Q. What is Arm?
12        A. Arm is a British holding company that is
13   responsible for the Arm Hardware Technology, the IP
14   specifically, which they license out to third-party
15   manufacturers.
16        Q. And what is the relationship of your
17   partnership with Arm in connection with Helios?
18   ███████████████████████████████████████████████████
19   ██████████████████████
20        Q. Does Arm have any locations in the United
21   States?
22        A. I have no idea.
23        Q. Does CT have any other partners aside from Arm
24   and the one we've discussed today?
25        A. Ingram Micro.
```

1      Q. Other than the ones we've discussed today, does

2  CT have any other partners?

3      A. Yes, quite a few.

4      Q. Can you just list those other partners for us?

5      A. There's the ones that are listed on our

6  website.  And then BC Tech, AI Partnerships Corp, IBM,

7  InnoBoost, OVH Cloud, Palo Alto Networks, Qualcomm,

8  StarFive, Sipeed, RED Semiconductors.  There may be

9  others as well.  There's been quite a few over the

10  years.

11      Q. Do you know whether any of those partners are

12  located in California?

13      A. I don't keep track of that.

14      Q. Let's look at CT12214 (sic).

15      (Deposition Exhibit No. 23 was marked for

16        identification.)

17      MR. SHUSTER:  Ms. Phillips, are you doing okay?

18  Do you need a break?  I know we've gotten a lot of

19  transcribing you're doing.

20      THE REPORTER:  I'm okay for now.  Thank you.

21  BY MS. RAIMER:

22      Q. Do you recognize the email at 12214 (sic)?

23      A. We're just trying to open it.

24      Q. Sure.  My apologies.  It's 122214.  I missed a

25  two there.

1      A. This is why I was saying it's faster if you

2   just share the screen where you got the exhibits there.

3         Okay.  We've got it open.

4      **Q. Do you recognize this email?**

5      A. Yes.

6      **Q. And what is the email?**

7      A. It's an email from Palo Alto Networks to CT

8   dated 22nd of November 2024, subject "Welcome to Palo

9   Alto Networks."

10     **Q. So your partnership with Palo Alto Networks**

11  **began around November 2024?**

12     A. Yes.  That's what it appears.

13     **Q. Palo Alto Networks is in Santa Clara,**

14  **California, right?**

15     A. Probably, based on the name, it's somewhere in

16  California.  Wherever Palo Alto is.

17     **Q. I think it even says at the very bottom, their**

18  **address, Santa Clara, California, of the email.**

19        **What is the nature of your partnership with**

20  **Palo Alto Networks?**

21     A. That's a good question.  I don't remember, to

22  be honest with you.

23     **Q. Is it in relation to the Helios technology?**

24     A. It would be.  I don't remember what their

25  interest was.

1          Q. Did you activate your account with Palo Alto
2    Networks with this email?
3          A. Yes.
4          Q. You also mentioned IBM.  Let's bring up
5    CT 36 -- CT100367.  We can mark that as Exhibit 23 --
6    24.
7              (Deposition Exhibit No. 24 was marked for
8                 identification.)
9              MR. SHUSTER:  Exhibit -- okay.
10             THE WITNESS:  Okay.  Go ahead.
11   BY MS. RAIMER:
12         Q. Do you recognize this document?
13         A. I do.
14         Q. And what is it?
15         A. It's an NDA between CT and IBM.
16         Q. And this agreement was in December 2019; is
17   that right?
18         A. That's what it appears.
19         Q. I'm going to bring up CT100467, which we can
20   mark as Exhibit 25.
21             (Deposition Exhibit No. 25 was marked for
22                 identification.)
23             THE WITNESS:  Okay.  Go ahead.
24   BY MS. RAIMER:
25         Q. Do you recognize this email?

**Kipling C.S. Warner**

1        A. Yes.

2        Q. And this is an email regarding the IBM startups

3    program from April 2024; is that right?

4        A. Yes.

5        Q. So is this a different type of partnership with

6    IBM than the previous agreement that we looked at?

7        A. Yes.

8        Q. What is the nature of the partnership with

9    respect to the startups program?

10   ████████████████████████████████████████████████

11   ████████████████████████████████████████████████

12   ████████████████████████████████████████████████

13   ████████████████████████████████████████████████

14   ████████████████████████████████████████████████

15   ████████████████████████

16   ████████████████████████████████████

17   ████████████████████████████████████

18   ██████████████████████████████████████████

19   ██████████

20            THE WITNESS:  Megan, can you help us?

21            MS. RAIMER:  Let's look at CT100390.

22            MS. MCKEOWN:  That's Exhibit 26.

23            (Deposition Exhibit No. 26 was marked for

24              identification.)

25            THE WITNESS:  No.  That's not it.

1  BY MS. RAIMER:

2      Q. Do you recognize this document?

3      A. Yes.

4      Q. So this is an IBM agreement for cloud for

5  enablement and co-creation; is that correct?

6      A. Yes.

7      Q. And what's the nature of this agreement with

8  IBM, between CT and IBM?

9      A. I don't know.  I haven't read it in a long

10  time.

11      Q. Has IBM ever shipped hardware to CT for Helios

12  use?

13      A. Yes.

14      Q. And why did they ship hardware to CT?

15      A. As I said, if you could pull up the letter from

16  22nd of June 2020, that answers the question you had

17  before this one as well, the nature of the relationship

18  between the two businesses.

19      Q. We'll look for that.  But just from your

20  recollection, what is the nature -- or what is the

21  reason that they shipped CT hardware?

22      ████████████████████████████████████████

23  ████████████████████████████████████████████

24  ████████████████████████

25      Q. I think the letter you're talking about is at

```
 1   CT122189.

 2           So we can mark this document as Exhibit 27.

 3           (Deposition Exhibit No. 27 was marked for

 4             identification.)

 5   BY MS. RAIMER:

 6           Q. Is this the letter you're referencing?

 7           A. Just a moment.  We're still loading.

 8             Yes.

 9           Q. ████████████████████████████████████

10   ████████████████████████████████████████████████

11           A. Yes.

12           Q. And it's dated June 22nd, 2020?

13           A. Yes.

14           Q. Why was this letter written to CT?

15           ████████████████████████████████

16   ████████████████████████████████████████████████

17   ██████████████████████████████████████████

18   ████████████████████████████████████████████████

19   ████████████████████████████████

20   ██████████████████████████████████████

21   ███████████████████████████████████████████

22   ██████████████████████

23   ████████████████████████████████████████

24   ██████████████████

25   █████████████████
```

**Kipling C.S. Warner**



22    Q. What does it mean for CT's technology -- for

23  Helios to be OpenPOWER ready?

24    A. OpenPOWER Foundation was created originally by

25  IBM to promote their products and services that run on

 1   sound right?

 2         A. Yes.

 3         Q. And you knew Ms. Kiedrowski was a U.S. lawyer

 4   when you sent your email to her; is that right?

 5         A. I don't know that I knew that.  I just saw that

 6   she was listed as a contact in the Canadian application.

 7         **Q. You were aware that Cohesity was located in**

 8   **California when you reached out to Cohesity's counsel,**

 9   **correct?**

10         A. Yes.

11         **Q. Do you recall holding a telephone call with**

12   **Cohesity's counsel in September 2024?**

13         A. I don't remember the exact date, but it was

14   sometime in 2024, late 2024.

15         **Q. Do you recall during a phone call with**

16   **Cohesity's counsel claiming to have ready-to-file**

17   **affidavits and documents to support the first use dates**

18   **that CT asserted in its U.S. trademark application for**

19   **Helios?**

20         A. No, I didn't say that.  What I said was I have

21   documents that we could use to prove prior use.  You

22   can't have an affidavit without a proceeding, which

23   didn't exist at that point in time.

24         **Q. Do you recall during your phone call that you**

25   **advised that Cohesity is infringing CT's rights in**

 1   by Cohesity's counsel, I'm referring to both Monique

 2   Couture and Carrie Kiedrowski.  So you have not had a

 3   phone call with either of them?

 4        A. I've never had a phone call with them.  I don't

 5   know if my counsel has.

 6        Q. You're aware that Cohesity doesn't have a

 7   separate Canadian company in Canada, right?

 8        A. It did.

 9        Q. What company is that?

10        A. One moment.

11        Q. Actually, let me ask a different question.

12           You're aware that Cohesity, Inc., the U.S.

13   company, has employees located in Canada, right?

14        A. Just a moment, please.

15        Q. I can withdraw the other question.  I don't

16   want you to waste time on it.

17           You're aware that Cohesity, Inc., the U.S.

18   company, has employees located in Canada, right?

19        A. I don't keep track of where all their employees

20   are.

21        Q. You've heard of Cohesity's DataProtect

22   offering, right?

23        A. Yes.

24        Q. And you are aware that Cohesity's DataProtect

25   offering is integrated with Cohesity's Helios offering?

**Highly Confidential**

```
 1          A. I think it's the other way around.

 2          Q. But you're aware that DataProtect has a

 3   relationship with the Helios of Cohesity?

 4          A. Yes.

 5          Q. Do you recall emailing Cohesity's employer --

 6   employees in September of 2024 regarding the adoption of

 7   Cohesity's DataProtect platform in Canada?

 8          A. Yes.

 9          Q. You emailed 13 Cohesity employees on

10   September 3rd, 2024, regarding the adoption of

11   Cohesity's DataProtect platform in Canada, right?

12          A. Yes.  I don't remember where they are

13   physically located, but I do recall emailing them.

14          Q. Okay.  Megan will put into the chat

15   COHESITY_000012 to 24, which we can mark as

16   Exhibit 30 -- 31.  I'm just going to be behind all day.

17              (Deposition Exhibit No. 31 was marked for

18                identification.)

19              THE WITNESS:  Okay.  Go ahead.

20   BY MS. RAIMER:

21          Q. Do you recognize these emails?

22          A. Yes.

23          Q. Are these emails that you sent to Cohesity's

24   employees?

25          A. Yes.  I'm just looking at the first page, but
```

 1   if this is a bundle of the similar correspondence with

 2   Cohesity, yes, these are all sent.

 3          Q. Why did you email each of these Cohesity

 4   employees on September 3rd, 2024?

 5          A. I wanted to better understand the usage of the

 6   product, which I take the position is infringing on my

 7   mark in Canada.

 8          Q. Were you making sales-related product inquiries

 9   to Cohesity?

10          A. Well, I wasn't interested in purchasing or

11   licensing their product.  I was more interested in the

12   harm it might be causing to my own.

13          Q. Did you receive any responses to these emails?

14          A. I don't think so.  I'm pretty sure I didn't.

15          Q. How many trips have you taken to the United

16   States?

17          A. Trips?

18          Q. Yes, trips from Canada.

19          A. I haven't counted.  But most of my travel to

20   the United States has been when I was a teenager and

21   just over the border into Washington State.

22          Q. Would you say more than 10 times?

23          A. Yes.

24          Q. More than 20 times?

25          A. Yes.

```
 1        Q. More than 30 times?

 2        A. Yes.

 3        Q. More than 50 times?

 4        A. However often a churchgoer frequents, which

 5   would be, at most, once a week to Unitarian Church in

 6   Blaine.

 7        Q. Okay.  Aside from the churchgoing, would you

 8   say more than 30 times?

 9        A. I don't know.

10        Q. When was your last trip to the United States?

11   That was the one that was 10 years ago that we discussed

12   earlier?

13        A. I don't remember, but it would have been a long

14   time ago.

15        Q. You mentioned driving over the border.  Have

16   you also flown into the United States before?

17        A. Yes.

18        Q. How many times would you have taken a flight

19   into the United States?

20        A. I don't know.  I had family that lived down

21   there a long time ago.  But they live in Point Roberts,

22   which is -- you won't know this, but it's a small island

23   just off -- tangential to British Columbia.  You don't

24   need to fly.  You just drive over.

25        Q. Sounds lovely.
```

1          Do you think you would have been on more than

2    10 flights to the United States from Canada?

3          A. I haven't been counting.  It's certainly less

4    than a hundred, though.

5          Q. Do you have any plans to fly to the United

6    States?

7          A. No.

8          Q. Have you ever been denied entry into the United

9    States?

10         A. Yes.

11         Q. When were you denied entry into the United

12   States?

13         A. Probably early 2000s.

14         Q. What was the basis for that denial?

15         A. I was on my way to help my uncle build some

16   furniture, Ikea furniture at his office in Point

17   Roberts.  The customs official, American of course, was

18   satisfied that I would be taking an American's job by

19   volunteering my afternoon to assemble the Ikea

20   furniture, and I was denied entry into your country.

21         Q. Have you ever been denied entry in an airport?

22         A. I'm sorry?

23         Q. Have you ever been denied entry into the U.S.

24   at an airport?

25         A. No.

1    Q. When was the last time you applied for a visa

2  to enter the United States?

3    A. I don't remember, but when I did, it was at the

4  airport.

5    Q. Have you ever been denied a visa into the

6  United States?

7    A. Not through the airport.

8    Q. You have not made any attempt to apply for a

9  visa of any kind to the United States in connection with

10  this case, right?

11    A. No.

12    Q. You have received no indication from the U.S.

13  government that any visa application would be denied,

14  correct?

15    A. No.  That's not correct.

16    Q. What -- has the U.S. government sent you a

17  letter that advised a visa application would be denied?

18    A. It has not sent me personally a letter.

19    Q. Have you ever been asked by a U.S. Customs and

20  Border Protection officer about your cannabis use?

21    A. Yes.

22    Q. When did that occur?

23    A. Whenever it was the last time I tried to go

24  over the border many years ago, whenever that was.

25    Q. Have you ever been asked about your cannabis

1    use by a U.S. Customs and Border Protection officer at

2    the airport?

3         A. I don't remember, but I think it is commonplace

4    that they ask that through all points of entry.

5         Q. Why do you think that's commonplace?

6         A. Because the United States is very strict on its

7    drug policy.

8         Q. Are you aware that cannabis is legal in

9    California for adult recreational use and medical use?

10         MR. SHUSTER:  Objection.  Misstates the law.

11    BY MS. RAIMER:

12         Q. Are you aware that you can purchase cannabis

13    legally in California?

14         A. I haven't tried to purchase cannabis in the

15    state of California, so I wouldn't know.

16         Q. Has U.S. Customs and Border Protection ever

17    racially profiled you when you were applying to enter

18    the United States?

19         A. How would I know?

20         Q. Are you aware of whether U.S. Customs and

21    Border Protection has ever racially profiled you when

22    you were applying to enter the United States?

23         A. No, I'm not aware that they did.

24         Q. What Canadian government officials would you

25    coordinate with before filing an infringement suit in

1    the U.S. against Cohesity?

2         A. I would have to think further about that.  But

3    there are a number.

4         Q. You're not required, though, to ask permission

5    from Canadian government officials before filing suit

6    against a U.S. company in the U.S., correct?

7         A. Correct.

8         Q. You did not have to coordinate with any

9    government official in Canada before suing Cohesity in

10   Canada, correct?

11        A. Correct.

12        Q. If this case goes to trial, does CT intend to

13   ask the court to appear at trial by videoconference?

14        A. I haven't thought about that.  I wasn't aware

15   that was even an option.

16        MS. RAIMER:  I'm going to -- I just want to

17   turn and talk about the infringement notices for a

18   little bit.  But I just want to make sure nobody needs a

19   break before I do so, and that way we can just keep the

20   infringement notices in one section.  I promise we're

21   getting toward the end here.

22        THE WITNESS:  If you want to send it to Gary,

23   and I'll run to the washroom, and we'll have it open

24   when I am back.  Does that sound good, five minutes?

25        MS. RAIMER:  Sure.  Sounds great.

 1  it's saying that what you tried to do was take down

 2  information that was available to consumers in the

 3  United States.

 4          But let's go ahead and turn to our Apple

 5  takedown notices.

 6      A. Sure.

 7      Q. That's CT100106.

 8          (Deposition Exhibit No. 37 was marked for

 9            identification.)

10          MS. MCKEOWN:  (Inaudible.)

11          (Reporter interrupts for clarification of the

12            record.)

13  BY MS. RAIMER:

14      Q. Do you recall submitting a report to Apple in

15  October of 2024?

16      A. Yes.

17          MR. SHUSTER:  We don't have that document yet.

18  I mean, if you want him to just answer questions, that's

19  fine.  But I don't have an exhibit up.  It did just get

20  here, though.

21          MS. RAIMER:  We'll put up CT100106.

22          MS. MCKEOWN:  That's Exhibit 37.

23          MS. RAIMER:  We'll mark this one as Exhibit 37.

24  BY MS. RAIMER:

25      Q. Do you have this document up yet?

```
 1        A. Yes.  Go ahead.

 2        Q. Do you recognize this email?

 3        A. Yes, I did.

 4        Q. And did you send this email to

 5  appstorenotices@apple.com?

 6        A. Yes.

 7        Q. And it looks like you cc'd some Cohesity email

 8  addresses on here as well; is that right?

 9        A. These were the same addresses that were already

10  copied when Apple sent out the email that I was

11  responding to, and they said that you need to copy the

12  opposing party.

13        Q. In Point Number 3 on CT100107, you note that:

14             "We have submitted approximately a thousand

15  takedown requests to various platforms regarding the

16  unauthorized usage of CT's marks."

17        A. Yes.

18        Q. Is that an accurate statement?

19        A. It's close to that.  It's around 98,

20  99 percent.  At the time that that email was sent, that

21  was exactly what it was.

22        Q. And then it says:

23             "Some of these have included Cohesity's various

24  publications which have since been removed."

25        A. That's correct.
```

1        Q. Is that right?

2        A. Yes.

3        Q. Which Cohesity publications were removed?

4        A. So Amazon, I don't know what, if anything, that

5    they did.  But Apple and Google both removed the Helios

6    application from their stores, but they did not

7    communicate to me that that was directly a result of

8    CT's complaints.  I believe Meta also took down

9    publications in direct response to CT's complaint that

10   they were directed towards the Canadian geographical

11   region.

12       Q. Do you know whether that resulted in the

13   publications coming down in the United States as well?

14       A. Sorry.  You're asking about which publication?

15   Or which publisher or platform?

16       Q. Cohesity's various publications which have

17   since been removed.  Were those removed in the United

18   States as well?

19       A. I don't know.  I know that Apple and Google

20   appear to have taken down your app outside of Canada as

21   well, but I had nothing to do with that.

22       Q. So you -- you do not know what resulted in the

23   app no longer being available on the Apple or Google

24   store, correct?

25       A. No.  They never gave me a straight answer.  But

 1   "Where is the trademark registered?"  And it -- it asks

 2   for that.

 3           And I say, "Canada."

 4      **Q. Let's bring up CT100264.**

 5           MS. MCKEOWN:  44.

 6           (Deposition Exhibit No. 44 was marked for

 7              identification.)

 8           THE WITNESS:  Okay.  Go ahead.  15th of

 9   October, 2024.

10   BY MS. RAIMER:

11      **Q. Is this a response that you received from**

12   **Facebook?**

13      A. It appears to be, yes.

14      **Q. And in the response, it says:**

15           "Thanks for contacting us.  We've reviewed your

16   report, and it's not clear that the reported content

17   infringes your trademark rights.  In particular, the

18   reported content doesn't appear to be directed at the

19   geographic locations where you claim trademark rights."

20           Is that right?

21      A. That's not the whole email, but that's part of

22   it.

23      **Q. Right.**

24           And then it lists some links.  And let's go

25   to --

```
 1        A. It says:

 2           "We removed the content you reported for

 3   violating Facebook's terms of service or Instagram's

 4   terms of service.  We understand this action to resolve

 5   your intellectual property issue."

 6           And then it lists -- I guess it's eight posts

 7   and ten photos that were removed.

 8        Q. And those are the ones on CT100268

 9   through 100270; is that right?

10        A. It's hard to read the Bates number.  It's very

11   small.  But it's in that email, that same document.

12        Q. And these links that Facebook removed in

13   response to the reports, they related to Cohesity's

14   Helios; is that right?

15        A. Yes.

16        Q. Facebook is headquartered in California, right?

17        A. I don't know where they are headquartered, but

18   that wouldn't surprise me.  I think the company isn't

19   Facebook.  I think it's Meta now.

20        Q. CT knew that the removal of Helios' photos and

21   content on Facebook as a result of these infringement

22   reports would cause harm to Cohesity in California;

23   isn't that right?

24        A. I can't speculate, but I didn't ask them to

25   remove publications directed towards the United States.
```

1   I asked them to remove publications directed towards the

2   Canadian geographical region.

3          **Q. And do you know whether that's possible for**

4   **Facebook to do that?**

5          A. It's not my responsibility to know that.  I

6   don't.

7          **Q. Did you also file a takedown report with**

8   **Instagram?**

9          A. I don't remember.  If I did, I would have

10  produced that to you.

11         **Q. Let's look at CT100326.**

12         MR. SHUSTER:  We're up to Exhibit 45?

13         MS. MCKEOWN:  That's correct.

14         MS. RAIMER:  So we'll mark this one as

15  Exhibit 45.

16            (Deposition Exhibit No. 45 was marked for

17               identification.)

18         MS. MCKEOWN:  And just for the record,

19  Exhibit 44 was CT100264.

20         THE WITNESS:  Okay.  Go ahead.

21  BY MS. RAIMER:

22         **Q. Do you recognize this trademark report form?**

23         A. I don't see a trademark report form.  It's an

24  email.  But this subject is "Trademark report form."

25  And then there's an identifying unique number.

```
 1          Q. And is this email to you?

 2          A. Yes.

 3          Q. And from Instagram?

 4          A. Yes, which is Meta, I believe.

 5          Q. And it also notes that:

 6          "It's not clear that the reported content

 7    infringes your trademark rights, and the reported

 8    content doesn't appear to be directed at the geographic

 9    locations where you claim trademark rights."

10          Is that right?

11          A. That's what it says.  I think it's a form

12    letter from a bot.

13          Q. Instagram is headquartered in California; isn't

14    that right?

15          A. I don't know.  I don't know that Instagram is a

16    company.  Isn't it owned by Meta?  It's a brand of Meta?

17          Q. Is Meta headquartered in California?

18          A. Probably.

19          Q. Did you also file a takedown report with

20    Twitter or X, formerly known as Twitter?

21          A. Yes.  I don't know who owns that, or I think it

22    is its own company.

23          Q. At the time of your report, X was also located

24    in California, right?

25          A. I don't know.  Probably.
```

**Page 169**

1      Q. Did you also submit a trademark complaint to

2  YouTube?

3      A. I think so.

4      Q. Do you recall whether that trademark complaint

5  was successful?

6      A. I don't.  I figured that, because I was dealing

7  with a lot of bots, the best process would be to just

8  get a court order in Canada, which is what I'm doing.

9      Q. YouTube is also headquartered in California,

10  right?

11      A. I think they are owned by Google, which is the

12  Alphabet company, and I think they are headquartered in

13  California.

14      Q. So other than the infringement reports we

15  talked about -- Apple, Amazon, Google, Facebook, GitHub,

16  Instagram, YouTube -- do you recall any other

17  infringement reports or takedown notices that you issued

18  to U.S. service providers?

19      A. I don't recall.

20      MR. SHUSTER:  Objection.  It's a little bit

21  late, but it's vague and ambiguous.  You're talking

22  about reports about Cohesity, right?

23      MS. RAIMER:  Yes.  About Cohesity's Helios

24  specifically.

25      A. Yes.  I think we've gone over most, if not all,

1   Helios software --

2          THE WITNESS:  I've never -- but I don't deny

3   communicating with lots of people in this case.  That

4   particular name doesn't ring a bell.  But if we put that

5   in the privileged log, then it's probably someone by

6   that name.  I don't know if that's the same person,

7   though, that you're referring to.  Did you check the

8   email address?  Or I don't remember if there were names

9   or email addresses in there or what.

10          MS. RAIMER:  I believe they were just names, so

11  we can send that information to Mr. Shuster.

12          MR. SHUSTER:  Yeah, we'll get to the bottom of

13  it.

14          THE WITNESS:  All right.

15  BY MS. RAIMER:

16      **Q. I think that you have noted during our**

17  **deposition that CT does not currently have U.S.**

18  **customers.  I don't want to misstate; is that correct?**

19      A. That's correct.

20      **Q. Has CT had any U.S. customers in 2025 at all?**

21      A. No.  I don't think so.

22      **Q. Did CT have any U.S. customers in 2024?**

23      A. I don't remember.  I'm not just saying that.

24  It's just I have to wear 20, 30 different hats as a

25  founder, and sometimes in that trade shows, sometimes in

1 writing emails, and I don't remember the current state

2 of things for every single administrative task that I

3 did specifically when it was done.

4     **Q. Do you have the ability to pull information on**

5 **U.S. customers?**

6     A. It's not consolidated in one place.  As with a

7 lot of other records, the documents that we produced

8 were quite onerous and labor intensive to compile, and

9 anything beyond that would be probably quite demanding

10 on me because I don't have someone to delegate to.

11     **Q. Are you aware of any customer names other than**

12 ██████████████ **located in the United States for**

13 **Helios?**

14     A. Not off the top of my head, no.  You're talking

15 about customers who have actually licensed Helios?

16     **Q. Yes, actually licensed Helios.**

17     A. Yes, off the top of my head, no.  And that's

18 because the United States is not really a primary focus

19 for me.  I have various partnerships down there.  That's

20 just because that's where they are located, but that's

21 not really the industry I am courting for my customer

22 base at this time.

23     **Q. Are you aware of any licenses other than that**

24 **with** ████████████ **with U.S. consumers for Helios?**

25     A. No, not off the top of my head.  It's not to

```
1    say there weren't any.  I just don't remember them.

2         Q. Does CT plan to counterclaim against Cohesity

3    for trademark infringement once its trademark

4    registration issues --

5              MR. SHUSTER:  Objection --

6    BY MS. RAIMER:

7         Q. -- in the United States?

8              MR. SHUSTER:  Objection.  Calls for

9    attorney-client privileged communications.

10             So don't repeat anything we discussed.  If

11   there's not privileged material, you can testify to it,

12   but things from our discussions, don't, or your

13   discussions with Polina.

14        A. So I don't have anything else to add, Anna.  I

15   think he answered that.

16             MS. RAIMER:  Okay.  I think that's all the

17   questions I have.

18             Do you want to do any redirect, Mr. Shuster?

19             MR. SHUSTER:  No.  You know, I think it's late

20   enough there, and the record is, you know, hopefully

21   clear enough that I'll take a pass.

22             THE WITNESS:  There's no smoking gun.

23             THE REPORTER:  And then can I get your order on

24   the record, Mr. Shuster?  Do you want a copy?

25             MR. SHUSTER:  The client has to be sent a copy
```

Highly Confidential

Kipling C.S. Warner                                          Cohesity, Inc. vs.
                                                  Cartesian Theatre Corp.

1          I, the undersigned, a Certified Shorthand

2    Reporter of the State of California, do hereby certify:

3          That the foregoing proceedings were taken

4    before me at the time and place herein set forth; that

5    any witnesses in the foregoing proceedings, prior to

6    testifying, were duly sworn; that a record of the

7    proceedings was made by me using machine shorthand,

8    which was thereafter transcribed by me; that the

9    foregoing is a true record of the testimony given.

10          Further, that if the foregoing pertains to

11   the original transcript of a deposition in a federal

12   case, before completion of the proceedings, review of

13   the transcript [X] was [ ] was not requested.

14          I further certify I am neither financially

15   interested in the action nor a relative or employee of

16   any attorney or party to this action.

17          IN WITNESS WHEREOF, I have this date

18   subscribed my name.

19

20

21   Dated:  August 28, 2025

22

23

24   _____
     Layli Phillips
25   RPR, CRR, CSR No. 14402